UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


GROVER REED,

            Petitioner,

v.                               Case No. 3:05-cv-612-J-32

WALTER A. MCNEIL, et al.,

            Respondents.

_____

**ORDER**[1]

**I. Status**

     Petitioner Grover Reed is a death-sentenced inmate of the Florida penal system who is represented by counsel.  He is proceeding in this action on a Petition for Writ of Habeas Corpus (Doc. #1) (hereinafter Petition) filed pursuant to 28 U.S.C. 2254.  Petitioner also filed a Memorandum of Law in Support of Habeas Corpus Petition (Doc. #2) (hereinafter Petitioner's Memorandum).  Petitioner challenges his state court (Duval County) judgment of conviction for first degree murder, sexual battery and armed robbery.

_____

    [1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the matter addressed herein and is not intended for official publication or to serve as precedent.

The following nine grounds are raised in the Petition:

## GROUND I

THE PROSECUTOR'S DISCRIMINATORY USE OF PEREMPTORY CHALLENGES TO EXCLUDE PROSPECTIVE BLACK JURORS FROM THE JURY DENIED MR. REED HIS RIGHT TO AN IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## GROUND II

MR. REED WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF THE CAPITAL PROCEEDINGS, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## GROUND III

THE STATE'S FAILURE TO DISCLOSE INFORMATION ABOUT FINGERPRINT EXPERT BRUCE SCOTT AND POLICE OFFICER DAVIS SUMMERSILL VIOLATED THE DISCLOSURE REQUIREMENTS OF BRADY V. MARYLAND[2] AND ITS PROGENY.

## GROUND IV

MR. REED WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE AND SENTENCING PHASE OF THE CAPITAL PROCEEDINGS, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PREPARE. A FULL ADVERSARIAL TESTING DID NOT OCCUR.

## GROUND V

THE PROSECUTOR'S INFLAMMATORY AND IMPROPER COMMENTS AND ARGUMENT, AND THE INTRODUCTION OF NON-STATUTORY AGGRAVATING FACTORS RENDERED MR. REED'S CONVICTION AND RESULTING DEATH SENTENCE FUNDAMENTALLY UNFAIR AND UNRELIABLE IN VIOLATION OF SIXTH, EIGHTH AND FOURTEENTH

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

AMENDMENTS.  COUNSEL'S FAILURE TO OBJECT, AND
APPELLATE COUNSEL'S FAILURE TO RAISE THIS
CLAIM ON APPEAL AS FUNDAMENTAL ERROR
CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

GROUND VI

MR. REED'S SENTENCE WAS TAINTED BY IMPROPER
INSTRUCTIONS IN VIOLATION OF THE EIGHTH AND
FOURTEENTH AMENDMENTS.

GROUND VII

MR. REED'S DEATH SENTENCE RESTS UPON AN
UNCONSTITUTIONAL AUTOMATIC AGGRAVATING
CIRCUMSTANCE IN VIOLATION OF THE EIGHTH
AMENDMENT TO THE UNITED STATES CONSTITUTION.

GROUND VIII

IT WAS ERROR TO FAIL TO REVERSE MR. REED'S
SENTENCE OF DEATH AND REMAND FOR RESENTENCING
UPON THE STRIKING OF TWO AGGRAVATING FACTORS,
IN VIOLATION OF DUE PROCESS, EQUAL PROTECTION,
AND THE EIGHTH AND FOURTEENTH AMENDMENTS.

GROUND IX

FLORIDA'S CAPITAL SENTENCING STATUTE VIOLATES
THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION.

Petition at 9, 23, 58, 65, 88, 93, 96, 98, 100.

On October 31, 2005, Respondents filed their Answer to
Petition for Writ of Habeas Corpus (Doc. #11) (hereinafter
Response).  Petitioner's Reply to Answer to Petition for Writ of
Habeas Corpus (Doc. #13) (hereinafter Reply) was filed on December
30, 2005.

Thereafter, Petitioner sought leave to raise a claim of actual
innocence.  See Petitioner's Motion to Amend Petition for Writ of

3

Habeas Corpus (Doc. #18), filed February 5, 2007; Petitioner's Motion to Supplement His Motion to Amend (Doc. #21), filed March 15, 2007.  On July 10, 2007, the Court entered an order construing Petitioner's Motion to Amend Petition for Writ of Habeas Corpus (Doc. #18) as a motion to amend his Reply; granting the motion to the extent that Petitioner's claim of actual innocence would be considered in addressing whether any procedurally defaulted claims raised in the Petition should be addressed on the merits to avoid a fundamental miscarriage of justice; and, giving Respondents the opportunity to file a surreply.  See the Court's Order (Doc. #25), filed July 10, 2007.  Respondents' Surreply to Gateway Claim of Actual Innocence (Doc. #26) was filed on August 7, 2007.

## II. Procedural History

On July 10, 1986, Petitioner was indicted for first degree murder, sexual battery and armed robbery.  Ex.[3] 1 at 20-21.  The Florida Supreme Court summarized the evidence presented at Petitioner's trial on these charges:

> The record reflects the following pertinent facts.  In December of 1985 Reed, accompanied by his woman friend and two young children, arrived in Jacksonville homeless and destitute.  Through Traveler's Aid they were given shelter in the home of the Reverend Ervin Oermann, a Lutheran minister.  They stayed with Reverend Oermann and his wife, Betty, for just over a week but were asked to

---

[3] The Court hereinafter refers to the exhibits submitted with Respondents' November 3, 2005, Federal Habeas Response Exhibit List (Doc. #12) as "Ex."

4

leave when Reverend Oermann discovered that Reed had drug paraphernalia. However, Reed continued to receive aid from the Oermanns in the form of money and transportation. Eventually the Oermanns began to feel they were being used and withdrew all support. Reed resented the discontinuance of aid and vowed to get even.

On February 27, 1986, Reverend Oermann returned home from a night class and found his wife, Betty, dead on the living room floor. An autopsy showed she had been strangled, raped, and stabbed repeatedly in the throat. Found in the house was a distinctive baseball cap. For some time this cap was the only lead police had, so they produced a television recreation of the crime and showed the cap. One viewer recognized the cap as being much like one Reed wore. Further investigation revealed that Reed was last seen wearing his cap on the day Mrs. Oermann was killed. Ultimately, he was arrested.

The most significant evidence of Reed's guilt may be summarized as follows:

(a) Witnesses said they had seen Reed wearing his baseball cap on the day of the murder before the probable time of death but not thereafter. They positively identified the cap as Reed's because of the presence of certain stains and mildew.

(b) Reed's fingerprints were found on checks that had been taken from the Oermann home and had been found in the yard.

(c) An expert witness gave testimony that hairs found on the body and in the baseball cap were consistent with Reed's hair.

(d) Another expert witness gave testimony that the semen found in the body could have been Reed's.

(e) Reed's cellmate, Nigel Hackshaw, gave testimony that Reed had admitted breaking

> into the Oermann house and killing Mrs.
> Oermann.

Reed v. State, 560 So.2d 203, 204 (Fla. 1990) (per curiam) (hereinafter Reed I); Ex. 21.

On November 20, 1986, the jury found Petitioner guilty as charged. Ex. 2 at 276-78. Neither side presented additional evidence to the jury at the penalty phase. After hearing the argument of counsel, the jury recommended death by a vote of eleven to one. Id. at 308. The judge delayed sentencing so that a presentence investigation (hereinafter PSI) could be completed. After receiving the PSI and considering additional mitigating evidence presented by Petitioner, the judge sentenced him to death.[4] Ex. 3 at 382-88.

On appeal to the Florida Supreme Court, Petitioner raised the following issues:

> ISSUE I
>
> THE PROSECUTOR'S DISCRIMINATORY USE OF PEREMPTORY CHALLENGES TO EXCLUDE BLACKS FROM THE JURY DENIED REED HIS RIGHT TO AN IMPARTIAL JURY AS GUARANTEED BY ARTICLE I, SECTION 16 OF

---

[4] The judge found the following aggravating factors: (1) the defendant was previously convicted of other felonies involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged in the commission of a sexual battery; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; (4) the capital felony was committed for pecuniary gain; (5) the capital felony was especially heinous, atrocious or cruel; and, (6) the capital felony was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The judge found that there were no mitigating factors. Ex. 3 at 389-92.

THE FLORIDA CONSTITUTION AND THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

ISSUE II

THE TRIAL COURT ERRED IN ALLOWING REED'S TRIAL
COUNSEL TO WAIVE INSTRUCTIONS TO LESSER
INCLUDED OFFENSES OF THE ROBBERY AND SEXUAL
BATTERY COUNTS IN REED'S ABSENCE AND WITHOUT
HIS PERSONAL WAIVER OR RATIFICATION OF HIS
LAWYER'S ACTIONS.

ISSUE III

THE TRIAL COURT ERRED IN MISLEADING THE JURY
AS TO THE IMPORTANCE OF ITS SENTENCING
RECOMMENDATION BY MAKING IMPROPER COMMENTS AND
GIVING THE STANDARD PENALTY PHASE JURY
INSTRUCTION WHICH, ALONG WITH THE JUDGE'S AND
PROSECUTOR'S MISLEADING REMARKS, DIMINISHED
THE ROLE OF THE JURY'S SENTENCING
RECOMMENDATION.

ISSUE IV

THE TRIAL COURT ERRED IN SENTENCING GROVER
REED TO DEATH BECAUSE THE SENTENCING WEIGHING
PROCESS INCLUDED IMPROPERLY FOUND AGGRAVATING
CIRCUMSTANCES IN VIOLATION OF THE EIGHTH AND
FOURTEENTH AMENDMENTS.[5]

ISSUE V

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT
THE JURY ON THE MITIGATING CIRCUMSTANCE
CONCERNING REED'S IMPAIRED CAPACITY TO
APPRECIATE THE CRIMINALITY OF HIS CONDUCT.

---

[5] Petitioner challenged the following four aggravating factors
on appeal: (1) the defendant was previously convicted of other
felonies involving the use or threat of violence to the person; (2)
the capital felony was committed for the purpose of avoiding or
preventing a lawful arrest; (3) the capital felony was especially
heinous, atrocious or cruel; and, (4) the capital felony was
committed in a cold, calculated and premeditated manner without any
pretense of moral or legal justification.

<u>ISSUE VI</u>

THE TRIAL COURT ERRED IN CONSIDERING A PRESENTENCE INVESTIGATION WHICH CONTAINED VICTIM IMPACT INFORMATION AND OPINIONS ON SENTENCING FROM THE VICTIM'S SPOUSE.

Initial Brief of Appellant[6] at i-ii.

On June 15, 1989, the Florida Supreme Court initially reversed the conviction and sentence, finding that the prosecutor used peremptory challenges in a discriminatory manner. Ex. 20. However, on March 1, 1990, the court granted the state's motion for rehearing and clarification, withdrew the opinion filed June 15, 1989, and substituted a new opinion affirming Petitioner's conviction and death sentence. <u>Reed I</u>; Ex. 21.

Petitioner filed a petition for writ of certiorari to the United States Supreme Court, raising the following issue: whether the trial court's penalty phase jury instructions and the prosecutor's argument, which advised the jury that its role during the penalty phase was merely advisory and that the ultimate sentencing decision would be made by the judge, violated the Eighth and Fourteenth Amendments and the holding in <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985). Ex. 24. The petition for writ of certiorari was denied on October 1, 1990. <u>Reed v. Florida</u>, 498 U.S. 882 (1990); Ex. 26.

---

[6] This exhibit is appended to Respondents' May 14, 2008, Notice of Filing (Doc. #32).

On February 23, 1989, Petitioner filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850, in which he raised the following sixteen claims:

CLAIM I

ACCESS TO THE FILES AND RECORDS PERTAINING TO MR. REED IN THE POSSESSION OF CERTAIN [STATE] AGENCIES HAVE BEEN WITHHELD IN VIOLATION OF CHAPTER 119.01 ET SEQ., FLA. STAT., THE DUE PROCESS CLAUSE AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, THE EIGHTH AMENDMENT AND THE CORRESPONDING PROVISIONS OF THE FLORIDA CONSTITUTION.   MR. REED CANNOT PREPARE AN ADEQUATE RULE 3.850 MOTION UNTIL HE HAS RECEIVED DOCUMENTS WHICH ARE DISCOVERABLE UNDER CHAPTER 119 AND AFFORDED TIME TO REVIEW AND AMEND.

CLAIM II

MR. REED WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND HIS RIGHT TO BE JUDGED BY A JURY TRULY REPRESENTATIVE OF THE COMMUNITY IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS THROUGH TRIAL COUNSEL'S IGNORANCE OF BASIC DECISIONS SUCH AS STATE V. NEIL,[7] STATE V. SLAPPY,[8] AND BATSON V. KENTUCKY.[9]

CLAIM III

GROVER REED WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE PHASE OF HIS TRIAL, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

---

[7] State v. Neil, 457 So.2d 481 (Fla. 1984).

[8] State v. Slappy, 522 So.2d 18 (Fla. 1988).

[9] Batson v. Kentucky, 476 U.S. 79 (1986).

9

CLAIM IV

EVIDENCE IN EXISTENCE AT THE TIME OF THE TRIAL
ESTABLISHES MR. REED IS INNOCENT OF THE
OFFENSE FOR WHICH HE WAS CONVICTED AND
SENTENCED TO DEATH, AN[D] THUS HIS CONVICTION
AND DEATH SENTENCE VIOLATE THE EIGHTH AND
FOURTEENTH AMENDMENTS.

CLAIM V

GROVER REED WAS DENIED THE EFFECTIVE
ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE
PHASE AND PENALTY PHASE OF HIS TRIAL, WHEN
COUNSEL WRONGLY CONCEDED GUILT AND AGGRAVATING
CIRCUMSTANCES, IN VIOLATION OF THE SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS.

CLAIM VI

THE INTRODUCTION OF IRRELEVANT GUILT PHASE
TESTIMONY AND NONSTATUTORY AGGRAVATING FACTORS
SO PERVERTED MR. REED'S TRIAL THAT IT RESULTED
IN AN UNRELIABLE VERDICT AND THE TOTALLY
ARBITRARY AND CAPRICIOUS IMPOSITION OF THE
DEATH PENALTY IN VIOLATION OF THE EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION.

CLAIM VII

GROVER REED WAS DENIED THE EFFECTIVE
ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE
OF HIS CAPITAL TRIAL, IN VIOLATION OF THE
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

CLAIM VIII

MR. REED WAS DEPRIVED OF HIS RIGHTS TO DUE
PROCESS AND EQUAL PROTECTION UNDER THE
FOURTEENTH AMENDMENT TO THE UNITED STATES
CONSTITUTION, AS WELL AS HIS RIGHTS, UNDER THE
FIFTH, SIXTH, AND EIGHTH AMENDMENTS, BECAUSE
THE MENTAL HEALTH EXPERT WHO EVALUATED HIM AT
TRIAL WAS NOT PERMITTED TO CONDUCT A
PROFESSIONALLY APPROPRIATE EVALUATION, AND
BECAUSE DEFENSE COUNSEL FAILED TO RENDER
EFFECTIVE ASSISTANCE, RESULTING IN A CAPITAL

PROCEEDING AT WHICH MR. REED WAS DEPRIVED A
FAIR, INDIVIDUALIZED, AND RELIABLE CAPITAL
GUILT-INNOCENCE AND SENTENCING DETERMINATION.

### CLAIM IX

THE SHIFTING OF THE BURDEN OF PROOF IN THE
JURY INSTRUCTIONS AT SENTENCING DEPRIVED MR.
REED OF HIS RIGHTS TO DUE PROCESS AND EQUAL
PROTECTION OF LAW, AS WELL AS HIS RIGHTS UNDER
THE EIGHTH AND FOURTEENTH AMENDMENTS.
COUNSEL'S FAILURE TO OBJECT WAS INEFFECTIVE
ASSISTANCE.

### CLAIM X

MR. REED'S DEATH SENTENCE RESTS UPON AN
UNCONSTITUTIONAL AUTOMATIC AGGRAVATING
CIRCUMSTANCE, IN VIOLATION OF MAYNARD V.
CARTWRIGHT,[10] LOWENFIELD V. PHELPS,[11]
HITCHCOCK V. DUGGER,[12] AND THE EIGHTH
AMENDMENT.

### CLAIM XI

IT WAS ERROR TO FAIL TO REVERSE MR. REED'S
SENTENCE OF DEATH AND REMAND FOR RESENTENCING
UPON THE STRIKING OF TWO AGGRAVATING FACTORS,
AND MR. REED WAS DENIED THE PROTECTIONS
AFFORDED UNDER THE FLORIDA CAPITAL SENTENCING
STATUTE, IN VIOLATION OF DUE PROCESS, EQUAL
PROTECTION, AND THE EIGHTH AND FOURTEENTH
AMENDMENTS.

### CLAIM XII

MR. REED'S TRIAL WAS FRAUGHT WITH PROCEDURAL
AND SUBSTANTIVE ERRORS, WHICH CANNOT BE
HARMLESS WHEN VIEWED AS A WHOLE SINCE THE
COMBINATION OF ERRORS DEPRIVED HIM OF THE

---

[10] Maynard v. Cartwright, 486 U.S. 356 (1988).

[11] Lowenfield v. Phelps, 484 U.S. 231 (1988).

[12] Hitchcock v. Dugger, 481 U.S. 393 (1987).

FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

Ex. 27 at 7, 15, 37, 109, 118, 123, 136, 181, 183, 186, 194, 197.

On July 21, 1992, Petitioner filed a supplement to his motion, in which he raised the following additional claim:

MR. REED'S JURY RECEIVED INSTRUCTIONS ON AGGRAVATING FACTORS WHICH WERE UNCONSTITUTIONALLY OVERBROAD. THE JURY INSTRUCTIONS IN THIS CASE FAILED TO ADEQUATELY CHANNEL THE JURY'S DISCRETION, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.

Ex. 29 at 2.

On August 26, 1992, the circuit court denied the motion, as supplemented, without first conducting an evidentiary hearing. Ex. 30. Petitioner appealed, and on June 2, 1994, the Florida Supreme Court affirmed in part, reversed in part, and remanded the case to the circuit court to conduct an evidentiary hearing on the ineffective assistance of counsel claims. Reed v. State, 640 So.2d 1094 (Fla. 1994) (per curiam) (hereinafter Reed II); Ex. 36. Petitioner filed a Motion for Rehearing, which was denied on August 15, 1994. Ex. 37; Ex. 39.

On February 12, 1996, Petitioner filed a Second Supplemental and/or Amended Motion to Vacate Judgment of Conviction and Sentence. Ex. 54 at 42. Thereafter, on May 28, 1996, Petitioner filed a Consolidated Supplemental and/or Amended Motion to Vacate Judgments of Conviction and Sentence (hereinafter 3.850 motion), in which he raised the following claims:

## CLAIM I

MR. REED IS ENTITLED TO ACCESS TO THE COMPLETE FILES OF STATE AGENCIES PURSUANT TO CHAPTER 119, FLORIDA STATUTES, AND ARTICLE I, SECTION 24 OF THE FLORIDA CONSTITUTION.

## CLAIM II

MR. REED WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AND HIS RIGHT TO BE JUDGED BY A JURY TRULY REPRESENTATIVE OF THE COMMUNITY AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## CLAIM III

GROVER REED WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE PHASE OF HIS TRIAL, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

## CLAIM IV

EVIDENCE IN EXISTENCE AT THE TIME OF THE TRIAL ESTABLISHES MR. REED IS INNOCENT OF THE OFFENSE FOR WHICH HE WAS CONVICTED AND SENTENCED TO DEATH, AND THAT COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE STATE'S CASE, RESULTING IN A CONVICTION AND DEATH SENTENCE THAT VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS.

## CLAIM V

GROVER REED WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE PHASE AND PENALTY PHASE OF HIS TRIAL, WHEN COUNSEL WRONGLY CONCEDED GUILT AND AGGRAVATING CIRCUMSTANCES, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

## CLAIM VI

THE INTRODUCTION OF IRRELEVANT GUILT PHASE TESTIMONY AND NONSTATUTORY AGGRAVATING FACTORS SO PERVERTED MR. REED'S TRIAL THAT IT RESULTED IN AN UNRELIABLE VERDICT AND THE TOTALLY

13

ARBITRARY AND CAPRICIOUS IMPOSITION OF THE
DEATH PENALTY IN VIOLATION OF THE EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION.

## CLAIM VII

GROVER REED WAS DENIED THE EFFECTIVE
ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE
OF HIS CAPITAL TRIAL, IN VIOLATION OF THE
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

## CLAIM VIII

MR. REED WAS DEPRIVED OF HIS RIGHTS TO DUE
PROCESS AND EQUAL PROTECTION UNDER THE
FOURTEENTH AMENDMENT TO THE UNITED STATES
CONSTITUTION, AS WELL AS HIS RIGHTS, UNDER THE
FIFTH, SIXTH, AND EIGHTH AMENDMENTS, BECAUSE
THE MENTAL HEALTH EXPERT WHO EVALUATED HIM AT
TRIAL WAS NOT PERMITTED TO CONDUCT A
PROFESSIONALLY APPROPRIATE EVALUATION, AND
BECAUSE DEFENSE COUNSEL FAILED TO RENDER
EFFECTIVE ASSISTANCE, RESULTING IN A CAPITAL
PROCEEDING AT WHICH MR. REED WAS DEPRIVED A
FAIR, INDIVIDUALIZED, AND RELIABLE CAPITAL
GUILT-INNOCENCE AND SENTENCING DETERMINATION.

## CLAIM IX

THE SHIFTING OF THE BURDEN OF PROOF IN THE
JURY INSTRUCTIONS AT SENTENCING DEPRIVED MR.
REED OF HIS RIGHTS TO DUE PROCESS AND EQUAL
PROTECTION OF THE LAW, AS WELL AS HIS RIGHTS
UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.
COUNSEL'S FAILURE TO OBJECT WAS INEFFECTIVE
ASSISTANCE.

## CLAIM X

MR. REED'S DEATH SENTENCE RESTS UPON AN
UNCONSTITUTIONAL AUTOMATIC AGGRAVATING
CIRCUMSTANCE, IN VIOLATION OF MAYNARD V.
CARTWRIGHT, LOWENFIELD V. PHELPS, HITCHCOCK V.
DUGGER, AND THE EIGHTH AMENDMENT.

CLAIM XI

IT WAS ERROR TO FAIL TO REVERSE MR. REED'S
SENTENCE OF DEATH AND REMAND FOR RESENTENCING
UPON THE STRIKING OF TWO AGGRAVATING FACTORS,
AND MR. REED WAS DENIED THE PROTECTIONS
AFFORDED UNDER THE FLORIDA CAPITAL SENTENCING
STATUTE, IN VIOLATION OF DUE PROCESS, EQUAL
PROTECTION, AND THE EIGHTH AND FOURTEENTH
AMENDMENTS.

CLAIM XII

MR. REED'S TRIAL WAS FRAUGHT WITH PROCEDURAL
AND SUBSTANTIVE ERRORS, WHICH CANNOT BE
HARMLESS WHEN VIEWED AS A WHOLE SINCE THE
COMBINATION OF ERRORS DEPRIVED HIM OF THE
FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

CLAIM XIII

MR. REED'S JURY RECEIVED INSTRUCTIONS ON
AGGRAVATING FACTORS WHICH WERE
UNCONSTITUTIONALLY OVERBROAD. THE JURY
INSTRUCTIONS IN THIS CASE FAILED TO ADEQUATELY
CHANNEL THE JURY'S DISCRETION IN VIOLATION OF
THE EIGHTH AND FOURTEENTH AMENDMENTS.

CLAIM XIV

MR. REED IS ENTITLED TO RELIEF BASED UPON
NEWLY DISCOVERED EVIDENCE, INEFFECTIVE
ASSISTANCE OF COUNSEL, PROSECUTORIAL
MISCONDUCT, AND/OR A VIOLATION OF BRADY V.
MARYLAND. MR. REED'S RIGHTS UNDER THE FIFTH,
SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION, AND THE
CORRESPONDING PROVISIONS OF THE FLORIDA
CONSTITUTION HAVE BEEN VIOLATED.

Ex. 54 at 43, 44, 66, 137, 145, 149, 163; Ex. 55 at 208, 211, 213,

218, 221, 237, 239.

The circuit court conducted an evidentiary hearing on February

19-22, 2002.   Ex. 40.   On August 28, 2002, the circuit court

15

entered an order denying the 3.850 motion.  Ex. 56 at 512-47.  In the introductory portion of the order denying the 3.850 motion, the court addressed several matters, including the reasons for the delay in filing and ruling on the motion.

> The defendant was convicted of first degree murder, sexual battery, and robbery, and was sentenced to death by this Court, the Honorable John D. Southwood on January 9, 1987.  The defendant's conviction and death sentence were affirmed on March 1, 1990 by the Florida Supreme Court at <u>Reed v. State</u>, 560 So.2d 203.  This Court's denial of the defendant's motion for post-conviction relief was reversed by the Florida Supreme Court on June 2, 1994 at 640 So.2d 1094.  That opinion is likely to be now regarded by practitioners of the criminal law as the seminal Florida case on the attorney/client privilege in post-conviction motions.

> Assorted administrative and practical matters appear to have occurred to cause delay in conducting the formal hearing on the defendant's motion.  It appears from the file in this cause that the matter of the availability of public records caused delay. It is clear that a debilitating stroke suffered by the Senior Judge to whom the case was once assigned delayed matters.  It further appears that currently appointed post-conviction defense counsel may have suffered one, and possibly two (2), personal accidents during the course of his representation of the defendant.  This matter was assigned to the undersigned during the summer of 2001. Assorted status conferences and a hearing pursuant to <u>Huff v. State</u>, 622, So.2d 982 (Fla. 1993)[13], preceded the evidentiary

---

[13] <u>Huff v. State</u>, 622 So.2d 982, 983 (Fla. 1993) (per curiam) (finding that, due to the severity of punishment at issue in a death penalty case, a circuit judge must hold a hearing on an initial 3.850 motion for the purpose of determining whether an

hearing which was held February 19-22, 2002.
During the course of the hearing, some
eighteen (18) witnesses testified.

Following the *Huff* hearing, this Court
perceived the defendant's claims to be as
follows (using the numerical designations from
the defendant's motion):

Claim III - ineffective assistance during
guilt phase, including (1) failing to consult
with a hair expert, (2) failing to consult
with an independent serologist, (3) entering
into a stipulation regarding chain of custody,
(4) failing to consult with an independent
fingerprint expert, (5) failing to recognize
conflict regarding an unidentified
fingerprint, (6) failure to present an alibi
defense based on the testimony of trial
witness, Mark Rainey, and (7) failure to
effectively impeach Nigel Hackshaw regarding
his testimony on the defendant's jailhouse
confession.

Claim IV - ineffective assistance for
failing to present expert serological
testimony regarding the defendant's non-
secretor status.

Claim V - ineffective assistance in
conceding during closing argument that the
defendant's crime was robbery and was heinous.

Claim VI - ineffective assistance for
failing to object to the prosecutor's
reference to the victim as a minister's wife
and trial counsel's reference to the victim's
husband as a minister.

Claim VII - ineffectiveness in failing to
present mitigating evidence of the defendant's
family and background.

---

evidentiary hearing is required and to hear legal argument relating
to the motion).

Claim VIII - ineffectiveness in failing to present psychiatric or psychological testimony as mitigation during the penalty phase.

Claim IX - ineffectiveness in failing to object to the prosecutor's use of the term "heavy and demanding" aggravation during closing argument.

Claim XIV - regarding newly discovered evidence based on the allegedly recanted testimony of state witness, Nigel Hackshaw, and his testimony on the defendant's jailhouse confession.  As will be noted later, the defendant abandoned this ground after both counsel interviewed Nigel Hackshaw at approximately the time of the evidentiary hearing.

The Court also considered a matter claimed to be a "*Brady*" issue regarding the testimony of fingerprint examiner, Bruce Scott.  A small amount of testimony regarding the defendant's newly added claim of the existence of footprint evidence and defense counsel's failure to pay attention thereto was also offered.

For historical purposes, if nothing else, it should be noted at this point that the defendant opted not to testify during the course of the evidentiary hearing.  It is further noted that he was offered the opportunity for DNA testing under the provisions of F.S. 925.11 and FRCrP 3.853 but declined.

It should also be noted at this point, particularly given the defendant's claims regarding psychiatric/psychological evidence, that the defendant is presently in full control of his mental faculties.  This Court has had the benefit of being with the defendant on several occasions since the summer of 2001.  He has been consistently alert, calm, and interested.  In those instances in which this Court actually had the

> opportunity to speak with the defendant, he was articulate and well-spoken.  During the course of the evidentiary hearing, he was repeatedly observed to be in deliberate conversation with defense counsel.  Letters from the defendant to this Court and his *pro se* motions have been carefully prepared, well thought out, and exhibit a more than conversant knowledge of Florida law.  All the defendant's written materials have been written in a flowing, legible handwriting, and have been more than articulate.

Id. at 512-14.  After making these introductory comments, the circuit court addressed each claim in a comprehensive, thirty-six page order, finding that several claims had been abandoned and the remainder were without merit.

Petitioner appealed to the Florida Supreme Court, raising the following issues:

> 1.  The trial court erred in refusing to grant an evidentiary hearing on the issue of whether the defendant's trial counsel was ineffective in failing to adequately challenge the State's use of peremptory challenges to strike black jurors . . . .
>
> 2.  The trial court erred in not holding that defense counsel's failure to use a hair-type expert denied Defendant the effective assistance of counsel . . . .
>
> 3.  The trial court erred in not holding that defense counsel's failure to use a blood-type expert denied Defendant the effective assistance of counsel . . . .
>
> 4.  The trial court erred in not holding that defense counsel's failure to use a fingerprint expert denied Defendant the effective assistance of counsel . . . .

5.   The trial court erred in not holding that defense counsel's failure to present an alibi defense denied the defendant the effective assistance of counsel . . . .

6.   The trial court erred in not holding that the State's failure to disclose information about police officer David Summersill and fingerprint expert Bruce Scott violated the disclosure requirements of <u>Brady v. Maryland</u> and its progeny . . . .

7.   The trial court erred in not holding that defense counsel was ineffective in failing to challenge the State's case based on blood-type evidence of apparent innocence . . . .

8.   The trial court erred in not holding that defense counsel was ineffective for failing to require proof of the chain of custody of evidence . . . .

9.   The trial court erred in not holding that defense counsel's concessions of guilt and aggravating circumstances denied Defendant the effective assistance of counsel . . . .

10.   The trial court erred in not holding that defense counsel's failure to present evidence of mitigating circumstances denied Defendant the effective assistance of counsel . . . .

11.   The trial court erred in not holding that defense counsel was ineffective for failing to preserve the issue of felony murder functioning as an unconstitutional automatic aggravating circumstance . . . .

12.   The trial court erred in not holding that defense counsel's failure to object to the State's improper comments to the jurors denied the Defendant the effective assistance of counsel . . . .

13.   The trial court erred in not holding that the defendant received ineffective assistance of counsel due to the cumulative errors of his trial attorney . . . .

Ex. 64 at i-iii.

Petitioner also filed a Petition for Extraordinary Relief and for a Writ of Habeas Corpus in the Florida Supreme Court, in which he raised the following claims:

CLAIM [1]

THE FLORIDA SUPREME COURT'S DECISION IN REED V. STATE, 560 So.2D 203 (FLA. 1990) WHICH UPHELD THE DEFENDANT'S DEATH SENTENCE DESPITE THE INVALIDATION OF TWO AGGRAVATING CIRCUMSTANCES HAS BEEN EFFECTIVELY OVERRULED BY RING V. ARIZONA, 536 U.S. 584 (2002)[.]

CLAIM 2

APPELLATE COUNSEL FAILED TO RAISE THE ISSUE OF THE PROSECUTOR'S IMPROPER REMARKS TO THE JURY[.]

CLAIM 3

APPELLATE COUNSEL FAILED TO RAISE THE ISSUE OF UNCONSTITUTIONALLY VAGUE JURY INSTRUCTIONS ON AGGRAVATING CIRCUMSTANCES[.]

CLAIM 4

APPELLATE COUNSEL FAILED TO RAISE THE ISSUE OF DEFENDANT'S TRIAL ATTORNEY'S FAILURE TO BRING A POST-TRIAL MOTION TO CHALLENGE THE SUFFICIENCY OF THE STATE'S EVIDENCE[.]

Ex. 71 at 4, 10, 11, 12.

On April 15, 2004, the Florida Supreme Court entered an order affirming the circuit court's order denying post-conviction relief and denying the Petition for Extraordinary Relief and for a Writ of Habeas Corpus. Reed v. State, 875 So.2d 415 (Fla. 2004) (per curiam) (hereinafter Reed III); Ex. 67. Petitioner filed a Motion

21

for Rehearing, which was denied on June 3, 2004.  Ex. 68; Ex. 69.

The mandate issued on July 6, 2004.  Ex. 70.

Petitioner sought review in the United States Supreme Court,

raising the following two issues:

> 1. Does Court-appointed counsel's failure to present an alibi defense - where alibi evidence exists and offers the only plausible defense - violate the accused's right to effective assistance of counsel which is guaranteed by the Due Process Clause of the Fourteenth Amendment and by the Assistance of Counsel Clause of the Sixth Amendment to the United States Constitution?

> 2. Does Court-appointed counsel's combined errors in not presenting an alibi defense and in not objecting to a request that the jury show the accused the "same mercy" he showed the victim violate the accused's rights to effective counsel and trial by impartial jury as guaranteed by the [D]ue Process Clause of the Fourteenth Amendment and by the Impartial Jury Clause of the Sixth Amendment to the United States Constitution?

Ex. 74 at i.  The petition for writ of certiorari was denied on

November 8, 2004.  Ex. 76.

The Petition was filed in this Court on July 5, 2005.  Thus,

this action was timely filed in this Court.  <u>See</u> 28 U.S.C.

2244(d)(1).

### III. Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a

federal court must consider whether such a hearing could enable an

applicant to prove the petition's factual allegations, which, if

true, would entitle the applicant to federal habeas relief."

Schriro v. Landrigan, 127 S.Ct. 1933, 1940 (2007) (citation omitted).  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id.

This Court has carefully reviewed the record and concludes Petitioner is not entitled to an evidentiary hearing.  The pertinent facts of the case are fully developed in the record before the Court.  Smith v. Singletary, 170 F.3d 1051, 1054 (11th Cir. 1999).  Thus, the Court can "adequately assess [Reed's] claim[s] without further factual development."  Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004).  Therefore, an evidentiary hearing will not be conducted by this Court.

## IV.  Standard of Review

Since this action was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA), April 24, 1996, the Court will analyze Petitioner's claims under 28 U.S.C. § 2254(d), as amended by AEDPA.  Nelson v. Alabama, 292 F.3d 1291, 1294-95 (11th Cir. 2002), cert. denied, 538 U.S. 926 (2003); Fugate v. Head, 261 F.3d 1206, 1215 n.10 (11th Cir. 2001), cert. denied, 535 U.S. 1104 (2002); Wilcox v. Florida Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998), cert. denied, 531 U.S. 840 (2000).  Under AEDPA,

however, the review "is 'greatly circumscribed and highly deferential to the state courts.' Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002)." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).

The Eleventh Circuit has explained this deferential review of state court adjudications:

> [Section] 2254(d) allows federal habeas relief for a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was: "(1) . . . contrary to, or involved an unreasonable[14] application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Marquard, 429 F.3d at 1303. The phrase "clearly established Federal law," as used in § 2254(d)(1), encompasses only the holdings, as opposed to the dicta, of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. —, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)); Osborne v. Terry, 466 F.3d 1298, 1305 (11th Cir. 2006).

Stewart, 476 F.3d at 1208-09.

"AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants

---

[14] "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." Schriro v. Landrigan, 127 S.Ct. at 1939 (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)).

rebut this presumption with 'clear and convincing evidence.' § 2254(e)(1)." Schriro, 127 S.Ct. at 1939-40 (footnote omitted). This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002), cert. denied, 538 U.S. 906 (2003). See Peoples v. Campbell, 377 F.3d 1208, 1227 (11th Cir. 2004), cert. denied, 545 U.S. 1142 (2005). Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

## V. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted). The

25

Eleventh Circuit recently captured the essence of an ineffectiveness claim:

> The clearly established federal law for ineffective assistance of counsel claims was set forth by the U.S. Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish a claim of ineffective assistance of counsel, first, "the defendant must show that counsel's performance was deficient . . . [which] requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id</u>. at 687, 104 S.Ct. at 2064. Second, the defendant must show that counsel's deficient performance prejudiced him. <u>Id</u>. That is, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694, 104 S.Ct. at 2068.

<u>Gaskin v. Sec'y, Dep't of Corr.</u>, 494 F.3d 997, 1002 (11th Cir. 2007). "Establishing these two elements is not easy: 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" <u>Van Poyck v. Fla. Dep't of Corr.</u>, 290 F.3d 1318, 1322 (11th Cir. 2002) (per curiam) (citations and footnote omitted), <u>cert</u>. <u>denied</u>, 537 U.S. 812 (2002), 537 U.S. 1105 (2003).

"The same standard applies whether [a court is] examining the performance of counsel at the trial or appellate level." <u>Eagle v. Linahan</u>, 279 F.3d 926, 938 (11th Cir. 2001) (citing <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987)). "In considering

the reasonableness of an attorney's decision not to raise a particular claim, [a court] must consider 'all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Eagle, 279 F.3d at 940 (quoting Strickland v. Washington, 466 U.S. 668, 691 (1984)).

To determine whether Petitioner was prejudiced by his attorney's failure to raise a particular issue on appeal, the Court "must decide whether the arguments the [Petitioner] alleges his counsel failed to raise were significant enough to have affected the outcome of his appeal." United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)), cert. denied, 531 U.S. 1131 (2001). "If [a court] conclude[s] that the omitted claim would have had a reasonable probability of success, then counsel's performance was necessarily prejudicial because it affected the outcome of the appeal." Eagle, 279 F.3d at 943 (citing Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990)).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As noted previously, Petitioner raises the following claim in ground one:

> THE PROSECUTOR'S DISCRIMINATORY USE OF PEREMPTORY CHALLENGES TO EXCLUDE PROSPECTIVE BLACK JURORS FROM THE JURY DENIED MR. REED HIS RIGHT TO AN IMPARTIAL JURY AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Petition at 9.  Petitioner raised this claim on direct appeal, and the Florida Supreme Court adjudicated the claim as follows:

> Reed raises six issues in this appeal. The first involves jury selection. During the course of voir dire, the prosecutor used eight of his ten peremptory strikes to excuse blacks from the jury.[15]   After both sides had expended their peremptories, defense counsel moved for a mistrial pursuant to *State v. Neil*, 457 So.2d 481 (Fla. 1984).   At this point, Mr. Bateh, the prosecutor, asked to explain his reasons for striking the black jurors. The court stated:
>
>> Anyway, I'm well aware if the court determines that there's a prima facie showing of exclusion of jurors on a racial basis that it requires the State to make some showing to the court as to why they excluded them for other than racial basis, which Mr. Bateh is volunteering to do without me making a finding is what I understand you're saying.[16]
>
> After listening to the prosecutor's explanation for striking the black jurors,[17] the following discussion ensued:
>
>> THE COURT:   All right.   The state, of course, has submitted to a voluntary <u>Neil</u> inquiry, in essence, in this regard without the Court

---

[15] The record actually reflects that the prosecutor exercised nine peremptory challenges as to the jurors sworn to try the case, with six of the nine being used to strike black jurors.   The prosecutor also used two peremptory challenges to strike two black men as alternate jurors.   Two black jurors actually served on the jury.   <u>See</u> Ex. 11.

[16] <u>See</u> Ex. 11 at 309.

[17] The prosecutor's explanation for striking the black jurors can be found in Ex. 11 at 309-14.

making an initial determination that it was necessary. The two observations - and I don't have the statistics in front of me, but - and I'm not basing this decision on statistics, but I think we're all aware that somewhere in the neighborhood of 25 percent of the population of the registration in Duval County is black. I'm not sure those are accurate, but I think it's in that neighborhood. The composition of this jury right now, the present composition of the 12 jurors, there's two, which makes 16 and two-thirds of the jury is black of the 12. There's no blacks as far as alternates are concerned. Might I assume the victim in the case is white?

MR. BATEH:   That's correct, Your Honor.

MR. NICHOLS:  Yes, sir.

THE COURT:   The defendant is white. I don't question his standing to raise the question. There is a standing to raise the question, but taking the representations of Mr. Bateh, I find that the challenges exercised against the blacks are not based purely upon race or racial discrimination and, consequently, I will deny any motion for a mistrial or more properly, probably, a motion to strike the entire panel, but, at any rate, I deny the motion on that basis.[18]

In State v. Neil, 457 So.2d 481 (Fla. 1984), and State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct.

_____

[18] See Ex. 11 at 314-15.

2873, 101 L.Ed.2d 909 (1988), we established procedures that were intended to abolish the discriminatory exercise of peremptory challenges.  The defense must make a prima facie showing that there has been a strong likelihood that the jurors have been challenged because of their race.  If the judge makes that finding, the burden shifts to the prosecution to show valid nonracial reasons why the individual minority jurors were struck.  <u>Neil</u>.

In <u>Kibler v. State</u>, 546 So.2d 710, 712 (Fla. 1989), this Court recently said:

> We hold that under article I, section 16 of the Florida Constitution it is unnecessary that the defendant who objects to peremptory challenges directed to members of a cognizable racial group be of the same race as the jurors who are being challenged.  This does not mean, however, that the respective races of the challenged jurors and of the person who objects to the challenges may not be relevant in the determination of whether the challenges are being unconstitutionally exercised because of group bias.  Under the procedure prescribed by <u>Neil</u>, the objecting party must ordinarily do more than simply show that several members of a cognizable racial group have been challenged in order to meet his initial burden.  Thus, a defendant of a different race than the jurors being challenged may have more difficulty convincing the trial court that "there is a strong likelihood that they have been challenged only because of their race."  Moreover, in those cases in which the inquiry has been directed to the challenging party, the respective races of the challenged jurors and the defendant may also be

> relevant in the determination of
> whether the challenging party has
> met the burden of showing that the
> challenges were made for reasons not
> solely related to race.

(citation omitted).

Within the limitations imposed by State
v. Neil, the trial judge necessarily is vested
with broad discretion in determining whether
peremptory challenges are racially intended.
State v. Slappy. Only one who is present at
the trial can discern the nuances of the
spoken word and the demeanor of those
involved. Given the circumstances that both
the defendant and the victim were white and
that two black jurors were already seated, we
cannot say that the trial judge abused his
discretion in concluding that the defense had
failed to make a prima facie showing that
there was a strong likelihood that the jurors
were challenged because of their race.

Reed was not prejudiced by the prosecutor
having given explanations for his challenges.
In fact, if it appeared from the prosecutor's
explanation that his challenges were racially
motivated, the trial judge would have been
warranted in granting a mistrial despite not
yet having ruled that the defense had made a
prima facie showing. Here, Reed does not
question the prosecutor's motivation for five
of his eight challenges, and the reasons for
the other three had at least some facial
legitimacy. In trying to achieve the delicate
balance between eliminating racial prejudice
and the right to exercise peremptory
challenges, we must necessarily rely on the
inherent fairness and color blindness of our
trial judges who are on the scene and who
themselves get a "feel" for what is going on
in the jury selection process.

Reed I at 205-06.

This Court must evaluate the Florida Supreme Court's adjudication of this claim pursuant to AEDPA. First, this Court must address whether the Florida Supreme Court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law.[19]   "The phrase 'clearly established Federal law,' as used in § 2254(d)(1), encompasses only the holdings, as opposed to the dicta, of the United States Supreme Court as of the time of the relevant state court decision.[20]   See Carey v. Musladin, 549 U.S. ----, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006) (citing Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)); Osborne v. Terry, 466 F.3d 1298, 1305 (11th Cir. 2006)."   Stewart v. Sec'y, Dep't of Corr., 476 F.3d at 1208-09.

Thus, this Court must "look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"   Yarborough v. Alvarado, 541 U.S. 652, 661 (2004) (quoting Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003)).   However, the Eleventh Circuit has noted that a Supreme

---

[19] The Florida Supreme Court's adjudication of this claim relied solely upon state law. This Court need not inquire whether the adjudication of this claim was contrary to, or involved an unreasonable application of, state law. This Court must limit its inquiry to whether the decision was contrary to, or involved an unreasonable application of, clearly established federal law.

[20] The Eleventh Circuit recently found that "the highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision." Newland v. Hall, No. 05-15981, 2008 WL 2042822, at *29 (11th Cir. May 14, 2008).

Court case issued after the relevant state court decision can be considered clearly established law if the decision qualifies as an "old rule under <u>Teague</u>[21]." <u>Newland</u>, at *30.

Accordingly, this Court must determine what federal law was clearly established when the Florida Supreme Court issued its decision in <u>Reed I</u> on March 1, 1990. The Court notes that the Petitioner is white, and he contends that the prosecutor used peremptory challenges in a discriminatory manner to strike black jurors. In <u>Batson</u>, the Court held that, for a defendant to establish a prima facie case of purposeful discrimination in the selection of the petit jury:

> **[T]he defendant first must show that he is a member of a cognizable racial group**, <u>Castaneda v. Partida</u>, *supra*, 430 U.S., at 494, 97 S.Ct., at 1280, **and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.** Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." <u>Avery v. Georgia</u>, 345 U.S., at 562, 73 S.Ct., at 892. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

<u>Batson</u>, 476 U.S. at 96 (emphasis added). "Once the defendant makes a prima facie showing, the burden shifts to the State to come

---

[21] <u>Teague v. Lane</u>, 489 U.S. 288 (1989).

forward with a neutral explanation for challenging black jurors." Id. at 97. "The trial court then will have the duty to determine if the defendant has established purposeful discrimination." Id. at 98.

Clearly, the holding in Batson was limited to the peremptory strikes of jurors who were of the same race as the defendant. The United States Supreme Court did not extend the holding in Batson to cases where the defendant was of a different race than that of the excluded jurors until April 1, 1991, when it issued its decision in Powers v. Ohio, 499 U.S. 400 (1991) (holding that, under the Equal Protection Clause, a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race).[22]

The Eleventh Circuit Court of Appeals "has held that Powers created a new rule that cannot be applied retroactively on

---

[22]   The Court recognizes that the decision in Holland v. Illinois, 493 U.S. 474 (1990), was issued on January 22, 1990. In the concurring and dissenting opinions in Holland, five justices stated that the race of the defendant is irrelevant in determining whether the discriminatory use of peremptory challenges violates Batson. However, such statements are dicta since the issue before the Court in Holland was whether a white defendant had standing to object to the exclusion of black jurors on the Sixth Amendment's "fair cross-section" requirement, and whether the Sixth Amendment's "fair cross-section" requirement prohibits either side from exercising peremptory challenges in order to exclude a cognizable racial group. In fact, Justice Kennedy recognized in his concurring opinion "that this case does not resolve the question whether a defendant of a race different from that of the juror may challenge the race-motivated exclusion of jurors under the constitutional principles that underpin Batson." Holland, 493 U.S. at 488 (Kennedy, J., concurring).

collateral review to cases that became final before Powers was decided." Fortenberry v. Haley, 297 F.3d 1213, 1221 (11th Cir. 2002) (per curiam) (citing Farrell v. Davis, 3 F.3d 370, 372 (11th Cir. 1993) and Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997)).  Since the decision in Powers created a new rule, it cannot be considered clearly established law for purposes of reviewing the decision on the Batson claim in Reed I.  Thus, Petitioner cannot show that the Florida Supreme Court's decision was contrary to Batson since the holding in Batson did not even apply to his case at the time of his trial and direct appeal.  See Fortenberry, 297 F.3d at 1221 (noting that, because Fortenberry's appeal became final in 1989, two years before the Supreme Court decided Powers, and because Batson clearly limited its application to defendants of the same race as the excluded jurors, "Fortenberry's Batson claim would necessarily fail even if it were to fall within one of the exceptions to procedural default.").

Alternatively, even assuming Batson did apply to his case at the time of his trial and direct appeal, the Florida Supreme Court's adjudication was not contrary to Batson.  Petitioner cites Johnson v. California, 545 U.S. 162 (2005), in support of his argument that the Florida Supreme Court's adjudication of Petitioner's Batson claim (finding that the trial judge did not abuse his discretion in concluding that the defense had failed to make a prima facie showing that there was a strong likelihood that

the jurors were challenged because of their race) was contrary to clearly established law.  The pertinent portion of the <u>Johnson</u> case is set forth as follows:

> The question before us is whether <u>Batson</u> permits California to require at step one that "the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias."  30 Cal.4th, at 1318, 1 Cal.Rptr.3d 1, 71 P.3d, at 280. Although we recognize that States do have flexibility in formulating appropriate procedures to comply with <u>Batson</u>, we conclude that California's "more likely than not" standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case.
>
> . . . .
>
> We did not intend the first step to be so onerous that a defendant would have to persuade the judge - on the basis of all the facts, some of which are impossible for the defendant to know with certainty - that the challenge was more likely than not the product of purposeful discrimination.  Instead, a defendant satisfies the requirements of <u>Batson's</u> first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

<u>Johnson</u>, 545 U.S. at 168, 170.

Petitioner argues that the standard disapproved in <u>Johnson</u> is identical to the "strong likelihood" standard employed by the Florida Supreme Court in Petitioner's case.  However, the <u>Johnson</u> case pertained to the inquiry at the first step of the <u>Batson</u> analysis.  In this case, the trial court, in essence, skipped the first step of the <u>Batson</u> inquiry.

As noted previously, the prosecutor (Mr. Bateh) volunteered to explain his reasons for the strikes.   After doing so, the trial judge stated the following:

> Anyway, I'm well aware if the Court determines that there's a prima facie showing of exclusion of jurors or a racial basis that it requires the state to make some showing to the Court as to why they excluded them for other than racial basis, which Mr. Bateh is volunteering to do without me making a finding is what I understand you're saying.

Ex. 11 at 309.   At this point, Mr. Bateh replied, "Yes, sir, Your Honor," and then immediately started to explain the reasons for the strikes.   <u>Id</u>.   After the prosecutor finished providing the explanation, and before the trial judge proceeded to the third step in the <u>Batson</u> inquiry, the judge noted again that the state "submitted to a voluntary Neal [sic] inquiry, in essence, in this regard **without the Court making an initial determination that it was necessary**."   Ex. 11 at 314 (emphasis added).   Since the trial court never made an initial determination with respect to the first step of the <u>Batson</u> inquiry, the Florida Supreme Court's finding with regard to this step (that the trial judge did not abuse his discretion in concluding that the defense had failed to make a prima facie showing that there was a strong likelihood that the jurors were challenged because of their race) is irrelevant.

In <u>Hernandez v. New York</u>, 500 U.S. 352 (1991), the United States Supreme Court addressed this issue as follows:

37

> The prosecutor defended his use of peremptory strikes without any prompting or inquiry from the trial court. As a result, the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination. This departure from the normal course of proceeding need not concern us. We explained in the context of employment discrimination litigation under Title VII of the Civil Rights Act of 1964 that "[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The same principle applies under Batson. **Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.**

Id. at 359 (emphasis added).

Thus, whether or not the Florida Supreme Court utilized the wrong standard in addressing the first step of the Batson inquiry is irrelevant. Accordingly, this Court must now address whether the trial court's finding of no purposeful discrimination, and the Florida Supreme Court's ultimate conclusion regarding the third step of the Batson inquiry, are entitled to deference under AEDPA.

The prosecutor offered the following explanation for striking the black jurors:

> MR. BATEH: Yes, sir, Your Honor, what I have been looking for in selecting this jury is, number one, individuals who have not been

arrested before and, number two, individuals
who have some experience with life, have some
years on them. I'm looking for -- I have been
trying to avoid youthful juries for fear they
do not have enough experience with life to be
able to make a hard decision that would be
required in this particular case and I've been
kind of using the age 25 as a cut-off, that is
it's a standard that I've used in this case
and I've used in other cases where I've had
first degree murders. It's my impression that
individuals that are below the age of 25
oftentimes do not have the maturity about them
to make decisions and I'd like to begin by
stating I believe juror No. 344, Ms. Wesley,
was black. She was excused by me because she
is 23 years old and, essentially, impressed me
with had [sic] her lack of maturity. Ms.
Madison, No. 3 juror, No. 353, indicated to me
that she was 20 years old and I excused her,
essentially, for that reason. She was single,
had no kids, worked as a hair operator. I was
also concerned because there was hair evidence
involved in this case. Her work with hair, I
thought, may have an undue bearing on her in
the manner she may have misinterpreted some of
the evidence that's going to be presented.
That's another reason I excused her.

     Your Honor, I've got to study my notes to
see --

     THE COURT: Ms. Humphries, I believe, is
the next one, No. 19 seat.

          . . . .

     MR. BATEH: Your Honor, she was excused
essentially because she was totally
unemployed. I was concerned about -- she said
she was unemployed for about a year, over a
year, and I know a number of physical
therapists or physical therapist assistants
and I'm aware that there's a real demand.

     THE COURT: She's on Workmen's Comp,
whether you caught that or not.

MR. BATEH:  Beg your pardon?

THE COURT:  She's currently on Workmen's Comp as opposed to being unemployed.

MR. BATEH:  Yes, sir.

THE COURT:  Go ahead.

MR. BATEH:  That's the next point I wanted to make, she did assert that she was on Workmen's Comp.  It would just seem to me someone who has remained unemployed for a period of a year when from my own experience I'm aware there's a need for services that she can render just struck me as an aspect of her character that I did not particularly like. And that was the reason that challenge was exercised.

Your Honor, is that all on that first --

[THE COURT]:  No, the first one is Ms. Campbell who is 18 years -- excuse me.  No, Mr. Campbell is --

MR. BATEH:  Your Honor, Mr. Campbell struck me by his age, number one, and, number two, his appearance.  He just struck me as an individual who did not have a great deal of maturity about him and I thought he would have difficulty dealing with the factual issues involved in this case in a mature way.

Your Honor, as to the --

THE COURT:  Mr. Seldon is the fourth one in the second group.

MR. BATEH:  Yes, sir.  Your Honor, my challenge to Mr. Seldon was essentially based on the fact that he admitted to me that he is now working on behalf of an individual that was previously convicted by the State Attorney's Office here in Jacksonville who convicted him of murder and he's in the process of working with the defense lawyers trying to seek a new trial, as he explained

it, open up his case, as he said.  He's searching through records of that individual's background to assist in reversing his conviction and I just thought that his leanings were too close or he was too defense oriented to be fair to the state in this case.

.  .  .  .

THE COURT:  Georgie Robinson, No. 340 in the 11th seat.

MR. BATEH:  Your Honor, she has an arrest record that I'm aware of.  She has been arrested just a number of times, the last time being -- last time being in 1982, and she has prior arrests before that.  That was my reason for excusing her.

THE COURT:  And then you go to Mr. Strickland who is number 363, alternate juror, granted, in the 13th seat.

MR. BATEH:  Your Honor, Mr. Strickland indicated that he's worked at St. Luke's Hospital for about four years.

THE COURT:  Six or seven.  Anyway it was a number of years.

MR. BATEH:  A number of years and is still a messenger and that just struck me as a bit unusual.  I thought that probably it comments on his intelligence, motivation, maybe even maturity.  It just seems to me that someone who has been with an organization like St. Luke's and is still a messenger after four, five, six, seven years employment just doesn't reflect very well on him in my eyes.

Your Honor, Mr. Adams --

THE COURT:  He is 378 in the 15th seat for the purpose of the record again.

MR. BATEH:  Yes, sir, Your Honor, it's hard to [put] into words.  I just sensed an uneasy chemistry between Mr. Adams as I was

41

> interrogating him.  A member of the plumber's
> union.    I  have  had  experiences  with
> individuals that are in that union in the past
> as a prosecutor, individuals that are involved
> in illegal activities from that union.  His
> wife also being a cosmetologist.  I just got
> an impression from questioning him that be did
> not like me.  It's hard to really put that
> into  rational  words.    It  was  a  rational
> decision,  but  it  was  kind  of  a  gut  level
> impression.  I would just state had I received
> those impressions from a white man as opposed
> to  a  black  man,  I  would  exercise  that
> challenge on Mr. Adams, but that was the basis
> of my challenge of Mr. Adams.

Ex. 11 at 309-14.

As  noted  previously,  the  trial  court  made  the  following
finding  with  respect  to  the  third  step  of  the  <u>Batson</u>  inquiry:
"taking  the  representations  of  Mr.  Bateh,  I  find  that  the
challenges exercised against the blacks are not based purely upon
race  or  racial  discrimination  and,  consequently,  I  will  deny  any
motion  for  a  mistrial  or  more  properly,  probably,  a  motion  to
strike  the  entire  panel,  but,  at  any  rate,  I  deny  the  motion  on
that basis."  Ex. 11 at 315.  On appeal, the Florida Supreme Court
implicitly  found  that  there  was  no  purposeful  discrimination,
addressing  the  third  step  of  the  <u>Batson</u>  inquiry  as  follows:

> Here, Reed does not question the prosecutor's
> motivation for five of his eight challenges,
> and  the  reasons  for  the  other  three  had  at
> least  some  facial  legitimacy.    In  trying  to
> achieve  the  delicate  balance  between
> eliminating racial prejudice and the right to
> exercise  peremptory  challenges,  we  must
> necessarily rely on the inherent fairness and
> color blindness of our trial judges who are on
> the scene and who themselves get a "feel" for

> what is going on in the jury selection
> process.

Reed I at 206.

These decisions--that the prosecutor did not use his peremptory challenges to exclude the veniremen from the petit jury on account of their race--are accorded great deference under AEDPA. As explained by the United States Supreme Court:

> In Hernandez v. New York, a plurality of
> the Court concluded that a state court's
> finding of the absence of discriminatory
> intent is "a pure issue of fact" accorded
> significant deference:

>> Deference to trial court
>> findings on the issue of
>> discriminatory intent makes
>> particular sense in this context
>> because, as we noted in Batson, the
>> finding "largely will turn on
>> evaluation of credibility." 476
>> U.S., at 98, n. 21, 106 S.Ct. 1712.
>> In the typical peremptory challenge
>> inquiry, the decisive question will
>> be whether counsel's race-neutral
>> explanation for a peremptory
>> challenge should be believed. There
>> will seldom be much evidence bearing
>> on that issue, and the best evidence
>> often will be the demeanor of the
>> attorney who exercises the
>> challenge. As with the state of
>> mind of a juror, evaluation of the
>> prosecutor's state of mind based on
>> demeanor and credibility lies
>> "peculiarly within a trial judge's
>> province." Wainwright v. Witt, 469
>> U.S. 412, 428, 105 S.Ct. 844, 83
>> L.Ed.2d 841 (1985), citing Patton v.
>> Yount, 467 U.S. 1025, 1038, 104
>> S.Ct. 2885, 81 L.Ed.2d 847 (1984).

> 500 U.S., at 365, 111 S.Ct. 1859.

43

Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations. "[I]f an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review." <u>Id</u>., at 367, 111 S.Ct. 1859.

In the context of direct review, therefore, we have noted that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous. <u>Id</u>., at 364, 111 S.Ct. 1859. A federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system. Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference. Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2); <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S., at 399, 120 S.Ct. 1495 (opinion of O'CONNOR, J.).

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 339-340 (2003).

Here, Petitioner has not come forward with clear and convincing evidence to rebut the state courts' factual finding that the prosecutor did not use his peremptory challenges to exclude the

veniremen from the petit jury on account of their race.   Whether this Court might have concluded otherwise on de novo review is irrelevant.

In sum, this Court concludes that Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.   Deference will be given to the state courts' rulings.

## B. Ground Two

In ground two of the Petition, Petitioner raises the following claim:

> MR. REED WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF THE CAPITAL PROCEEDINGS, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Petition at 23.   In sub-claims A through F, Petitioner presents six instances of alleged ineffectiveness during the guilt-innocence phase of the proceedings.

Prior to adjudicating the specific guilt-phase ineffectiveness claims in the order denying the 3.850 motion, the circuit court made the following observations:

> At the outset of this consideration, it should be noted that trial counsel in this matter at the time of the trial was, and remains, an experienced defense attorney, well

45

known to the Bar in this circuit. By the time he represented the defendant, he had spent many years as an assistant state attorney and perhaps as many years as criminal defense counsel. According to his testimony at the evidentiary hearing, he had been involved in fifteen (15) to twenty (20) murder cases, most of which involved the death penalty, before he had actually undertaken the defendant's representation. He was appointed to represent the defendant because a conflict occurred with the public defender's original representation of the defendant. This Court finds his testimony at the evidentiary hearing to be credible and plausible, and that it revealed sound tactical and ethical decisions on his part, many of which were occasioned by the defendant's statements to him regarding the crime itself, and, equally important, the defendant's instructions to trial counsel as to how to proceed.

This court finds that trial counsel's decisions regarding the defense of this case devolved from counsel's conclusions that the defendant had admitted to him that the defendant was, in fact, responsible for the rape and murder of Mrs. Oermann. (See, 1.11, p.199 through 1.10, p.204, evidentiary hearing (hereafter "E.H."), February 21, 2002). During the course of trial counsel's contact with the defendant, the defendant suggested to trial counsel that there had been consensual sex with the victim and that someone else had killed her. When questioned regarding his fingerprint on the victim's check found in the backyard, the defendant generally commented that he wasn't aware that he had dropped the check. When confronted with the testimony of Nigel Hackshaw reporting the defendant's jailhouse confession, the defendant acted surprised and suggested that he did not expect the witness to cooperate, nor that his statement should be repeated. As a further example of the circumstances under which trial counsel was working, when asked about witnesses which would establish an alibi, the defendant intimated that it would be a waste

of trial counsel's time to look further for
alibi witnesses.

As a number of the defendant's current
claims involve failing to call or consult
additional experts, or involve the failure to
conduct further investigation, it seems
appropriate to note that such failure to
further investigate is not necessarily the
ineffective assistance of counsel at least in
those instances in which the defendant has
effectively admitted his guilt to his
attorney. See, e.g., <u>Gudinas v. State</u>, 816
So.2d 1095 (Fla. 2002). It seems that this
would be particularly so when further
investigation or consultation would be
fruitless or potentially harmful to the
defendant.

There has been **<u>no</u>** suggestion by the
defendant's current claims that any of the
expert evidence offered against the defendant
at trial was invalid or incorrect. Neither
has there been any suggestion by the defendant
that the retention of additional defense
experts would have produced any evidence
directly contradicting that offered by the
state. In fact, though individuals recognized
in their fields, the defendant's experts
during the course of the evidentiary hearing,
all non-lawyers, really offered nothing more
than their comments on the trial performance
of experienced defense counsel. As noted
below, one of the defendant's evidentiary
hearing experts, Dr. Dale Nute, even
acknowledged that the matter which he was
discussing, had it been offered at the trial,
would have produced an implausible, even
improbable situation for the jury. Trial
counsel is certainly not expected to offer
matters which might affect the credibility of
himself or his representation of the
defendant. The defendant's psychological
expert, candidly admitted to the Court that
the testimony that he offered during the
evidentiary hearing, had it been offered at
trial, would likely have revealed to the jury
that, in the expert's opinion, the defendant

47

> was a person with tendencies to extreme violence, and whose personality disorder made him the perfect candidate for the kind of crimes committed in this case. It is certainly not ineffective assistance of counsel for an attorney not to call an expert when doing so causes his client to run the risk of having the state successfully make his client look like a sociopathic killer.

Ex. 56 at 516-18.

In sub-claim A of ground two, Petitioner contends that counsel was ineffective for failing to challenge the prosecutor's explanations for striking black jurors and/or seeking to establish the prosecutor's pattern of discriminatory behavior. This claim was raised in Petitioner's 3.850 motion and was addressed by counsel and the judge at the <u>Huff</u> hearing, <u>see</u> Ex. 57 at 611-16. After the discussion, the judge stated, "All right. Let me think about that one. My inclination is that the record in this so far really does negate this particular claim." <u>Id</u>. at 616. After the <u>Huff</u> hearing, the circuit court summarily denied this claim. <u>See</u> <u>Reed III</u> at 420 n.3 (identifying four ineffectiveness claims that the circuit court summarily denied after the <u>Huff</u> hearing).[23]

_____

[23] These four claims were that trial counsel: failed to object to the prosecutor's allegedly race-based use of peremptory challenges; failed to obtain a jury instruction that a felony murder determination is not, in itself, a sufficient aggravator to justify the death penalty; failed to bring a motion before the trial court to vacate the judgment and sentence after the Florida Supreme Court struck two aggravators on direct appeal; and, failed to object to the "heinous, atrocious, or cruel" and the "cold, calculated and premeditated" instructions. <u>Reed III</u> at 420 n.3. Respondents did not provide this Court with a copy of the circuit court's order summarily denying these four ineffectiveness claims.

Petitioner appealed the summary denial of this claim to the Florida Supreme Court.   In addressing this issue, the Florida Supreme Court quoted its order in <u>Reed I</u> with respect to the prosecutor's allegedly discriminatory use of peremptory challenges, and then addressed this ineffectiveness claim as follows:

> Reed argues that, after the prosecutor gave nonracially prejudicial reasons for the strikes, his trial counsel rendered deficient performance by not following up and pointing out that the prosecutor's reasons were illogical.   However, it is clear from the above summary of these proceedings that trial counsel objected to the strikes, and the trial court took the objection into consideration. Although Reed alleges his counsel did not make a strong enough argument that the jurors were challenged because of their race, the trial court apparently assumed arguendo that that [sic] a prima facie showing had been made and nonetheless found the prosecutor's reasons sufficient.   Furthermore, Reed raised the issue on direct appeal, arguing the prosecutor's reasons did not meet the race-neutral test mandated in <u>Neil</u>.   Reed's brief to this Court challenged the validity of each of the specific reasons given by the prosecutor, and this Court found the trial court did not abuse its discretion in denying Reed's motion for mistrial.   Thus, this issue has been litigated and was properly found to be procedurally barred, "even if couched in ineffective assistance language."  <u>Johnson v. Singletary</u>, 695 So.2d 263, 265 (Fla. 1996).

<u>Reed III</u> at 421.

Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the Florida

Supreme Court's decision regarding the ineffectiveness claim[24] was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Deference will be given to the Florida Supreme Court's ruling.

Additionally, this Court finds this claim to be without merit. Counsel argued that a mistrial was warranted based upon the prosecutor's allegedly discriminatory use of peremptory challenges. Ex. 11 at 305-09. Petitioner alleges counsel should have challenged the prosecutor's explanations for striking black jurors and sought to establish the prosecutor's pattern of discriminatory behavior. In hindsight, counsel might have done more. However, "[b]ecause 'it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight,' Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 1854, 152 L.Ed.2d 914 (2002), [the Court] must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate

---

[24] This Court will not defer to the Florida Supreme Court's finding that the ineffectiveness claim was procedurally barred. The ineffectiveness claim is different than the substantive Batson claim raised on direct appeal, and was properly raised in the 3.850 motion. However, the Florida Supreme Court also found that counsel objected and made a strong enough argument to convince the trial judge to proceed with a Batson inquiry. This implicit finding of no ineffectiveness is entitled to deference.

the conduct from counsel's perspective at the time.' Strickland, 466 U.S. at 689, 104 S.Ct. at 2065." Lawhorn v. Allen, 519 F.3d 1272, 1294 (11th Cir. 2008).  In this case, counsel's conduct was objectively reasonable, given the information he had before him at the time.

In sub-claim B, Petitioner contends that counsel was ineffective for failing to utilize a hair-type expert.  Petition at 29-34.  Petitioner raised this issue in his 3.850 motion, and the circuit court adjudicated the claim as follows:

In support of his contention that trial counsel was ineffective for failing to consult a hair expert, the defendant offered the testimony of Dr. Dale Nute, presently a professor of criminology.  While Dr. Nute had previously been employed as a supervisor for the Microscopic Hair Analysis Section of the Florida Department of Law Enforcement laboratory, Dr. Nute was not himself an expert in hair analysis.  Although this Court allowed the testimony of Dr. Nute for purposes of the record, at this point this Court concludes that his testimony on the issue is not really credible given his lack of expertise thereon. However, even in the light most favorable to the defendant, Dr. Nute's testimony failed to offer anything to indicate that there was anything incorrect about the state's hair evidence at the trial or that there was anything detrimental about the manner in which it was presented.  At best, Dr. Nute's suggestions were that he could have provided a "plausible but not very probable" explanation of ways that the defendant's pubic hair could have been associated with the victim's body and the location at which it was found.

Furthermore, Dr. Nute's hearing testimony really failed to offer anything about hair, shedding hairs, or the transference of

shedding hairs that would not already be known
by an experienced criminal defense lawyer.
Lastly, by way of observation, it seems that
Dr. Nute may have placed more importance on
his post-trial consideration of the presence
of hair consistent with that of the defendant
in the soft drink cap than was actually
warranted.   The trial transcript indicates
that the more weighty issue was that the cap
itself was positively identified as that of
the defendant and that it was last seen in his
possession on the day of the murder.

Ex. 56 at 518-19.

Upon   Petitioner's   appeal,   the   Florida   Supreme   Court
adjudicated the claim as follows:

Reed's second claim is that the circuit
court   erred   in   finding   no   ineffective
assistance of counsel regarding his trial
counsel's failure to retain a hair expert.
With regard to this and all other ineffective
assistance claims, the test to be applied by
the   circuit   court   is   two-pronged:   the
defendant must show both that trial counsel's
performance   was   deficient   and   that   the
defendant was prejudiced by the deficiency.
See Strickland v. Washington, 466 U.S. 668,
104   S.Ct.   2052,   80   L.Ed.2d   674   (1984).
Additionally, this Court's standard of review
is two-pronged: (1) this Court must defer to
the circuit court's findings on factual issues
so   long   as   competent,   substantial   evidence
supports them; but (2) must review de novo
ultimate   conclusions   on   the   deficiency   and
prejudice prongs.   See Stephens v. State, 748
So.2d 1028, 1033 (Fla. 1999) ("Thus, under
Strickland, both the performance and prejudice
prongs are mixed questions of law and fact,
with deference to be given only to the lower
court's factual findings.").

The victim was murdered approximately two
months after the period when Reed lived in the
victim's   home.     After   her   murder,   hair
evidence   was   collected   from   a   baseball   cap

found near the body and in "sweepings" from the victim's clothing and pubic hair. At trial, the State presented a hair expert, who testified the baseball cap hairs and one hair obtained from the clothing were microscopically the same as Reed's head hair sample and that one of the loose hairs found among the victim's pubic hair was microscopically the same as Reed's pubic hair sample. At the evidentiary hearing below, Reed introduced the testimony of Dr. Dale Nute for the purpose of showing how a hair expert could have suggested cross-examination questions revealing the comparatively low reliability of hair comparisons and provided information regarding alternative means of hair transference.

In rejecting many of Reed's ineffectiveness claims, the circuit court noted generally that Reed's trial counsel, Richard Nichols, was and remains an experienced defense attorney, well known to the Bar in the Fourth Circuit, who by the time he represented Reed, had been involved in fifteen to twenty prior murder cases both as an assistant state attorney and a criminal defense attorney. The circuit court found Nichols' testimony at the evidentiary hearing to be credible and to reveal sound tactical and ethical decisions devolved from his conclusion that Reed effectively had admitted that he was in fact responsible for the rape and murder of the victim.FN5 With specific regard to the failure to retain a hair expert, the circuit court found Reed had "failed to offer anything to indicate that there was anything incorrect about the state's hair evidence at the trial or that there was anything detrimental about the manner in which it was presented." State v. Reed, No. 86-6123-CF at 7 (Fla. 4th Cir. Ct. order filed Aug. 26, 2002) (postconviction order). Furthermore, the court concluded that Nute's testimony "failed to offer anything about hair, shedding hair, or the transference of shedding hairs that would not already be known by an experienced criminal defense lawyer."

Id. at 8.  Finally, the court noted that the
presence of hair consistent with Reed's hair
in the baseball cap was less significant than
the positive identification of Reed's cap
itself and testimony that it was last seen in
his possession on the day of the murder.

> FN5.   Nichols testified that he
> reached that conclusion on the basis
> of the following.  During the course
> of representation, Reed suggested he
> had consensual sex with the victim,
> but someone else had killed her.
> When questioned regarding his
> fingerprint on the victim's check
> that was found in the backyard,
> Reed's response suggested surprise
> that he had dropped it.   When
> confronted with the testimony of
> Nigel Hackshaw reporting Reed's
> jailhouse confession, Reed acted
> annoyed, commenting that he did not
> expect Hackshaw to cooperate with
> the State and did not expect that
> his statements would be repeated.
> And when asked about witnesses who
> would establish an alibi, Reed
> intimated that it would be a waste
> of trial counsel's time to look for
> alibi witnesses.

Essentially, the circuit court found: (1)
that there was no deficient performance,
because trial counsel had a reason to believe
that efforts to test the State's hair evidence
would be fruitless; and (2) that there was no
prejudice, because the employment of a hair
expert would not have assisted the defense.
We find no error in these conclusions.  Nute
testified that if he had been employed by
trial counsel, he would have advised the
defense to have reexamined the single most
critical piece of hair evidence, the pubic
hair.   However, given Reed's incriminating
statements, trial counsel could not be found
deficient under the standards of Strickland
for not having the hair reexamined.   See
Gudinas v. State, 816 So.2d 1095, 1101-02

(Fla. 2002) (finding no ineffective assistance in not pursuing DNA testing in light of incriminating statements by Gudinas to his attorneys and other inculpating physical evidence).  Nute also testified that he could have provided a "not very probable but . . . plausible way" the pubic hair could have been transferred without being involved in a rape. The circuit court clearly found this testimony insufficient to establish the prejudice prong of <u>Strickland</u>, and we agree.  Finally, regarding the head hairs, Nute testified a hair expert could have suggested some possible scenarios to explain their presence because "hairs are so easily shed, particularly head hairs, and they are so easily transferred and picked up by other items of clothing that it's - you can always come up with a possible scenario."  However, the fact that hairs shed and are easily transferred is within the average person's realm of knowledge.  We find no error in the conclusion that trial counsel did not provide deficient performance by failing to retain an expert to explain to him a fact commonly known.  Therefore, we affirm the denial of this claim.FN6

> FN6.  Although Reed's claim here focused upon the failure to retain a hair expert, he generally argued that trial counsel failed to test the State's evidence as severely as possible.  Trial counsel indicated at the evidentiary hearing that even in cases where he believes the defendant is guilty, it is his "obligation to hold the state's feet to the fire and make sure the evidence is legally gathered and legally presented and legally sufficient."  The circuit court expressly found trial counsel's testimony to be credible.  But even assuming arguendo that he could have more severely tested the State's hair evidence by the suggestion of other means of transference, there is no reasonable probability that

> but for any failure to suggest
> alternative scenarios the result of
> the proceeding would have been
> different. The circuit court
> correctly noted that the
> identification of Reed's hat was the
> more telling evidence. Indeed, when
> noting the most significant
> evidence, this Court listed the hat
> identification and fingerprint
> evidence before the hair evidence.

Reed III at 421-23.

Thus, there are qualifying decisions from both the circuit court and the Florida Supreme Court. Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Deference will be given to the state courts' rulings.

In sub-claim C, Petitioner contends that counsel was ineffective for failing to utilize a blood-type expert. Petition at 34-41. Petitioner raised this issue in his 3.850 motion, and the circuit court adjudicated this claim as follows:

> Dr. Nute also testified on the issue of
> failure to consult with an independent
> serologist. On the topic of serology, this
> Court finds Dr. Nute to be an expert.
> However, the bulk of Dr. Nute's testimony
> relates to the quality of defense counsel's
> trial questions, and not the quality of the
> evidence presented to the jury. While it

56

seems clear that Dr. Nute might, himself, have
posed the questions in a different way,
nothing in his testimony reveals in any way
that the evidence presented to the jury was
inaccurate, incomplete, or fundamentally
unfair to the defendant.

At the time of the trial in this cause,
clearly pre-DNA, the analysis of blood and
semen was, at best, based on general
observations. That is, at that time, it was
only possible to advise a jury that a
defendant *might* have contributed to collected
bodily fluids or that the defendant *probably*
did not contribute to collected bodily fluids.
The general nature of the science at the time,
based on his testimony at the evidentiary
hearing, was well known to trial counsel. His
consultation with an independent serologist
would not have changed the statistical numbers
in any way. More importantly, any competent
defense serologist would have also had to
testify that it was possible that the
defendant left his semen within the victim.

Ex. 56 at 519-20.

Upon Petitioner's appeal, the Florida Supreme Court
adjudicated the claim as follows:

Reed's third claim is that the circuit
court erred in finding no ineffective
assistance regarding his trial counsel's
failure to retain a serology expert and
failure to challenge the State's blood-type
evidence. At trial, the State presented the
testimony of Paul Doleman, a crime lab analyst
specializing in forensic serology. Doleman
testified that at that time forensic serology
could not produce positive identification but,
rather, could only include or exclude an
individual as part of a certain percentage of
the population that could have contributed a
particular body fluid. Doleman then testified
that the victim was [a] type O secretor and
that Reed was [a] type O nonsecretor. He
explained a secretor "is an individual who

will demonstrate their blood type . . . in
their body fluids other than blood," while a
nonsecretor "is an individual who does not
demonstrate their blood type . . . in their
other body fluids other than blood." Doleman
tested the vaginal swab taken from the victim
and found that it contained semen.  He also
detected antigenic activity "consistent with
or . . . equivalent to blood type O." Doleman
then stated:

> Having determined the blood type and
> the secretor status of Betty Oermann
> and having determined the blood type
> and the secretor status of Grover
> Reed and having determined that H
> antigenic activity was present on
> the vaginal swab, the seminal fluid
> and spermatozoa were present on the
> vaginal swab, I am able to make a
> determination that Grover Reed falls
> into the population, the male
> population, that could have had
> intercourse with Betty Oermann.

During cross-examination, Reed's trial counsel
elicited further testimony that, given the
victim's blood type and the results of the
testing, the percentage of the male population
that could have been the source of the semen
was approximately fifty-six to fifty-seven
percent.

Although neither the State nor trial
counsel asked Doleman to elaborate further on
how he reached the conclusion that Reed could
have been the source, the conclusion is not
illogical.  The implicit reasoning is that
when a vaginal swab from a woman who is known
to be type O secretor is tested and that swab
is found to contain semen as well as vaginal
fluid, the discovery of type O secretor alone
indicates one of two possible scenarios: (1)
that both the vaginal fluid and the semen came
from type O secretors; or (2) that the vaginal
fluid came from a type O secretor and the
semen came from a nonsecretor of any blood
type.  In other words, testing in this case

indicated that the semen could have derived from a type O secretor or any type nonsecretor. Therefore, Reed, a nonsecretor, fell within the male population from which the semen could have derived. Unfortunately, because neither side asked Doleman to further explain how he reached his conclusion, his testimony could have been interpreted as inconsistent. This is illustrated by a note sent to the judge from a juror prior to jury instructions, which read in part:

> [T]he witness said that he had examined the sperm in question, and that the blood type obtained from it was the same as that of Grover Reed.
>
> . . . [A]s I understand it, [Reed's] blood type can not be obtained from his saliva or sperm.
>
> What I would like to know is whether or not his testimony is consistent to the fact that the sperm could and did contain Grover Reed's blood type.

Due to juror confusion, the judge permitted the court reporter to re-read to the jury Doleman's testimony on direct and cross-examination.

Reed here argues that his trial counsel should have used the information that Reed was a nonsecretor to challenge Doleman's conclusion and would have been properly advised to do so if he had hired a blood-type expert. Reed again relied on Nute at the evidentiary hearing to support this claim. Nute testified that if he had been retained, he would have advised trial counsel regarding blood groups, the concept of secretor versus nonsecretor status, and "how to ask the questions involved in that." Specifically, Nute testified:

[S]ince there is no test to
determine whether the-in a mixture
whether [the antigen activity] came
from the semen or from the vaginal
secretion that you can't
automatically assume since you know
that the vaginal secretions have
antigens in them, since she was a
secretor, you can't automatically
assume, well, the semen doesn't.
The semen also could have it and if
there are a couple scenarios, that
depending on how much the mixture
there were between the semen and the
vaginal secretion . . . that it was
likely that the semen could have
come from a person, an O person who
had the antigen present in their
semen which would have increased the
number of people who could have done
it considerably but it would have
also excluded Mr. Reed since he was
a nonsecretor and since you couldn't
tell whether the semen itself was a-
from a nonsecretor or not that point
should have been brought out very
strongly in the trial.

Nute summarized his point by stating that the
testing could not have indicated whether the
semen came from a nonsecretor or secretor and
therefore could neither include nor exclude
Reed as the source of the semen. However, when
asked whether "the only true thing" that could
be said about the blood-type evidence was
"that the defendant could have been in that
majority of all American males, 56 percent
that could have contributed the semen," Nute
answered that that was correct. And, on cross-
examination, Nute acknowledged the correctness
of Doleman's finding that Reed fell within the
fifty-six to fifty-seven percent of the male
population that could have had intercourse
with the victim.

According to trial counsel's testimony at
the evidentiary hearing, the strategy with
regard to the State's blood-type evidence was

to show that it could not specifically
identify the source and could only place
someone in a large group.  When asked if he
felt relatively well versed in the science of
ABO blood typing at that time, trial counsel
stated it was a "pretty simple proposition"
and that he had had many prior cases involving
blood testimony.

While Reed contends that his trial
counsel should have further challenged this
testimony, we find that the circuit court did
not err in concluding that trial counsel's
consultation with an independent serologist
would not have changed the statistical numbers
in any way.  As explained above, Doleman's
final conclusion that the discovery of type O
secretor alone in the vaginal swab indicated
that the semen could have derived from a type
O secretor or any type nonsecretor was not
illogical.  Given Nute's own admission that
Doleman correctly concluded Reed "could have
been in that majority of all American males,
56 percent that could have contributed the
semen," we find no error in the conclusion
that trial counsel's failure to question the
manner in which Doleman reached that
percentage was not deficient performance.
Rather, it appears that trial counsel took the
most appropriate approach by eliciting
Doleman's further testimony that a very high
percentage, fifty-six to fifty-seven percent,
of all males could have contributed the semen.
Therefore, we find no error in the denial of
this claim.

Reed III at 423-25.

There are qualifying decisions from both the circuit court and

the Florida Supreme Court.  Upon thorough review of the record and

the applicable law, it is clear Petitioner is not entitled to

relief because the state courts' decisions were not contrary to

clearly established federal law, did not involve an unreasonable

application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Deference will be given to the state courts' rulings.

In sub-claim D, Petitioner contends that counsel was ineffective for failing to utilize a fingerprint expert.  Petition at 41-46.  Petitioner raised this issue in his 3.850 motion, and the circuit court adjudicated the claim as follows:

> The defendant next suggests that trial counsel was ineffective for failing to retain a fingerprint expert.  The testimony presented by the defendant at the evidentiary hearing has failed to produce any indication that the identification of the defendant's fingerprint was wrong.  The defendant's current presentation seems to argue that had trial counsel retained a fingerprint expert, trial counsel would have known that fingerprints cannot be dated.  The defendant attempts to tie this issue to the trial testimony of Bruce Scott, FDLE fingerprint examiner, who ventured at trial that he believed that the defendant's fingerprint found on the victim's check in the backyard was relatively fresh (or words to that effect).  That fingerprints cannot be dated was well known to trial counsel.  Paraphrasing his testimony at the evidentiary hearing, trial counsel was stunned when the state's fingerprint expert volunteered that information during his testimony.  Trial's counsel's objection at trial and his cross-examination of Bruce Scott at trial, and his argument to the jury during the guilt phase, clearly reveal that trial counsel knew that fingerprints could not be dated.  In fact, trial counsel's cross-examination questions eventually led the state's fingerprint expert to acknowledge that fingerprints could not actually be dated, but that there were circumstances from which one could infer when

the fingerprint had been left.   During the
course of the trial, it was obvious to the
jury that the fingerprint was fresh as it was
found on a check to which the defendant had no
access, in a wallet to which the defendant had
no access, which had been inside the residence
prior to the rape and murder of the victim,
and which was found laying in the backyard by
investigating officers after the discovery of
the victim's body.

At the evidentiary hearing (pp 179-193,
E.H. Feb. 21, 2002), trial counsel testified
that he kept current with the field of
forensic sciences at the time, as well as
policies of local law enforcement, including
the FDLE.  Trial counsel knew that it was the
policy of the FDLE to have a supervising
examiner review any identifications made by
any FDLE fingerprint examiner before positive
identification was reported.   Trial counsel,
therefore, knew that there was a second
opinion confirming the identification of the
defendant's fingerprint on the victim's check.
Furthermore, during the course of the
evidentiary hearing, the state produced Ernest
Hamm, the supervisor of the FDLE fingerprint
examination section at the time, who testified
that not only had he confirmed Bruce Scott's
identification of the defendant's fingerprint
for the trial, he had again examined the
evidence and again confirmed the
identification of the defendant's fingerprint
just prior to the evidentiary hearing.

The defendant's current presentation has
failed to establish that the state's
fingerprint evidence was flawed in any respect
or that trial counsel's performance on this
issue was in any way deficient.   The
defendant's current attacks on the credibility
of Bruce Scott by way of his *Brady* claim are
discussed later in this order.

.   .   .   .

The defendant's next claim related to the
guilt phase pertains to the defendant's

63

perception that trial counsel failed to
discover, and thereafter develop, conflict
within the testimony of fingerprint expert,
Bruce Scott.  At the evidentiary hearing, the
defendant presented the testimony of Ron
Fertgus, a fingerprint examiner.  Mr. Fertgus
opined that Bruce Scott's written report
indicated the existence of a second
fingerprint, but that Bruce Scott did not
testify to its existence at trial nor did
trial counsel raise the issue on cross-
examination.  Again, the defendant has failed
to support this claim and in any way show that
trial counsel's performance was deficient.  No
evidence has been presented to this Court
during the course of the evidentiary hearing
that, if there was a second print, it was
*identifiable.*  Furthermore, upon the facts in
this case, and trial counsel's inference of
the defendant's confession, without even
hearing from trial counsel on this issue, it
seems obvious that his failure to follow
through on a second fingerprint (if there was
one), was tactically appropriate.  The
defendant's fingerprint had already been
identified on a check to which the defendant
had no authorized access, in a location where
the defendant should not have been, and found
immediately after the rape and murder of the
victim.  If nothing else, had trial counsel
pressed the issue, he might have found the
second print further enhancing the state's
case against his client.  Trial counsel's
failure to follow that path is seemingly
anything but deficient.

Ex. 56 at 520-23.

Upon Petitioner's appeal, the Florida Supreme Court

adjudicated the claim as follows:

Reed's fourth claim is that the circuit
court erred in finding no ineffective
assistance regarding his trial counsel's
failure to retain a fingerprint expert.  Trial
testimony indicated that the victim kept
personal checks in her wallet, after the crime

64

some of her checks were found on the ground in her backyard, and her wallet was found in a canal near her house.  The State presented the testimony of Bruce Scott, a former Florida Department of Law Enforcement (FDLE) latent fingerprint examiner, who tested the checks for fingerprints and found one print of value. Scott's comparison of that print to Reed's known fingerprints resulted in a positive identification.

Scott testified that he developed the latent print through a chemical application of ninhydrin acetone solution that causes latent prints to become visible through a chemical color reaction.  He stated that a latent print will turn a light pink to an extremely dark purple when the solution is applied and that the colors "usually have an indication of strength . . . meaning the concentration of the latent print, whether the person was perspiring heavily or whether the person would handle it normally and also how long the print possibly might have been on that check."  He described the print on the victim's check as producing an "extremely strong, quick reaction, which yielded a dark purple color." When asked what was significant about that fact, Scott stated:

> Well, I'm certainly not capable of dating fingerprints, which means that this latent was made a week ago or this was three hours ago or whatever, but after looking at hundreds of thousands of reactions and looking at latent fingerprints, I made an opinion at that time, I was working it on March 4, 1986, that it was a - I termed it a fresh print or a print that, because of the dark purple reaction, because of how the chemical reaction occurred, you're dealing with a print that's - I've never seen one react like that older than ten days.

When asked if there was any other
significance, Scott stated, "I felt the
individual at the time the latent was made was
probably perspiring heavily."  At that point,
trial counsel objected:

> Your Honor, I'm going to move
> to have [the testimony] stricken as
> being outside the field of his
> expertise.  He's been qualified as a
> person to make a fingerprint latent
> comparison analysis to say whether
> or not a print came from the same
> person.  Frankly I have never heard
> someone qualified in this area to be
> able -

At that point, the judge overruled the
objection "subject to any cross-examination as
to whether or not he can do something."  When
the prosecutor continued this line of
questioning, trial counsel asked that the
record reflect his objection to the testimony
as being outside of the field of the witness's
expertise and "not a matter of cross-
examination, but a matter of admissibility,
that there's no voir dire."

On cross-examination, trial counsel asked
Scott if he had a degree in chemistry,
physics, medicine, or pathology.  When the
State objected, trial counsel stated that his
purpose was to show that any testimony
regarding "what rate somebody is sweating" was
beyond Scott's expertise.  Trial counsel then
intensely cross-examined Scott regarding
environmental conditions that affect the rate
at which a fingerprint deteriorates.  Scott's
answers were generally unresponsive - a fact
acknowledged on the record by the trial judge.
But Scott conceded that testing cannot
determine on what date a print was left and
that he was unaware of the environmental
conditions in which the check was kept between
its discovery and the testing of it.  Trial
counsel also elicited Scott's acknowledgment
that people perspire at different rates and
that Scott did not test Reed to determine

66

whether he perspires more or less than the average person.

Reed here claims that his counsel was deficient for not obtaining the assistance and testimony of a defense fingerprint expert to challenge Scott's testimony. At the evidentiary hearing, Reed presented the testimony of Ronald Fertgus, a forensic consultant and former latent print examiner. Fertgus disagreed with Scott's testimony that a ninhydrin reaction reveals the print strength, the perspiration rate of the donor, or the length of time the print had been on the item. He testified that there is currently no way to date a fingerprint, citing professional publications for support. He also stated that there is no data to support the claim that one can determine a person was perspiring heavily when a print was left because "[n]inhydrin works on trace amounts of amino acids so it doesn't matter if you sweat a lot or sweat a little." Fertgus could not testify, however, that Scott's identification of the latent print as matching Reed's fingerprint was erroneous because Fertgus was never asked to perform a comparison himself.

In response, the State presented the testimony of Alan Chipperfield, Reed's first counsel, who had turned the case over to Nichols during pretrial when a conflict developed with the public defenders' office. Chipperfield testified that he observed part of Reed's trial and was very surprised by Scott's testimony regarding the freshness of the print because it was his understanding that freshness could only be determined from surrounding circumstances, not from the print itself. As for Nichols, he stated at the evidentiary hearing that based on past trial experience, he had a fair understanding of latent fingerprint comparisons at the time of Reed's trial. He further testified that during the preparation of Reed's case, there was no reason to question Scott's fingerprint identification, he was aware it was FDLE policy to have a superior examiner review and

verify fingerprint identifications, and his strategy was to minimize the fingerprint's importance by showing that Reed previously lived in the victim's house.   Specifically, regarding Scott's testimony that the fingerprint was fresh, Nichols stated that he could not have foreseen the testimony because he had "never heard of anybody even speculating that a print could be dated."  But he also recalled feeling that the jury understood after his cross-examination that Scott's statements on that point "appeared to be preposterous."

In denying this claim, the circuit court noted that Reed failed to produce any testimony indicating that the identification of the fingerprint was erroneous and that it was well known to Nichols that fingerprints cannot be dated, as evidenced by his objection and cross-examination.   Further, the court wrote, "it was obvious to the jury that the fingerprint was fresh as it was found on a check to which the defendant had no access, in a wallet to which the defendant had no access, which had been inside the residence prior to the rape and murder of the victim, and which was found laying in the backyard by investigating officers."  Postconviction order at 10.

The circuit court correctly noted that Reed failed to present evidence indicating that Scott's identification of the print was in error.   Rather, Reed's claim focuses entirely on Scott's testimony that the print was fresh and left by someone who was heavily perspiring.  He asserts that his trial counsel was ineffective for failing to retain a defense fingerprint expert who could have countered those claims.  However, substantial evidence in the form of testimony by Chipperfield, Nichols, and even Ronald Fertgus supports the conclusion that Nichols could not have foreseen the presentation of that particular testimony.  Counsel cannot be found ineffective for failing to arm himself with a defense expert to counter testimony that was

68

unforeseeable.   And to the extent that Reed
might be claiming that his counsel should have
retained an expert after Scott's testimony,
such action appears to have been unnecessary.
Nichols   rigorously   cross-examined   Scott,
eliciting   his   acknowledgment   that   a
fingerprint cannot be "dated," environmental
conditions can affect a fingerprint, he did
not consider environmental conditions when he
concluded that the fingerprint was "fresh,"
and he did not factor in the varying rates of
human perspiration.  As Nichols testified, the
point   was   made   to   the   jury   that   Scott's
testimony was "preposterous."   The jury's
guilty   verdict   does   not   contradict   this
because, as the circuit court noted, other
circumstances beyond the ninhydrin reaction
effectively   "dated"   the   fingerprint.
Furthermore, Reed's assertion that his counsel
was   ineffective   for   not   requesting   a   motion
for mistrial based on a <u>Frye</u>[25] violation is
undermined by the fact that his counsel did so
object,   stating   that   the   objection   was   "a
matter of admissibility, that there's no voir
dire - I mean there's no predicate laid to
show that he has the expertise to render this
kind of opinion."   Therefore, we affirm the
denial of this claim.

<u>Reed III</u> at 425-28 (footnote omitted).

There are qualifying decisions from both the circuit court and

the Florida Supreme Court.  Upon thorough review of the record and

the applicable law, it is clear Petitioner is not entitled to

relief because the state courts' decisions were not contrary to

clearly established federal law, did not involve an unreasonable

application of clearly established federal law, and were not based

on an unreasonable determination of the facts in light of the

---

[25] <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923).

evidence presented in the state court proceedings.  Deference will be given to the state courts' rulings.

In sub-claim E, Petitioner contends that counsel was ineffective for failing to challenge the collection of evidence and the chain of custody.  Petition at 46-48.  Petitioner raised this issue in his 3.850 motion, and the circuit court adjudicated the claim as follows:

> The defendant's next guilt phase claim suggests that trial counsel was ineffective in stipulating to the chain of custody regarding the collected hair samples, and to the matter of the storage of the check upon which the defendant's fingerprint had been found.  No evidence was actually presented by the defense at the evidentiary hearing.  However, during the course of its direct examination of trial counsel, the state did inquire as to his reasons for entering into the stipulation. From his testimony, the Court concludes that his doing so was appropriate under the circumstances and, in fact, likely enhanced his credibility before the jury.  Trial counsel's testimony indicated that he knew that the state could establish the chain of custody and that the evidence would be admitted (this Court infers), but it would have been inappropriate to object.  Regarding trial counsel's performance on this issue, a somewhat trite phrase comes to mind.  "Do graciously that which you must do anyway."
>
> This Court concludes that by failing to offer any evidence on the issue the defendant has abandoned this claim.  Even if he has not done so, the evidence before the Court is such that this Court concludes that trial counsel's performance was not deficient on this issue.

Ex. 56 at 520.

Upon Petitioner's appeal, the Florida Supreme Court adjudicated the claim as follows:

> Reed's seventh claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's failure to challenge the chain of custody of the State's physical evidence.  At trial, Reed's counsel stipulated to all chain-of-custody issues, stating that he thought such testimony would unnecessarily lengthen the trial.  Nonetheless, the State did present limited testimony regarding the chain of custody through the testimony of Steve Leery, Carol Herring, and Paul Doleman.  At the evidentiary hearing, trial counsel explained his decision:
>
> > [M]y policy has always been to stipulate to chain of custody when I know the state could prove it anyway, and after the pretrial discovery showed that the chain of custody was intact I routinely have done that.  I think that a jury is affected by everything they see you do in the courtroom and everything you can do to subtly enhance your credibility with them, part of which is stipulating to things that the state is going to prove readily or stipulate to things that need to come in the record but don't have lots of significance and you can't win an argument over them anyway, I think those things are part of the subtle signals that a jury looks at to decide whether or not they can believe you when you are talking to them in closing arguments to tell them why this case has defects in it.
>
> Below, Reed neither questioned trial counsel about this issue nor presented evidence indicating that the chain of custody was flawed.  The circuit court concluded that

trial counsel's decision was appropriate under the circumstances and likely enhanced his credibility before the jury by stating, "Do graciously that which you must do anyway." Indeed, where counsel has reason to believe pursuing certain lines of defense would be fruitless or even harmful, counsel does not act unreasonably in not pursuing them. Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, both the trial transcript and testimony at the evidentiary hearing indicate that trial counsel believed challenging the chain of custody of the State's evidence would be fruitless. Reed has presented no evidence indicating otherwise. Therefore, we affirm the circuit court's denial of this claim. Cf. Pope v. State, 569 So.2d 1241, 1246 (Fla. 1990) (finding no ineffective assistance where counsel stipulated to unavailability of State witness, thereby allowing admission of deposition, where witness was in fact unavailable; noting to hold otherwise "would preclude counsel from ever entering into such stipulations which serve to avoid the unnecessary consumption of time at trial").

Reed III at 432-33.

There are qualifying decisions from both the circuit court and the Florida Supreme Court.  Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Deference will be given to the state courts' rulings.

In sub-claim F, Petitioner contends that counsel was ineffective for failing to present evidence impeaching the state's case. Petition at 48-56. Petitioner raised this issue in his 3.850 motion, and the circuit court adjudicated the claim as follows:

> In support of this claim, the defendant called three (3) witnesses at the evidentiary hearing. Mark Rainey, an acquaintance and neighbor of the defendant, who testified at the trial; Christine Niznik, the defendant's significant other, who was living at Ware's Trailer Park with the defendant (and who apparently refused to testify at the trial); and David Summersill, Jacksonville Sheriff's Office, who had contact with the defendant at approximately 4:00 P.M., on the afternoon of the murder. Officer Summersill also testified to assorted computer logs which the defendant offered during the course of the evidentiary hearing. Officer Summersill did not testify at the trial.
>
> Considering the evidence at trial and the testimony during the evidentiary hearing, this Court concludes that the defendant has failed to establish any deficient performance on the part of trial counsel as to this issue. In considering this particular claim, one must remember that trial counsel had deduced that the defendant had actually admitted the crimes to trial counsel. One must also remember that the defendant had intimated to trial counsel that the search for alibi witnesses would be fruitless.
>
> At the trial, the state presented two (2) witnesses, Debra Hipp and Lisa Ann Smith, who testified that they saw the defendant running into the trailer park at approximately 7:30 or 8:00 on the evening of the murder. Based on the testimony of the victim's husband, the state's theory was that the victim was raped and murdered sometime between 5:40 P.M. and

9:50 P.M., on February 27, 1986.  These were the times when Rev. Oermann departed for his meeting and returned to find his wife's body. Mark Rainey's testimony at both the trial and the evidentiary hearing was less than conclusive as to the time when he saw the defendant at the trailer park on the evening of the murder.  Perhaps more importantly to the state, Mark Rainey was the witness who positively identified the soft drink baseball cap found at the scene as being that of the defendant.

Christine Niznik's testimony at the evidentiary hearing was less than succinct. Her testimony was evasive and conflicting.  It was obvious to this Court that she had virtually no interest in having been exposed to the judicial process.  She suggested that after his return to the trailer park, the defendant was with her for the entire remainder of the evening of the murder.  She also related to this Court that she had never felt any compulsion to contact anyone regarding the defendant's presence with her as it was the lawyer's responsibility to contact her and not vice versa.  In sum, this Court finds the testimony of Christine Niznik to be less than credible.

Perhaps without notice to the state, the defendant called Officer Summersill to relate that he had contact with the defendant at approximately 4:00 P.M. on the afternoon of the murder.  Defendant's suggestion appears to be that trial counsel was somehow deficient in failing to find the existence of the police report documenting this contact.  No testimony was offered that the defendant had ever told trial counsel of the contact with Officer Summersill.  From the evidence and the arguments it appears that the prosecutor didn't know about Officer Summersill's contact with the defendant either.

According to Officer Summersill, he met the defendant at approximately 4:00 P.M. on the afternoon of the murder.  The defendant

was in the back of a car on Ricker Road and
was somewhat intoxicated.  The police report
makes no reference to the defendant's being in
possession of a baseball cap, nor did Officer
Summersill have any such recollection.
Officer Summersill did not arrest the
defendant, but, instead, merely prepared a
"contact report" which was filed with the
Jacksonville Sheriff's Office.

With regard to this report, this Court
cannot find that it is in any[ ]way a basis
for the defendant's current claim against
trial counsel.  Part of the trial evidence
indicated that the defendant had borrowed a
car which had broken down on Ricker Road on
the afternoon of the murder.  The report at
best confirms this and places the defendant on
a major thoroughfare not far from the scene of
the murder and his own trailer park.  The
victim's residence was less than a mile from
that of the defendant[.]

More importantly, trial use of the report
would have done nothing more than to damage
the defendant as its contents certainly would
have been used by the state to impeach the
defendant's statement given to the police.  In
his interview with the assigned homicide
detective, the defendant related that he had
been at his trailer park throughout the *entire*
day of the homicide (11. 6-14, p547, TT).
That he had contact with Officer Summersill at
4:00 p.m. that afternoon is utterly
inconsistent with his statement.

Accordingly, with regard to Officer
Summersill's contact with the defendant, this
Court concludes that it, in no way, supports a
finding of deficiency on the part of trial
counsel.  Furthermore, even had counsel known
of the existence of the report, it would have
made no difference to the outcome of the
trial.  Its use might actually have been to
the detriment of the defendant.

Through Officer Summersill[,] the
defendant also offered computer printouts of

calls made from Ware's Trailer Park on the
late afternoon and evening of the murder.
Though not a custodian of such records,
Officer Summersill was familiar with their
nature and was allowed to testify from them.
Presumably they were offered to establish a
time frame for calls which the trial testimony
showed may have been made to the Jacksonville
Sheriff's Office on the day of the murder.
The defendant's suggestion is that a fight
between the defendant and another person
(possibly Christine Niznik) was boisterous
enough for the police to be called. However,
the logs introduced at the hearing fail to
support this suggestion. As an aside, this
Court is well aware, and the testimony at the
evidentiary hearing supports this observation,
that Ware's Trailer Park in 1986 and 1987 was
a well-known problem area which gave rise to
many calls to, and visits by, the Jacksonville
Sheriff's Office not to mention frequent
arrests. The testimony offered regarding the
logs in no way supported the defendant's
suggestion that he had an alibi. Furthermore,
that testimony offered by the defendant
regarding the computer logs turned out to be
essentially irrelevant and more than likely
would not have been permitted as evidence at
the trial.

During the course of his testimony,
Assistant Public Defender, Allan Chipperfield,
initially appointed to represent the
defendant, related that he had attempted to
obtain transcripts of the dispatch tapes
pertaining to the calls documented in the
computer printouts. He learned that the tapes
had already been reused and that their
previous contents were, therefore, unavailable
for anyone. Mr. Chipperfield also testified
that it was his custom at the time to provide
newly appointed counsel with his entire file,
including any progress notes and synopses of
his investigation. This Court concludes that
the information regarding the non-existence of
the dispatch tapes was likely transmitted to
trial counsel. Accordingly, this Court cannot
conclude that there is any deficient

76

performance on the part of trial counsel for
failing to obtain evidence which did not
exist. Lastly, this Court observes that even
had the logs and tapes been found by trial
counsel, their existence would not have
changed the outcome of the trial. Even in the
light most favorable to the defendant, the
computer printouts introduced indicate that
the only possibly pertinent call was made from
Ware's Trailer Park at approximately 9:15 P.M.
on the evening of the murder. According to
the trial testimony of either Lisa Ann Smith
or Debra Hipp, the defendant was seen
returning to the trailer park between 7:30 and
8:00 P.M. on the evening of the murder.

This Court concludes that trial counsel
made both a tactical decision and an ethical
decision not to attempt to establish an alibi
defense. Trial counsel's ethical decision not
to assert an alibi defense was based on his
conclusion that the defendant had acknowledged
his commission of the crimes to trial counsel
and that calling witnesses to establish an
alibi defense was likely subornation of
perjury (1.20, p.205 through 1.12, p.207 E.H.
February 21, 2002). This Court can find no
deficiency on the part of trial counsel for
respecting his ethical obligations as an
attorney.

Furthermore, this Court concludes that
trial counsel made an informed tactical
decision not to attempt to establish an alibi
defense. This Court's consideration of the
trial testimony and the alibi testimony
offered by the defendant during the course of
the evidentiary hearing leads to the
conclusion that, at best the defendant's alibi
was incomplete. This "incompleteness" was
known to trial counsel. According to his
testimony at the evidentiary hearing, it is
his belief that an incomplete alibi defense
does nothing but to lower the credibility of
the defendant's case and strengthen any
weaknesses in the defendant's case. (See,
1.16 through 23, p.207 E.H. February 21,
2002). This Court can find nothing deficient

in the professional mind of trial counsel on
this issue.

In sum, with regard to the issue of the
defendant's purported alibi, this Court can
find nothing inappropriate, much less
deficient, in the performance of trial
counsel. In fact, it appears obvious to this
Court that trial counsel appropriately
complied with his oath of professional
responsibility.

Finally, at least with regard to this
particular issue, this Court notes that the
defendant's presentation at the evidentiary
hearing fails to establish that the defendant
did, in fact, have an alibi which would have
altered the outcome of the trial. Given the
times and locations when defendant was
observed, the time when the victim's husband
left his residence and returned, and the
distance (less than a mile) from Ware's
Trailer Park to the victim's residence, the
defendant still had the opportunity to commit
the crimes for which he stands convicted.

Ex. 56 at 523-28.

Upon Petitioner's appeal, the Florida Supreme Court

adjudicated the claim as follows:

Reed's fifth claim is that the circuit
court erred in finding no ineffective
assistance regarding his trial counsel's
failure to present an alibi defense. At
trial, the victim's husband testified that he
left his wife at home at around 5:40 p.m. and
found her murdered when he returned home at
9:50 p.m. Witness Mike Shelburne testified
that he played a game of "quarters" with Reed
in the morning at the trailer park where they
both lived and later in the day went with him
to the grocery store and a friend's house.
When they left the friend's house at "around
lunch," the car they were in broke down on
Ricker Road. Shelburne decided to walk home,
left Reed with the car, and did not see him

again until Reed woke him at home after dark.
Witness Debra Hipp testified she visited
Reed's girlfriend, Chris Niznik, at around
12:45 p.m. and agreed to lend her car to Reed
if he returned it by 1:30 p.m. because she
needed it then.   He did not return the car,
and she spent the day at the trailer park
anxiously waiting for his return.   Between
7:30 and 8 p.m., she finally saw Reed return
on foot, running between the trailers and
glancing around.   He gave her the car keys,
did not explain the missing car, and went into
his trailer without turning on the lights.
Meanwhile, Hipp's husband had been out looking
for the car and returned around 8:15 or 8:30
p.m.   Witness Lisa Smith, Reed's neighbor,
corroborated Hipp's testimony, testifying she
waited with Hipp and Niznik for Reed's return
and saw Reed return home between 7:30 and 8
p.m., jogging through the trailer park and
acting "scared" and "nervous."   Finally,
Detective Warren testified that the distance
between the location where the car broke down
and the trailer park was 5.1 miles, the
distance between the trailer park and the
victim's home was 1.2 miles, and the
straightest route from where the car broke
down to the victim's home would lead past the
trailer park.

Reed presented no witnesses at trial and
filed a handwritten waiver form indicating
that he maintained his innocence, was never
near the victim's home on the day of her
murder, was not with anyone between the time
Shelburne left him with the car and the time
he returned home, and because he believed "no
witness could establish [an] alibi," had
instructed his counsel to call no witnesses in
order to reserve the right to present first
and last closing arguments.   However, Reed now
claims that his counsel should have presented
alibi testimony from Mark Rainey, Chris
Niznik, and Officer Summersill.   These
witnesses testified to the following at the
evidentiary hearing.   First, Mark Rainey
testified that he joined Patrick Hipp in the
search for Debra Hipp's missing car.   They

found it, towed it back to the trailer park, did not see Reed at that time, and sat at Hipp's trailer "for a while" before they saw Reed "fighting with a guy named Lee." It was dark both when they returned to the trailer park and when he saw Reed. Second, Niznik testified that Reed played cards with Shelburne in the late morning or early afternoon and then borrowed Hipp's car to go to the grocery store with Shelburne at around 1 p.m. Hours went by, and she became angry with him as she waited with Hipp and Smith. At some point, Smith called the police, who arrived but said they could do nothing. When asked what happened next, Niznik testified: "Then it was like starting to get dark and then he came back and it just got dark when he came back." From that time on, he was with her. Smith later called the police a second time because Reed and Lee got into a fight. Third, Officer Summersill testified regarding a computer printout from the Jacksonville Sheriff's Office that indicated a call was received from lot 50 of Reed's trailer park at 6:41 p.m., an officer arrived at 6:57 and left at 7:43, the incident was a disturbance of the peace, and the complainant was a Mrs. Stanford. The printout also indicated that a second call was received from Reed's lot, lot 52, at 9:12 p.m., an officer arrived at 9:21 and left at 9:32, the incident was another disturbance of the peace, and the complainant's name was Lisa Smith. Officer Summersill further testified that on the day of the murder he was dispatched to a location on Ricker Road and encountered Reed, who had been drinking and was in the back seat of a vehicle. His report of the incident noted Reed's clothing but made no mention of the unique baseball cap and indicated this contact was at 4 p.m. He estimated that to travel from the location where he encountered Reed to Reed's trailer park would take forty-five minutes to an hour by foot and five to ten minutes by car; it was another mile from there to the murder site.

Reed's first counsel, Chipperfield,
testified at the evidentiary hearing that he
investigated an alibi defense, including
determining distances and the time of sunset.
He obtained a record indicating the sun set at
6:24 p.m. on the day of the murder, indicated
in notes that he needed to "nail down" the
alibi defense with depositions of Rainey,
Hipp, Niznik, and Lee, and filed a notice of
alibi. He requested that the police preserve
tapes of calls on the day of the murder but
received a letter stating that those tapes
already had been reused. Finally, although he
did not recall meeting with trial counsel, he
testified that it was his practice to talk
with or even give a written summary to new
counsel when a file was transferred.

Nichols testified at the evidentiary
hearing that as he understood the available
testimony, "if you took that evidence in its
best light it still left enough time relative
to the fairly small distances that Mr.
Reed . . . could have committed the crime."
He discussed an alibi defense with Reed, and
Reed acknowledged it would be a fruitless
endeavor. Nichols stated that although he
believed his obligation would be "to hold the
state's feet to the fire and make sure the
evidence is legally gathered and legally
presented and legally sufficient," even where
his client had admitted guilt to him, the
presentation of an alibi witness in such
circumstances would be suborning perjury, and
he would withdraw from the case if the client
pressed him to present it.

In denying this claim, the circuit court
concluded that Reed failed to demonstrate that
his trial counsel rendered deficient
performance. The court held that trial
counsel made a tactical and ethical decision
to not attempt to establish an alibi defense
because the available testimony provided, at
best, an incomplete alibi. We find no error
in that conclusion. Reed's own waiver form
and trial counsel's testimony at the
evidentiary hearing provided competent,

substantial evidence that they discussed the presentation of an alibi defense, determined that the defense was incomplete, and chose instead to reserve the right to present first and last closing arguments.   The record supports the circuit court's conclusion that this was an informed tactical decision, given the available witnesses and their testimony at the evidentiary hearing.   Specifically, Officer Summersill's testimony placed Reed on Ricker Road at 4 p.m. Rainey's testimony did not place Reed at the trailer park until after dark.   And Niznik's testimony placed Reed at the trailer park just after dark.   The sun set at 6:24 p.m.   Thus, taking the testimony in the light most favorable to Reed, he still had approximately 2.5 hours to travel from Ricker Road to the victim's home, commit the murder, and return to the trailer park.   Officer Summersill stated it would take forty-five minutes to an hour to travel by foot the distance from Ricker Road to the trailer park. Presumably, it would take much less time to travel from there to the victim's home and back, given the shorter distance between those locations.   These facts support the circuit court's conclusion that Reed's alibi was, at best, incomplete as he had sufficient time to commit the murder, especially given Hipp and Smith's trial testimony that Reed returned running or jogging.   Furthermore, the fact that Summersill's report did not list the unique baseball cap in Reed's description would have contributed little in the face of other testimony indicating that Reed put on his "lucky hat" while playing cards with Shelburne earlier in the day and was never seen wearing it again after that day.   In fact, as the circuit court correctly noted, the entire encounter with Summersill would have discredited Reed's prior statements to police that he was at home the entire day. Given the relatively low probative value of this testimony, we cannot find error in the conclusion that trial counsel's decision to reserve first and last closing arguments and avoid the presentation of potentially

82

> perjurious testimony was not deficient
> performance.

Reed III at 428-30.

There are qualifying decisions from both the circuit court and the Florida Supreme Court.  Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Deference will be given to the state courts' rulings.

## C. Ground Three

In ground three, Petitioner raises the following claim:

> THE STATE'S FAILURE TO DISCLOSE INFORMATION
> ABOUT FINGERPRINT EXPERT BRUCE SCOTT AND
> POLICE OFFICER DAVIS SUMMERSILL VIOLATED THE
> DISCLOSURE REQUIREMENTS OF BRADY V. MARYLAND
> AND ITS PROGENY.

Petition at 58.

Petitioner raised this issue in his 3.850 motion, and the circuit court adjudicated it as follows:

> The defendant contends that the state
> violated the tenets of Brady v. Maryland, 373
> US 83, 83 S.Ct. 1194, 10 LED 2d 215 (1963).
> According to the defendant, this violation
> occurred when the state failed to disclose
> that [the] Florida Department of Law
> Enforcement (FDLE) fingerprint examiner had
> been suspended, then resigned, from the FDLE
> for use of cocaine.

83

A summary of the testimony at the evidentiary hearing is as follows: On or about April 7, 1986, fingerprint examiner Scott compared the defendant's known fingerprint to the latent print found on the victim's check found in her backyard on the evening of her death.  Scott positively identified the fingerprint on the check as being that of the defendant.  He prepared a written report. Because of a policy in effect at the time within the laboratory, Scott's supervisor and fellow fingerprint examiner, Ernest Hamm, did an independent comparison of the items and confirmed Scott's positive identification of the defendant.  Scott and Hamm worked closely both on a professional level and a physical level as they shared the same laboratory. Scott's trial testimony in November 1986, identifying the defendant led to the defendant's earlier claim regarding trial counsel's failure to retain an individual fingerprint examiner.

Steve Platt, chief of the Jacksonville FDLE crime lab in 1986 (now senior crime laboratory analyst) testified that sometime in the month of June 1986, Bruce Scott came to him and reported that over some time Scott had been collecting cocaine residue from exhibits which he had analyzed.  Scott further reported to Platt that he had, on occasion, tasted and sniffed the collected residue.  Platt believed that Scott may have been under the influence of something at the time of this conversation. Scott was immediately suspended.

Thereafter, representatives of the supervisory section of the FDLE conducted additional interviews with Scott.  Those interviews developed no further evidence against Scott.  As part of the investigation, all of Scott's cases for the preceding eighteen (18) months were reviewed and no deficiencies were noted.  During the course of this internal investigation, Scott resigned sometime in June 1986.

The results of the internal investigation were referred to then Assistant State Attorney Steve Kunz, now Assistant United States Attorney, for consideration. Because the only evidence against Scott was his own report of his shortcomings to his supervisors, and because of Florida's evidentiary rules regarding the establishment of a *corpus delicti,* and because there was virtually no other evidence against Scott, Kunz declined prosecution.  While Kunz probably discussed the matter with his superiors, he had no recollection of discussing the matter with the trial prosecutor, Assistant State Attorney George Bateh.

Assistant State Attorney Bateh testified at the evidentiary hearing that no one had ever told him about any shortcomings on the part of Bruce Scott.  According to his recollection, he first heard of Scott's resignation either by way of the defendant's 3.850 motion or the defendant's public records request.  Bateh further testified that had he known of the reason for Scott's resignation, he likely would have notified defense counsel, but would have simply used fingerprint examiner Hamm as his trial witness instead of Scott.  As mentioned earlier in this order, trial counsel testified that at the time he was aware of FDLE's policy requiring a supervisor's confirmation of any examiner's fingerprint identification.

It is, perhaps, too obvious to mention, but it seems apparent that Scott was not visibly under the influence of any substances at the trial as the trial court allowed him to testify and as his testimony comprises some forty (40) pages of trial transcript.

Upon the foregoing, this Court concludes that there has been no *Brady* violation as none of the evidence regarding examiner Scott would have been admissible.  There has been no showing by the defendant that Scott was under the influence of anything at the time of his examination, in fact, the subsequent internal

investigation found no deficiencies in any of his cases for the eighteen (18) months preceding his resignation, and, as noted previously, there has been no evidence indicating that Scott's trial testimony was in any way tainted. Scott was never arrested, never prosecuted, and (to be technical) was never terminated by FDLE for his actions. Furthermore, his closest associate, examiner Ernest Hamm, never saw Scott in any condition which he believed was Scott was [sic] under the influence of anything, never suspected any wrongdoing on the part of Scott, and to this day, remains confident that Bruce Scott was a competent qualified fingerprint examiner. Even were Scott to have been arrested, prosecuted, and imprisoned, none of this would have in any way affected the outcome of the defendant's trial. Fingerprint examiner Hamm was available to the state and would have testified to the positive identification of the defendant's fingerprints found at the scene of the murder.

This Court finds support for this conclusion in at least two (2) cases referred to by the state. In Breedlove v. State, 580 So.2d 605 (Fla. 1991), in a Rule 3.850 appeal, the Florida Supreme Court found that the state's failure to reveal criminal conduct on the part of an investigating officer was not, under the circumstances, a Brady violation as the officer's criminal conduct was not relevant to the evidence at trial. Among Mr. Breedlove's assorted appeals, one will also find Breedlove v. Moore, 2002 WL 63184 (11th Cir. 2002) wherein the 11th Circuit agreed that inadmissible evidence is not material for Brady purposes unless it would also lead to the discovery of admissible evidence. During the course of the evidentiary hearing, nothing was developed by the defendant which would even remotely suggest that there was other admissible evidence, nor, and more importantly, that there was anything inappropriate, wrong, incorrect, or fundamentally detrimental to the defendant with regard to the identification of his

> fingerprint at trial.  Accordingly, this Court
> concludes that the defendant has failed to
> support this particular claim.

Ex. 56 at 542-45.

Upon Petitioner's appeal, the Florida Supreme Court addressed

this issue as follows:

> Reed's sixth claim is that the circuit
> court erred in finding no Brady violation
> regarding a criminal investigation of Bruce
> Scott, the State's fingerprint expert.  In
> Strickler v. Greene, 527 U.S. 263, 281-82, 119
> S.Ct. 1936, 144 L.Ed.2d 286 (1999), the United
> States Supreme Court enunciated the three
> components of a true Brady violation as
> follows: "The evidence at issue must be
> favorable to the accused, either because it is
> exculpatory, or because it is impeaching; [2]
> that evidence must have been suppressed by the
> State, either willfully or inadvertently; and
> [3] prejudice must have ensued."  Under the
> prejudice prong, the defendant must show that
> the suppressed evidence is material.  See id.
> at 282, 119 S.Ct. 1936.  "[E]vidence is
> material only if there is a reasonable
> probability that, had the evidence been
> disclosed to the defense, the result of the
> proceeding would have been different.  A
> 'reasonable probability' is a probability
> sufficient to undermine confidence in the
> outcome."  Way v. State, 760 So.2d 903, 913
> (Fla. 2000) (quoting United States v. Bagley,
> 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d
> 481 (1985)).

> Steven Platt, Bureau Chief at FDLE at the
> time of Reed's case, testified at the
> evidentiary hearing that Scott confessed to
> him in June of 1986 that he had been consuming
> cocaine powder residue from evidence bags in
> the crime lab.  Platt reported the confession
> to his superiors, and FDLE reviewed Scott's
> cases from the prior eighteen months,
> including his identification of Reed's
> fingerprint on April 7.  Scott was suspended

87

on June 4 and resigned prior to June 17.  FDLE
conducted an internal investigation and
involved the State Attorney's office in order
to determine if there had been a prosecutable
offense.  As cases on which Scott had worked
were brought to trial and FDLE received
subpoenas for trial and deposition, the State
Attorney's office was informed that Scott had
resigned during the course of an internal
investigation.  Finally, Platt testified that
Scott's work was always reviewed by his
supervisor, Ernest Hamm, who testified at the
evidentiary hearing and lent full support to
Scott's abilities and identification.

Former Assistant State Attorney Steve
Kunz testified that although the Scott
investigation was referred to the State
Attorney's office for Duval County, Scott was
not prosecuted because "there was no corpus
for the criminal offense" beyond Scott's own
admission.  The circuit court admitted a
letter written by Kunz on August 28, 1986,
informing FDLE that criminal charges would not
be filed against Scott for that reason.  Kunz
testified that he would have discussed the
case with his supervisor but did not recall
discussing it with the prosecutor in Reed's
case, who also testified that no one told him
about the Scott investigation.  The prosecutor
further testified that had he known about it,
he likely would have notified Reed's counsel
but simply presented the testimony of Ernest
Hamm instead.

In denying Reed's <u>Brady</u> claim, the
circuit court cited <u>Breedlove v. State</u>, 580
So.2d 605 (Fla. 1991).  We agree with the
circuit court that the <u>Breedlove</u> decision
supports the conclusion that even if this
evidence was erroneously withheld, prejudice
did not ensue.  In <u>Breedlove</u>, this Court
wrote:

> While defense witnesses may be
> impeached only by proof of
> convictions, the rule regarding
> prosecution witnesses has been

expanded. Thus, this Court has
stated: "[I]t is clear that if a
witness for the State were presently
or recently under actual or
threatened criminal charges or
investigation leading to such
criminal charges, a person against
whom such witness testifies in a
criminal case has an absolute right
to bring those circumstances out on
cross-examination[.]" Fulton v.
State, 335 So.2d 280, 283-84 (Fla.
1976) (quoting Morrell v. State, 297
So.2d 579, 580 (Fla. 1st DCA 1974))
. . . .

This reasoning has been
generally accepted when a state
witness has been charged with a
crime. . . .

If a state witness is merely
under investigation, however, the
ability to cross-examine on such
investigation is not absolute.
Instead, any criminal investigation
must not be too remote in time and
must be related to the case at hand
to be relevant.

580 So.2d at 607-08. The Court then reviewed
numerous cases in support of this conclusion.
Significantly, although Breedlove was decided
after Reed's trial, many of the cases cited
therein, including this Court's Fulton
decision, preceded Reed's trial. The
Breedlove decision indicates that in order for
Reed to have introduced at trial for
impeachment purposes evidence of Scott's
cocaine use and the subsequent investigation,
he first would have been required to show that
the investigation was both related to Reed's
case and not too remote in time. Although the
investigation occurred in the same year as
Reed's trial, it is important to note that
Scott's testing of the fingerprints in this
case was completed prior to his confession and
the investigation, and his testimony at Reed's

trial occurred after the State Attorney's
office had already concluded it could not and
would not press charges against Scott.  More
importantly, the investigation into Scott's
cocaine use is not sufficiently related to
Reed's case to have permitted its admission.
Unlike those cases noted in <u>Breedlove</u> where
the particular facts indicated that a witness
had a reason to present false testimony in a
specific case, here Reed's allegation of bias
is general.  His theory does not explain why
Scott gave specific testimony in Reed's case
but rather why Scott was willing to give
testimony favorable to the State in any case.
Therefore, we agree with the circuit court
that this evidence would not have been
admissible even if provided to the defense.
Further, it is clear that Reed was not
prejudiced by the lack of this evidence.  The
State could have and likely would have
presented Hamm's testimony in substitution.
Because the third prong of <u>Brady</u> has not been
met, we affirm the denial of this claim.FN9

> FN9. Reed asserts a second <u>Brady</u>
> claim that the State failed to
> disclose the existence of Officer
> Summersill, who possessed
> information about Reed's whereabouts
> on the afternoon of the murder.  In
> its final order below, the circuit
> court failed to address Officer
> Summersill with regard to the <u>Brady</u>
> claim.  However, in addressing
> Reed's alibi claim, the court did
> conclude that trial counsel was not
> ineffective in failing to discover
> the existence of the police report
> documenting Officer Summersill's
> contact with Reed.  The court
> concluded use of the report at trial
> "would have done nothing more than
> to damage the defendant as its
> contents certainly would have been
> used by the state to impeach the
> defendant's statement given to the
> police [that he had been home the
> entire day]."  Postconviction order

90

at 14. The circuit court's conclusion that Officer Summersill's report and testimony would have been harmful rather than helpful implies that it also found no <u>Brady</u> violation because prejudice did not ensue. Because the timing of Officer Summersill's contact with Reed was such that it was neither inconsistent with the State's evidence nor supportive of an alibi defense, we likewise conclude that no <u>Brady</u> violation occurred since prejudice has not been proven.

<u>Reed III</u> at 430-32 (footnote omitted).

There are qualifying decisions from both the circuit court and the Florida Supreme Court. Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Deference will be given to the state courts' rulings.[26]

_____

[26] Petitioner also claims that the state courts did not consider the prejudicial, cumulative effect of the withheld evidence. Petition at 64. Since Petitioner was not prejudiced by the failure to receive information about Mr. Scott's cocaine use or information from Officer Summersill about Petitioner's whereabouts on the afternoon of the murder, there can be no prejudicial cumulative effect from the failure to receive this information.

## D. Ground Four

In ground four, Petitioner raises the following claim:

> MR. REED WAS DENIED THE EFFECTIVE ASSISTANCE
> OF COUNSEL AT THE PENALTY PHASE AND SENTENCING
> PHASE OF THE CAPITAL PROCEEDINGS, IN VIOLATION
> OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
> TO THE UNITED STATES CONSTITUTION.   COUNSEL
> FAILED TO ADEQUATELY INVESTIGATE AND PREPARE.
> A FULL ADVERSARIAL TESTING DID NOT OCCUR.

Petition at 65.  Petitioner presents two sub-claims in this ground.

In sub-claim A, Petitioner contends that counsel was ineffective for failing to present evidence of mitigating circumstances.  Petitioner raised this claim in his 3.850 motion, and the circuit court adjudicated it as follows:

> Neither defense mitigation evidence nor
> further aggravation evidence from the state
> was presented to the jury.  Counsel merely
> presented argument and the matter was
> submitted for the jury's recommendation.  The
> defendant now contends that trial counsel was
> ineffective for failing to present mitigation
> evidence relating to his family and personal
> background (this claim), and failing to
> present mitigating psychiatric/psychological
> testimony (the next claim).

> At the evidentiary hearing, it was
> uncontroverted that the defendant specifically
> refused to permit trial counsel to offer
> mitigation which would in any way suggest his
> guilt of the crimes with which he had been
> charged.  Furthermore, apparently on at least
> two (2) occasions, the defendant instructed
> trial counsel not to involve family members in
> the trial.  (See 1.21, p.210 through 1.9,
> p.212 E.H. February 21, 2002.)  That the
> defendant gave trial counsel such instructions
> is confirmed (albeit indirectly) by the
> handwritten waiver form signed by the
> defendant.  While the form is more directly

92

related to the defendant's waiver of trial evidence, paragraphs seven (7) and twelve (12) confirm trial counsel's testimony regarding the defendant's instructions declining any evidence of his guilt.  It also confirms that trial counsel and the defendant discussed the admission of psychological evidence.   The entire form is included herewith to insure context.  (Bolding is supplied.)

1.   I am Grover Reed, the defendant in 1st Degree Murder case in Duval County, Fla., Cs# 86-6123 CF Div.W.

2.   Throughout this case both publicly and privately and in all conversations with my attorney I have constantly maintained my complete innocence of all these charges.

3.   I have complete and clear recollection of the events before during, and after Feb. 27, 1986. There are no voids or gaps in my memory of this period.

4.   On Feb. 27, 1986 I was never at or near the residence of Betty Oermann, the victim in this case.

5.   I have not provided my attorney with the names of any people who were with me from the time Mike Shelboure left me with the broken down auto (about 2:30 p.m. 2-27-86) until I returned home to the trailer park because I was not with nor did I

see anyone whose name I
know during that time.

6.   My attorney has discussed
with me the possibility
of a defense based on a
theory that I in fact
killed the victim but was
temporarily insane.

**7.   I have refused to allow
my attorney to as[s]ert
or put forward any
defense which assumes or
implies I murdered Betty
Oermann.**

8.   I understand the State
argues 1st and last
during closing argument
. . . if I call any
witnesses other than
myself.  But my attorney
argue[s] 1st and last if
I call no witness other
than myself.

9.   Although my attorney and
I have discussed calling
certain witnesses I
believe that no witness
could establish and [sic]
alibi for me and no
witness could contribute
evidence which was not
available either through
my own testimony, if I
testify, or through the
state[']s own witnesses.

10.  I have therefore
instructed my attorney to
call no witnesses nor to
offer any evidence in my
behalf so my attorney can
have 1st and last
argument in [sic.]

11. My attorney has advised me that there is a high likelihood that I will be convicted of 1st Degree Murder and if convicted that I will be given the death penalty.

**12. My attorney has advised me that he believes the chances of being sentenced to death were hypothetically <u>less</u> if I pled guilty and presented mitigating psychological evidence.**

13. No offers have been made by the State to induce me to plead.

14. I have advised my attorney that although I understand his advice I will not plead guilty because I am not guilty.

11-19-86

(Signed Grover B. Reed)

This court concludes that the defendant waived the presentation of mitigation evidence by his instructions to counsel. He cannot now be heard to complain.

At the evidentiary hearing, the defendant called a brother, a sister, and a former school coach. Although the brother and sister related that they were aware of the defendant's trial, both agreed the defendant had not contact[ed] them and that they had only gleaned this information through the defendant's grandmother. According to their testimony, it was this grandmother who provided most of the maternal supervision for the defendant during his formative years.

All three (3) defense witnesses on this issue testified to the defendant's horrific childhood, his substance abuse, and his propensity to violence.  None of them testified that they had attempted to contact the defendant's lawyer and offer themselves to testify.  Having heard their testimony, this Court observes that it is quite plausible to conclude that in 1986, no one in this family, residents of a rural area near Nashville, Tennessee, had the financial wherewithal to travel to Jacksonville to testify.  The defendant has offered no evidence that they were actually available to testify at trial. In fact, though the matter was not raised by either side during the course of the evidentiary hearing, at the presentation of mitigating evidence to the trial judge, trial counsel related that certain witnesses were unavailable to testify. (p 916, TT).

> I want to alert the Court, too, that we had passed the matter to today to try to get witnesses here from out of state to testify in Mr. Reed's behalf, primarily in the fashion of character witnesses and because of finances and logistics, none of those people are available and I don't have any reasonable likelihood that they're going to be available so I cannot and will not at this time ask the Court to delay this hearing any further on that basis.

Nothing in the record indicates that these family members were the witnesses of which trial counsel spoke.  In assessing the evidentiary hearing testimony, this Court concludes that it is highly unlikely that the jury would have considered this evidence to be mitigating.  In fact, the brother related an instance in which he had taken the defendant into his residence because of the defendant's destitute situation.  During the course of that stay, the brother found that the defendant was continuing his substance abuse

and essentially evicted him from his home.
Sometime during the course of this conflict,
the defendant threatened the brother's wife.
These facts, had they been heard by the jury,
seem to be entirely too similar to the
evidence adduced during trial, that being that
the defendant was again taken into someone's
residence, again lost his permission to be in
the residence, and again threatened the woman
of the house.  The jury might also have heard
that on one (1) occasion, the defendant had
actually physically abused his grandmother and
broken her nose.  Without regard to this
Court's observations hereafter, had this
evidence been known to trial counsel at the
time, it is likely that he would not have
opted to introduce it.  If nothing else, the
evidence would tend to support the state's
trial position that the defendant was a
substance abuser prone to violence.

It should also be noted that had these
family members testified, they would have more
than likely been cross-examined by the state
on the defendant's criminal record, his
substance abuse, his propensity to violence
and his otherwise questionable character.
Although trial counsel might not actually have
known at the time what the family members
would have testified to (as he followed his
client's instructions not to contact them), it
is implausible to believe that he would have
called them to the stand to have the jury
learn anything about his client which was
consistent with the state's position in the
case.

Lastly, this Court notes that the
testimony of the defendant's brother at the
evidentiary hearing supports trial counsel's
testimony that the defendant wanted his family
members to have no part in the defense.
According to the brother, the defendant left
Tennessee following a fight with the brother
and was never heard from again until the
grandmother, at some point, related the
defendant's situation.  In fact, the brother
testified at the evidentiary hearing that it

97

was some ten (10) years later when he was
actually contacted by anyone (and it wasn't
the defendant) regarding the case against the
defendant.  That the defendant didn't contact
his brother for at least ten years confirms
the defendant's desire that his family not be
involved in his defense.

Forgetting for a moment this Court's
conclusion that defendant effectively waived
the opportunity to present mitigation
evidence, upon the evidence actually presented
at the evidentiary hearing, this Court cannot
conclude that there was any deficiency on the
part of counsel had the witnesses been
available for trial.  It seems obvious that
the negative nature of their testimony about
the defendant would have been so damaging to
the defendant as to far outweigh any
mitigative qualities that there may have been
to the evidence regarding the defendant's less
than pleasant childhood.  Accordingly, even if
the evidence had been known to trial counsel,
this Court cannot conclude that, had the
witnesses testified, there would have been any
difference in the outcome of the trial.  In
fact, it appears more likely than not that had
they testified, the result would have been
virtually the same.

In sum, this Court concludes that the
defendant has failed to establish any
deficiency on the part of trial counsel for
failing to call the family members proposed as
witnesses by the defendant.

.  .  .  .

The defendant contends that trial counsel
was ineffective in failing to present
psychiatric/psychological testimony during the
penalty phase of his trial. As previously
noted, at the instruction of the defendant, no
mitigation evidence was presented to the jury.

It should also be noted at this point
that, although counsel did not present
mitigation evidence to the jury, he did

present mitigation evidence to the trial
court. That evidence consisted of the reports
of Dr. Ernest Miller, a local psychiatrist,
who had examined the defendant at the request
of trial counsel during the course of his
representation of the defendant. Dr. Miller's
report documented the defendant's substance
abuse, huffing of gasoline, and other
psychiatric imbalances which were presumably
considered by the trial court. In addition,
trial counsel introduced hospital admission
records indicating drug dependency, and
records from a mental health facility showing
mental health problems. (pp. 921-922, TT).
Although the undersigned has not actually
reviewed these records, the state's post-
evidentiary hearing memorandum indicates that
the records contained a diagnosis of "chronic
lead poisoning encephalopathy with seizure
disorder."

At the evidentiary hearing, the defendant
called Dr. James Larson in support of this
claim. Dr. Larson is a clinical psychologist
with extensive experience in forensic
evaluations. Dr. Larson had been retained by
former post-conviction counsel to examine the
defendant approximately six (6) years after
the trial, and thus, approximately ten (10)
years before the evidentiary hearing.

Upon that examination, Dr. Larson
concluded that while the defendant had the
capacity to appreciate the criminality of his
conduct, his capacity to conform his conduct
to the law was impaired. (11.6-9, p.75, E.H.
February 19, 2002). In his diagnosis, Dr.
Larson concluded that the defendant exhibited
impaired judgment, educational deprivation,
cultural deprivation, physical abuse,
emotional abuse, drug use, and organic brain
syndrome, as non-statutory mitigation factors.
Based on the defendant's own history related
to Dr. Larson, Dr. Larson noted that
defendant's biological mother had killed his
father (however, Reed was an infant and had no
personal recollection of this event), that
defendant's mother had numerous paramours and

99

was an alcohol abuser, that one of the assorted husbands of the defendant's mother had been abusive to the children, that the defendant had resided with his maternal grandmother in a relatively stable environment, that the defendant had been placed in special education classes, that the defendant began abusing alcohol and huffing gasoline at an early age, that the defendant denied huffing gasoline on the day of the murder, that the defendant at one time had been treated for head trauma of some form, and that the defendant had been committed to a psychiatric facility during his youth.  Dr. Larson also acknowledged that the defendant was neither schizophrenic nor psychotic and was not delusional.

Dr. Larson's main conclusion was that the defendant had an anti-social personality disorder coupled with a narcissistic personality disorder.  Dr. Larson opined that individuals with such disorders tend to be selfish, self-indulgent, and frequently seek thrills without regard to their consequences. He also related that such individuals, including the defendant, are likely to be people who exploit others.  Dr. Larson also acknowledged that persons with these disorders are "a criminal personality" and agreed that the disorder is a "predisposition to criminality."   At one point, Dr. Larson advised the post-conviction prosecutor that the defendant's sort of disorder "gives you a job because so many of the people you prosecute would suffer from that kind of disorder." (See, at least, pp.62-64, 67-68, and 70-78, E.H., February 19, 2002).  During the course of his testimony, Dr. Larson acknowledged that certain aspects of his examination and testimony might be more helpful to the state than to the defense. (11.14-20, p.49, E.H., February 19, 2002). Dr. Larson also acknowledged that it was not out of the ordinary for defense counsel to "steer away" from using Dr. Larson as a witness when his conclusion was that their client had the same anti-social personality

disorder exhibited by defendant Reed.  (1.18, p.70 through 1.16, p.71, E.H., February 19, 2002).

Assuming for a moment that trial counsel had the defendant's permission to present this form of mitigation evidence, which he did not, this Court concludes that trial counsel would not have offered the testimony of Dr. Larson anyway.  Such a decision would have been appropriate given the facts of the murder and rape of which the defendant was convicted and the nature of Dr. Larson's diagnosis.  This Court concludes that it is all too likely that this sort of psychiatric testimony would have fit perfectly into the picture of the defendant painted by the state at trial, a substance abuser whose self-indulgence permitted him to commit unrestrained acts against others, including those who had ventured to love and care for him.

At the evidentiary hearing, Assistant Public Defender [Chipperfield], initial trial counsel, testified that the concept of offering psychiatric/psychological mitigation evidence is "a real complicated one" where the defendant is diagnosed as a sociopath or with an anti-social personality.  According to Mr. Chipperfield, "It is hard to put on a penalty phase where that's your only diagnosis."  He further acknowledged that such a diagnosis is not a "real favorable" one, and that at least a large part of the problem is that the diagnosis of anti-social personality is one of a person who basically has no regard for the rights and feelings of others. (1.17, p.95 - 1.16, p.96, E.H., February 21, 2002).

Trial counsel testified at the evidentiary hearing that (had Dr. Larson examined the defendant before trial), trial counsel would not have put before the jury the fact that defendant suffered from anti-social personality disorder.  Trial counsel related that he didn't think a jury would find that sort of evidence mitigating because anti-social personality disorder with narcissistic

tendencies is "essentially the profile of a
person who was going to be violent when it
fits their need." Trial counsel was further
concerned that effective cross-examination by
a prosecutor would have brought all of this
information out before the jury.

On this issue, then, this Court concludes
that the defendant has failed to establish a
deficient performance on the part of trial
counsel. Even had the defendant granted his
permission to present such evidence to the
jury, trial counsel understandably would not
have done so. Having heard the testimony of
Dr. Larson, this Court concludes that, had he
testified at trial, the primary thrust of his
testimony would have resulted in aggravation
against the defendant rather than mitigation
for the defendant. Even Dr. Larson
acknowledged that it's not likely that he
would have been called as a witness for the
defense.

Ex. 56 at 532-40.

Upon Petitioner's appeal, the Florida Supreme Court addressed

the issue as follows:

Reed's ninth claim is that the circuit
court erred in finding no ineffective
assistance regarding his trial counsel's
failure to present mitigation. The record
reflects that at the beginning of the penalty
phase, Reed's trial counsel informed the court
that he had reviewed aggravating and
mitigating factors with Reed and discussed
those he believed applied. He also stated
that he informed Reed of his right to take the
stand, Reed had "steadfastly maintained his
innocence," and Reed did not wish to take the
stand. The court then inquired of Reed, who
affirmed his counsel's statements were true,
and the penalty phase went forward with
neither side presenting additional evidence
but both making penalty-phase arguments.
After the jury delivered its eleven-to-one
recommendation of a death sentence, the judge

reviewed a presentence investigation report, a
psychiatric examination report by Dr. Ernest
Miller and Karen Kaldor, and mitigating
evidence presented by Reed's trial counsel in
the form of past medical records.FN12

> FN12.  The presentence investigation
> report contained a socioeconomic
> status report indicating: Reed's
> highest completed grade was the
> eighth grade; he previously was
> employed as a laborer and had five
> jobs in the prior two years; his
> father died in 1961 after being shot
> by his mother in self-defense; he
> had a one-year-old child to whom he
> provided voluntary support; he was
> diagnosed as suffering from lead
> intoxication and multiple substance
> abuse problems in 1981; and he was
> hospitalized for approximately one
> month at that time due to what Reed
> described as a "nervous breakdown."
> Additionally, the report contained
> comments by Reed's grandmother
> indicating that she never knew him
> to want to hurt anyone, believed his
> stepfather whipped the children and
> withheld food, and gained custody of
> her grandchildren due to Reed's
> mother's alcoholism and lack of
> interest in the children.  The
> psychiatric examination report
> indicated mental status and
> neurologic testing were performed on
> Reed, as well as an extensive
> background review.  The report
> repeated that Reed had an eighth
> grade education, was taken from his
> mother due to her alcoholism, and
> was treated in 1981 for lead
> encephalopathy related to the
> inhalation of gas fumes. The report
> reflected a normal waking
> electroencephalogram and a clinical
> impression of substance abuse
> disorder.  The past medical records
> reflected Reed's long history of

gasoline sniffing, Valium abuse, and
the resulting lead encephalopathy
and seizure disorder upon drug
withdrawal.   They also contained
doctors' notes indicating Reed had
previously shown bizarre and abusive
behavior and combativeness at home.

At the evidentiary hearing below, Reed
presented family background testimony by his
brother, sister, and former coach, as well as
mental health testimony by psychologist James
Larson.   Reed argued that, considering the
strength of the evidence against him in the
guilt phase, his trial counsel should have
investigated, developed, and presented a
strong body of mitigating evidence.   In
response, the State presented Reed's trial
counsel, who testified that (1) Reed had
rejected the use of testimony about his mental
condition because he did not want his counsel
to argue any circumstances that would imply
guilt, and (2) Reed rejected the use of
testimony by family and friends because he did
not want them involved in his trial.   He also
testified that he explained to Reed prior to
trial the risk of not preparing mitigation
given the high likelihood he would be
convicted and again discussed the matter with
him immediately after the conviction.

In denying Reed's claim that his counsel
was ineffective for failing to present
mitigating evidence, the circuit court wrote:

[I]t was uncontroverted that the
defendant specifically refused to
permit trial counsel to offer
mitigation which would in any way
suggest his guilt of the crimes with
which he had been charged.
Furthermore, apparently on at least
two (2) occasions, the defendant
instructed trial counsel not to
involve family members in the trial.
That the defendant gave trial
counsel such instructions is
confirmed (albeit indirectly) by the

104

handwritten waiver form signed by
the defendant.  While the form is
more directly related to the
defendant's waiver of trial
evidence, paragraphs seven (7) and
twelve (12) confirm trial counsel's
testimony regarding the defendant's
instructions declining any evidence
of his guilt.  It also confirms that
trial counsel and the defendant
discussed the admission of
psychological evidence.

Postconviction order at 21.  The court further
noted that Reed's brother's testimony-that he
and Reed had a fight, after which Reed left
Tennessee and was never heard from again and
that Reed did not contact him during the ten
years following the trial-confirmed that Reed
did not want his family involved in his
defense.  The court thus concluded that Reed
waived the presentation of mitigating evidence
by his instructions to his counsel and could
not now be heard to complain in postconviction
proceedings.FN14

FN14.  We note that this conclusion
is not inconsistent with this
Court's case law.  See Sims v.
State, 602 So.2d 1253, 1257-58 (Fla.
1992) (finding no error in trial
counsel's failure to investigate
mitigating evidence where client
directed counsel not to; "Counsel
certainly has considerable
discretion in preparing a trial
strategy and choosing the means of
reaching the client's objectives,
but we do not believe counsel can be
considered ineffective for honoring
the client's wishes.").

In addition to finding the claim
precluded by Reed's prior waiver, the circuit
court concluded, given the nature of the
evidence presented at the hearing below, that
"it is highly unlikely that the jury would
have considered this evidence to be

105

mitigating."   Postconviction order at 24.
Specifically, regarding the family background
testimony, the court wrote:

> In fact, the brother related an
> instance in which he had taken the
> defendant into his residence because
> of    the    defendant's    destitute
> situation.    During the course of
> that stay, the brother found that
> the defendant was continuing his
> substance abuse and essentially
> evicted him from his home.  Sometime
> during the course of this conflict,
> the    defendant    threatened    the
> brother's wife.   These facts, had
> they been heard by the jury, seem to
> be   entirely   too   similar   to   the
> evidence adduced during trial, that
> being that the defendant was again
> taken   into   someone's   residence,
> again lost his permission to be in
> the residence, and again threatened
> the woman of the house.   The jury
> might also have heard that on one
> (1) occasion, the defendant had
> actually   physically   abused   his
> grandmother and broken her nose....
> [H]ad this evidence been known to
> trial counsel at the time, it is
> likely that he would not have opted
> to introduce it.   If nothing else,
> the evidence would tend to support
> the state's trial position that the
> defendant was a substance abuser
> prone to violence.

> .   .   .   [H]ad these family
> members testified, they would have
> more than likely been cross-examined
> by the state on the defendant's
> criminal   record,   his   substance
> abuse, his propensity to violence
> and his otherwise questionable
> character.

Postconviction order at 24.  And regarding the
mental health testimony, the court reviewed

Dr. Larson's testimony, the main conclusion of which was that Reed had an antisocial personality disorder coupled with a narcissistic personality disorder and found "it is all too likely that this sort of psychiatric testimony would have fit perfectly into the picture of the defendant painted by the state at trial, a substance abuser whose self-indulgence permitted him to commit unrestrained acts against others, including those who had ventured to love and care for him."  Postconviction order at 28.

We conclude that the circuit court properly applied the law to this claim and that competent, substantial evidence supports the circuit court's ruling.  First, we note that trial counsel clearly investigated or was aware of Reed's background and mental health to an extent, as evidenced by the presentence investigation report, psychiatric report, and medical records presented to the trial court for penalty-phase consideration.  Those reports and records contained much of the mitigating information testified to by Reed's brother and sister.  Second, we agree with the circuit court that even if Reed's counsel had gone against his client's wishes and investigated further, the testimony that could have been presented was just as likely to have resulted in aggravation against rather than mitigation for Reed.

An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword.  See, e.g., Carroll v. State, 815 So.2d 601, 614-15 & n.15 (Fla. 2002); Asay v. State, 769 So.2d 974, 988 (Fla. 2000).  Here, the family background testimony involved numerous facts that placed Reed in a very negative light, such as that he once broke his grandmother's nose, abused drugs over many years, was jailed on various occasions, continued his drug use after his brother took him in on the condition that he stop using drugs, and threatened to kill his brother's wife.  Not only was this evidence

negative in general but was also particularly disadvantageous in light of the facts of the crime.  It would have opened the door for the State to draw a parallel between Reed's violent reaction to being evicted from his brother's home due to his drug use and the victim's murder after she and her husband discontinued assistance to Reed, also due in part to his drug use.  Also, testimony regarding Reed's violence toward his grandmother and threats toward his brother's wife would have established a pattern of violence against women who had taken him into their homes.  As for the mental health evidence, the circuit court correctly noted that Dr. Larson himself acknowledged certain aspects of his examination and testimony might have been more helpful to the State than the defense.  Furthermore, this Court has acknowledged in the past that antisocial personality disorder is "a trait most jurors tend to look disfavorably upon."  Freeman v. State, 852 So.2d 216, 224 (Fla. 2003).

We further conclude that the instant case is distinguishable from Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in which the United States Supreme Court found the decision of Wiggins' counsel not to expand their investigation into mitigation fell below the prevailing professional standards.  The primary concern in Wiggins was that Wiggins' counsel's failure to thoroughly investigate "resulted from inattention, not reasoned strategic judgment." Id. at 2537.  In the instant case, however, there is competent, substantial evidence that Reed's counsel advised Reed of the risks of not presenting mitigation evidence and that Reed steadfastly rejected both its investigation and presentation.  Furthermore, in Wiggins, the Court found that his counsels' failures prejudiced Wiggins because they never learned of much of his life history.  Here, however, a comparison of the testimony given at the evidentiary hearing with the information contained in the presentence investigation report, psychiatric examination

108

report, and past medical records obtained and presented by Reed's counsel reveals Reed's counsel was aware, even without further investigation, of the family and medical facts of Reed's background relevant to mitigation, including that Reed's education was limited, his father died after being shot by his mother, his mother suffered from alcoholism, and he was previously diagnosed as suffering from lead encephalopathy and substance abuse problems.

Reed III at 434-37 (footnotes and 13 and 15 omitted).

Petitioner argues that the state courts' adjudications of this claim are contrary to and an unreasonable application of clearly established federal law as set forth in Rompilla v. Beard, 545 U.S. 374, 386-91 (2005) (finding that defense counsel was ineffective for failing to examine a file on the defendant's prior conviction for rape and assault because the file contained evidence of potential mitigating factors, including a statement by a corrections counselor outlining the defendant's upbringing in a slum environment, test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders and test scores showing a third grade level of cognition after nine years of schooling), Wiggins v. Smith, 539 U.S. 510, 523-27 (2003) (finding that counsel's failure to investigate the petitioner's life history for mitigating evidence for the penalty phase of his murder trial, beyond reviewing a presentence investigation report and department of social services records, fell short of prevailing professional standards; the investigation

into mitigating evidence should have comprised efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence), Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (finding that defense counsel's failure to investigate and present any mitigating evidence at sentencing in a capital murder case was deficient performance, where counsel failed to present record evidence of the defendant's substantial alcohol and drug consumption and lack of sleep before the murder, favorable expert testimony regarding the defendant's cognitive ability to conform his conduct to the law, evidence of the defendant's history of drug and alcohol abuse, and evidence of his dysfunctional upbringing) and Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003) (finding that a tactical or strategic decision is unreasonable if it is based on a failure to understand the law, and further finding that the failure to conduct any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonable professional norms).  See Reply at 35-45.

However, this case is distinguishable from Rompilla, Wiggins, Williams and Hardwick.[27]  As noted by the Florida Supreme Court, the

---

[27] As will hereinafter be discussed, this is not a case where counsel's failure to understand the law resulted in the failure to present mitigating evidence.  Instead, the state courts found that Petitioner specifically instructed counsel not to present mental health mitigation or mitigation testimony from family and friends to the jury.

record reflects that Mr. Nichols "was aware, even without further investigation, of the family and medical facts of Reed's background relevant to mitigation, including that Reed's education was limited, his father died after being shot by his mother, his mother suffered from alcoholism, and he was previously diagnosed as suffering from lead encephalopathy and substance abuse problems."[28] Reed III at 437.   Thus, this is not a case where counsel failed to present mitigating evidence due to a failure to investigate and discover such evidence.

At the evidentiary hearing in state court, Mr. Nichols testified that he discussed the presentation of mitigating evidence with Petitioner.  Mr. Nichols described the two forms of mitigating evidence and Petitioner's instructions regarding such evidence:

> One of the forms [of mitigation] at least
> requires that you essentially say, yes, I did

---

[28] In fact, after the verdict was published at the guilt phase of the trial, the parties discussed issues relating to the penalty phase of the trial, and Mr. Nichols stated the following:

> I also would like to alert the Court that in my discussions with the defendant, he has constantly maintained his innocence, that there was a previous psychiatric examination done and that I don't know whether conversations subsequent to this may create some issues that would require me to explore psychiatric testimony to be presented at the advisory hearing.  If that comes to my attention, I will let Court know immediately so that we can arrange our schedule accordingly.

Ex. 14 at 843.

it but here is why and that would have been testimony about anything that had to do with his psychiatric or medical condition and he clearly instructed me not to argue anything that would imply that he was guilty and not to say he was guilty but here that [sic] you should forgive him or minimize this because of A, B and C, and the other aspects of mitigation is just to bring in family and friends to show that he is relatively a nice fellow and this was some -- not part of a pattern of behavior but just some aberration, and he essentially told me he did not want any of his family or friends to have to be subjected to this process and **he didn't want mitigation called in either of those categories**.

Ex. 60 at 659 (emphasis added).

Both the circuit court and the Florida Supreme Court found that Petitioner instructed Mr. Nichols to refrain from presenting mental health evidence and testimony from family and friends to the jury at the sentencing phase.[29] Petitioner has not rebutted these factual findings by clear and convincing evidence.

---

[29] The Florida Supreme Court implicitly found that Petitioner instructed Mr. Nichols to refrain from presenting mental health evidence and testimony from family and friends by: (1) noting that the trial court's conclusion (that Petitioner waived the presentation of mitigating evidence by his instructions to counsel regarding mitigating evidence) "was not inconsistent with this Court's case law." <u>Reed III</u> at 436 n.14; (2) finding that the circuit court properly applied the law to this claim and that competent, substantial evidence supported the circuit court's ruling, <u>id</u>. at 436; and (3) "agree[ing] with the circuit court that even **if Reed's counsel had gone against his client's wishes** and investigated further, the testimony that could have been presented was just as likely to have resulted in aggravation against rather than mitigation for Reed." <u>Id</u>. at 436-37 (emphasis added).

The facts, as found by the state courts, are similar to the factual scenario in <u>Schriro</u>.  In <u>Schriro</u>, the United States Supreme Court stated the following:

> Neither <u>Wiggins</u> nor <u>Strickland</u> addresses a situation in which a client interferes with counsel's efforts to present mitigating evidence to a sentencing court.  <u>Wiggins</u>, <u>supra</u>, at 523, 123 S.Ct. 2527 ("[W]e focus on whether the investigation supporting *counsel's* decision not to introduce mitigating evidence of Wiggins' background was itself reasonable" (emphasis added and deleted)).  Indeed, we have never addressed a situation like this.  In <u>Rompilla v. Beard</u>, 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), on which the Court of Appeals also relied, the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented.  In short, at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish <u>Strickland</u> prejudice based on his counsel's failure to investigate further possible mitigating evidence.

<u>Schriro</u>, 127 S.Ct. at 1942.

Like the Court in <u>Schriro</u>, this Court concludes that, at the time the Florida Supreme Court rendered its decision in <u>Reed III</u>, it was not objectively unreasonable for that court to find that a defendant who refused to allow the presentation of mitigating evidence could not establish prejudice based on his attorney's failure to investigate possible mitigating evidence.  <u>See also</u> <u>Blankenship v. Hall</u>, No. 08-10511, 2008 WL 4191952, at *21 (11th

Cir. Sept. 15, 2008) ("Significant deference is owed to failures to investigate made under a client's specific instructions not to involve his family."); <u>Newland v. Hall</u>, 527 F.3d 1162, 1193-96 (11th Cir. 2008) (applying <u>Schriro</u> and finding that counsel's failure to investigate the possibility of presenting mitigation testimony from the defendant's family members did not constitute deficient performance where the defendant specifically instructed counsel not to contact his family and discouraged counsel from researching his past).

Additionally, the Florida Supreme Court's decision with respect to the prejudice prong is due deference.

> Under <u>Strickland</u>, it is not enough for [Petitioner] to show that any "errors had some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S.Ct. at 2067. Instead, [Petitioner] must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694, 104 S.Ct. at 2068. To establish that, [Petitioner] must show that "absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Id</u>. at 695, 104 S.Ct. at 2069.

<u>Wood v. Allen</u>, No. 06-16412, 2008 WL 4215078, at *25 (11th Cir. Sept. 16, 2008). To evaluate prejudice, the Court must consider the total available mitigation evidence as adduced pre-trial, at trial, and at the Rule 3.850 hearing. <u>Id</u>.

As noted by the state courts, the evidence Petitioner alleges counsel should have presented in mitigation would have also led to

the introduction of very damaging evidence.  The Eleventh Circuit
has "rejected prejudice arguments where mitigation evidence was a
'two-edged sword' or would have opened the door to damaging
evidence." Id. at *28 (citing Grayson v. Thompson, 257 F.3d 1194,
1227 (11th Cir. 2001)).  Additionally, had Mr. Nichols presented the
mitigation evidence identified by Petitioner, there is no
reasonable probability that the jury or judge would have found the
four statutory aggravating factors were outweighed by such
mitigating evidence.

In sum,

> [Petitioner] must show the state court's
> application of Strickland was unreasonable.
> This is no easy task.  [Petitioner] "must do
> more than satisfy the Strickland standard.  He
> must also show that in rejecting his
> ineffective assistance of counsel claim the
> state court applied Strickland to the facts of
> his case in an objectively unreasonable
> manner." Rutherford v. Crosby, 385 F.3d 1300,
> 1309 (11th Cir. 2004) (emphasis added)
> (quotation omitted).

Blankenship, 2008 WL 4191952, at *15 (footnote omitted).  This he
has failed to do.

In sub-claim B of this ground, Petitioner alleges that counsel
was ineffective for conceding Petitioner's guilt and the existence
of aggravating factors.  Petitioner raised this claim in his 3.850
motion, and the trial court adjudicated it as follows:

> In this claim, the defendant asserts that
> trial counsel inappropriately conceded the
> defendant's guilt of robbery during closing
> argument.  The defendant further suggests that

counsel's reference to the facts of the case as being especially heinous were inappropriate and detrimental to the defendant. The defendant has offered no evidence in support of this claim, either by way of the defendant's own testimony or by questioning trial counsel on this issue during the course of the evidentiary hearing. Accordingly, the Court concludes that the defendant has abandoned the claim.

In this claim the defendant cites to Mills v. State, 714 So.2d 1198 (Fla. 4th DCA 1998). This Court recognizes that case stands for the proposition that confessing a client's guilt sets forth a colorable claim for ineffective assistance of counsel. Conversely, the state suggests that the defendant is actually arguing Nixon v. Singletary, 758 So.2d 618 (Fla. 2000). The state further argues that Nixon does not apply to the facts in this case.

Even if the defendant has not abandoned this claim, in the light most favorable to him, the transcript of trial counsel's closing arguments and his explanation thereof during the course of the evidentiary hearing, indicate that his argument in no way reached even the threshold of the defendant's contention. It is noted at this point that Nixon found per se ineffective assistance of counsel where trial counsel confessed the defendant's guilt of all crimes charged without the consent of the defendant. In this case trial counsel's argument cannot be construed as a confession of defendant's guilt. At worst, one might opine that trial counsel suggested to the jury that the defendant might be guilty of some lesser crime. At least two (2) post-Nixon cases suggest that concession to a lesser included offense is not per se ineffectiveness, but might actually be the appropriate tactical decision to be made by trial counsel. See, State v. Williams, 797 So.2d 1235 (Fla. 2001) and Atwater v. State, 788 [S]o.2d 223 (Fla. 2001).

116

Upon the trial transcript and trial counsel's testimony at the evidentiary hearing, the Court concludes that trial counsel's argument was merely a discussion of reasonable doubt with the jury. For example, in one portion of his argument, trial counsel queried:

> What if there were testimony that he entered the house with the intention of either asking for money and thinking that there was no one there and getting money and what if he was horrified to have found Betty Germann there having been murdered and raped and that in that state of confusion or drinking or whatever, he went ahead and took Betty Germann's purse.

Trial counsel further suggested that the jury might conclude that the soft drink baseball cap got left at the victim's home sometime after her husband left and before he returned. Trial counsel then suggested that "beyond that everything else is speculation." Trial counsel further suggested to the jury that they could "legitimately on this evidence find him guilty of theft" but then suggested that to "find Grover Reed guilty of robbery, rape or murder you have to play the odds." During the course of the evidentiary hearing, trial counsel testified that he was merely trying to convince the jury that although Reed may have done something, it was not premeditated murder but rather that it "boiled out of some unexplained situation." His apparent purpose was to suggest that the jury find the defendant guilty of some lesser charge. (See, 11.21-25, p.2ll E.H. February 21, 2002).

Upon the matters presented, this Court concludes that it has not been demonstrated that trial counsel's performance was deficient on this issue. This Court concludes that trial counsel made an informed tactical decision based on the evidence as he knew it

to be at the time of the trial and in light of his assorted conversations with his client.

Ex. 56 at 528-30.

Upon Petitioner's appeal, the Florida Supreme Court addressed this claim as follows:

> Reed's eighth claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's concession of guilt to a lesser included offense.  During first and last closing arguments, Reed's counsel emphasized two major points: (1) the jury should hold the State to its high burden of proof; and (2) the jury should not make decisions based on their emotions about the crime.  More specifically, he argued that the State's case consisted entirely of circumstantial evidence and did not meet the requirement that circumstantial evidence be inconsistent with any reasonable hypothesis of innocence.  To illustrate that point, he stated:

>> And what if there were testimony that he entered the house with the intention of either asking for money and thinking there was no one there and getting money and what if he was horrified to have found Betty Oermann there having been murdered and raped and in that state of confusion and drinking or whatever his - whatever his situation was then, went ahead and took Betty Oermann's purse and left . . . . Now, the question, and this may be the most significant question that you can ask yourselves . . . can you eliminate that as a hypothesis based on the evidence that has been presented to you . . . . Being a thief doesn't make you a rapist and a murderer.

>> . . . .

118

I think you can legitimately on
this evidence find him guilty of a
theft and that theory is every bit
as consistent with the established
facts as the speculation of the
state.

Trial counsel apparently suggested this
possibility because he believed the evidence
regarding the baseball cap was strong enough
to place Reed at the scene of the crime.FN10
Reed here claims his counsel rendered
ineffective assistance by effectively
conceding guilt of theft because by all
appearances at trial, the same person
committed all three crimes of robbery, rape,
and murder.

FN10. Prior to this hypothesis,
trial counsel stated to the jury,
"Now, there's one thing I think that
you can fairly assume . . . . I
think you're going to conclude, I
think you're going to conclude that
that's Mr. Reed's hat . . . that
earlier in the day he had it on and
that sometime after 5:45 and before
Reverend Oermann came home that he
was in the house."

In denying this claim, the circuit court
first noted that Reed offered no evidence in
its support at the evidentiary hearing and
thereby abandoned the claim. Because the
nature of the claim requires only record
support and legal arguments, which Reed made
in his written closing arguments below, we
reject this basis for denial of the claim.
However, the circuit court also found that
trial counsel's argument could not be
construed as a confession of Reed's guilt to
the crimes charged, writing, "At worst, one
might opine that trial counsel suggested to
the jury that the defendant might be guilty of
some lesser crime. [But at] least two (2)
post-Nixon cases suggest that concession to a
lesser included offense . . . might actually
be the appropriate tactical decision to be

119

made by trial counsel." Post-conviction order at 18.  Indeed, this Court has said:

> Sometimes concession of guilt to some of the prosecutor's claims is good trial strategy and within defense counsel's discretion in order to gain credibility and acceptance of the jury.
>
> When faced with the duty of attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime, such as a deliberate, considered killing without the remotest legal justification or excuse, it is commonly considered a good trial strategy for a defense counsel to make some halfway concessions to the truth in order to give the appearance of reasonableness and candor and to thereby gain credibility and jury acceptance of some more important position.

Atwater v. State, 788 So.2d 223, 230 (Fla. 2001) (quoting McNeal v. State, 409 So.2d 528, 529 (Fla. 5th DCA 1982)).  This was clearly trial counsel's objective given his concession to the jury that the baseball cap evidence was strong and the fact that following closing arguments he requested that theft be added to the verdict form as a lesser included offense of robbery.  Trial counsel's testimony at the evidentiary hearing - that he was trying to convince the jury that although Reed may have done something, it was not premeditated murder - supports the circuit court's ruling. Therefore, we affirm the denial of this claim.FN11

> FN11.  Additionally, Reed claims his counsel effectively conceded the HAC aggravating circumstance in the guilt-phase closing arguments. The relevant argument followed trial counsel's discussion of the

importance of the State's high
burden of proof:

>Nobody among us now is
>going to stand up and say
>that's too tough.  Nobody
>among us now is going to
>say you relax that
>standard.  This is such a
>heinous event, and it is
>heinous, and this is such
>a despicable human being
>and there's no proof of
>that, that you should
>play the odds, that you
>should find this man
>guilty on speculation
>. . . .  When a
>prosecutor says that to
>you . . . he's saying you
>relax this standard . . .
>you find him guilty . . .
>even though the testimony
>doesn't stand up to
>objective, rational
>scrutiny.

Clearly, the point of this
argument was not to concede the HAC
aggravator but rather to acknowledge
the brutality of the crime in an
attempt to sympathize with the
jury's emotional reaction to it,
warn them against a misguided desire
to convict anyone on the basis of
that emotional reaction, and ensure
they held the State to its burden of
proof in the guilt phase.
Furthermore, given the facts of this
case, we cannot find that, in the
absence of this comment, the HAC
aggravator would not have been found
by the judge or jury.

Reed III at 433-34.

There are qualifying decisions from both the circuit court and the Florida Supreme Court.  Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Deference will be given to the state courts' rulings.

### E. Ground Five

In ground five, Petitioner raises the following claim:

> THE PROSECUTOR'S INFLAMMATORY AND IMPROPER COMMENTS AND ARGUMENT, AND THE INTRODUCTION OF NON-STATUTORY AGGRAVATING FACTORS RENDERED MR. REED'S CONVICTION AND RESULTING DEATH SENTENCE FUNDAMENTALLY UNFAIR AND UNRELIABLE IN VIOLATION OF SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.  COUNSEL'S FAILURE TO OBJECT, AND APPELLATE COUNSEL'S FAILURE TO RAISE THIS CLAIM ON APPEAL AS FUNDAMENTAL ERROR CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

Petition at 88.  Petitioner raised this issue in his 3.850 motion, and the circuit court adjudicated it as follows:

> The defendant's current motion suggests that trial counsel was ineffective for failing to object to the prosecutor's reference to the victim as a minister's wife and the prosecutor's reference to the defendant as the irresponsible father of illegitimate children. Defendant also suggests that it was inappropriate for trial counsel himself [to] refer to the victim's husband as a minister and to acknowledge to the jury that the

122

defendant was, in fact, a drifter with children born out of wedlock.

The defendant has offered no evidence on this particular issue, either by way of defendant's own testimony or through cross-examination of trial counsel at the evidentiary hearing. Accordingly, this Court concludes that the defendant has abandoned this particular claim.

However, considering this ground in the light most favorable to the defendant, this Court notes that trial counsel did, in fact, object to the prosecution's reference to the matter of the defendant's irresponsibility and his drug use. (See, pp. 375, 513, and 517, TT). Furthermore, trial counsel's direct reference to the actual facts in the case cannot be said to be ineffective. After all, the jury had to have learned that Reverend Oermann was a minister and his wife, therefore, a minister's wife, by the simple fact of the jury's learning of the way in which the defendant, his significant other, and their illegitimate children were introduced to the Oermanns. Counsel's reference to the status of the victim and her husband did little more than to place the entire situation and the defendant into perspective.

With regard to trial counsel's references to the defendant of which the defendant complains, this court concludes that they were appropriate under the circumstances and that they were in direct response to the prosecutor's closing argument. They were also in furtherance of trial counsel's reasonable doubt argument. (See, generally, pp. 783-789, TT). For example, at one point trial counsel said

"Being a drifter and being a father of illegitimate children and being a vagrant and somebody who is living off somebody else's good will doesn't make you a rapist and a

murdere[r].  Being a thief doesn't
necessarily make you a rapist and a
murderer."  (11.5-9, p.789, TT).

While this one phrase might not place the
defendant in the best possible light, it is a
comment exactly on the evidence presented at
trial and the prosecutor's reference to the
same in closing argument.

The Court concludes that defendant has
failed to establish any deficient performance
on the part of trial counsel on this claim.

Ex. 56 at 530-32.

Upon Petitioner's appeal, the Florida Supreme Court

adjudicated the claims as follows:

Reed's eleventh claim is that the circuit
court erred in finding no ineffective
assistance regarding his trial counsel's
failure to object to references by the
prosecutor to the victim's husband as
"Reverend" and "a minister," as well as
testimony by State witnesses indicating that
Reed was unemployed, cohabited with his
girlfriend, had illegitimate children, and was
a drug abuser.  However, it is clear from the
record that in order to understand how Reed
knew the victim, the jury needed to know that,
through Traveler's Aid, Reverend Oermann met
and sheltered Reed, Niznik, and their small
children when they arrived homeless and
destitute in Jacksonville.  Further, they
needed to know that Reverend Oermann was away
from home at specific times on the night of
the murder because he had a church function to
attend at 6 p.m.  Thus, his status as a
minister was inextricably intertwined with
these necessary facts.  And, in order to
understand motive, the jury needed to know
that Reed was asked to move out when Reverend
Oermann discovered he had drug paraphernalia,
the Oermanns continued to provide financial
support to Reed until they determined he was
not making an effort to obtain steady

> employment, and thereafter Reed told Lisa
> Smith about these events and vowed to "get
> even" with the Oermanns.  We find no error in
> the circuit court's rejection of this claim.

Reed III at 438.

There are qualifying decisions from both the circuit court and Florida Supreme Court.  Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Deference will be given to the state courts' rulings.

## F. Ground Six

In ground six, Petitioner raises the following claim:

> MR. REED'S SENTENCE WAS TAINTED BY IMPROPER
> INSTRUCTIONS IN VIOLATION OF THE EIGHTH AND
> FOURTEENTH AMENDMENTS.

Petition at 93.  Specifically, Petitioner contends that the jury instructions on all six aggravating factors "failed to give the jury meaningful guidance as to what was necessary to find these factors present."  Id. at 94.  Respondents contend, and this Court agrees, that this claim is procedurally barred.

Petitioner raised this claim in the July 21, 1992, supplement to his first motion for post-conviction relief, see Ex. 29 at 2, and the circuit court found that it was procedurally barred because

125

it should have been raised on direct appeal.  Ex. 30 at 8-9.  Upon Petitioner's appeal, the Florida Supreme Court affirmed, finding that "[t]his issue is procedurally barred because Reed did not object to the instructions at trial nor did he raise this issue on direct appeal."  <u>Reed II</u> at 1096.

Procedural default may result from non-compliance with state procedural requirements.  <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30, <u>reh'g</u> <u>denied</u>, 501 U.S. 1277 (1991).

> Federal courts are barred from reaching the merits of a state prisoner's federal habeas claim where the petitioner has failed to comply with an independent and adequate state procedural rule.  <u>Wainwright v. Sykes</u>, 433 U.S. 72, 85-86, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).  When a state court correctly applies a procedural default principle of state law, federal courts must abide by the state court decision, <u>Harmon v. Barton</u>, 894 F.2d 1268, 1270 (11th Cir. 1990), but only if the state procedural rule is regularly followed, <u>Ford v. Georgia</u>, 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). . . .

<u>Siebert v. Allen</u>, 455 F.3d 1269, 1271 (11th Cir. 2006), <u>cert</u>. <u>denied</u>, 127 S.Ct. 1823 (2007); <u>see</u> <u>also</u> <u>Baldwin v. Johnson</u>, 152 F.3d 1304, 1317 (11th Cir. 1998) (finding that federal courts may not review a claim that a petitioner procedurally defaulted under state law if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and the bar presents an independent and adequate state ground for denying relief), <u>cert</u>. <u>denied</u>, 526 U.S. 1047 (1999).

126

The procedural bar imposed in Petitioner's case is firmly established and regularly followed in the Florida courts. See Teffeteller v. State, 734 So.2d 1009, 1016 (Fla. 1999) (holding that substantive claims raised by post-conviction relief movant were procedurally barred because they could have been raised on direct appeal); Smith v. State, 445 So.2d 323, 325 (Fla. 1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.").

"Procedural defaults in state courts will foreclose federal court review, absent a showing of cause and prejudice." Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 770 (11th Cir. 2003) (citing Wainwright v. Sykes, 433 U.S. 72 (1977)), cert. denied, 540 U.S. 1222 (2004).  "[A] petitioner may gain federal review of an otherwise procedurally defaulted claim if he can demonstrate both cause excusing the default and actual prejudice resulting from the bar."  Hill v. Jones, 81 F.3d 1015, 1022-23 (11th Cir. 1996) (citations omitted), cert. denied, 519 U.S. 1119 (1997).

"[A] federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice." Fortenberry v. Haley, 297 F.3d at 1222 (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)), cert. denied, 538 U.S. 947 (2003). The fundamental miscarriage of justice exception is only available

in extraordinary cases upon a showing of "'actual' innocence" rather than mere "'legal' innocence." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted), cert. denied, 535 U.S. 926 (2002).

Petitioner alleges that appellate counsel was ineffective for failing to raise this claim on direct appeal, thus establishing cause and prejudice. See Reply at 47-48. Petitioner raised this ineffective assistance of appellate counsel claim in his state court habeas petition, and the Florida Supreme Court adjudicated the claim as follows:

> In Reed's first rule 3.850 motion, he claimed the jury instructions on all of the aggravating circumstances in his case were unconstitutionally vague. The circuit court denied that claim, and this Court affirmed, stating, "This issue is procedurally barred because Reed did not object to the instructions at trial nor did he raise this issue on direct appeal." Reed, 640 So.2d at 1096. In his third claim in this petition, Reed now asserts that he was denied effective assistance of counsel by his appellate counsel's failure to raise this issue on direct appeal. However, in addition to noting that this issue was not preserved for appellate review, we further conclude that it is extremely unlikely that Reed would have successfully appealed this issue because each of the four aggravating circumstances that remained following Reed's direct appeal have withstood similar attacks. See Banks v. State, 700 So.2d 363, 367 (Fla. 1997) (finding instruction of aggravating circumstance of committed while engaged in a sexual battery does not constitute an automatic aggravator); Whitton v. State, 649 So.2d 861, 867 n.10 (Fla. 1994) (noting the avoid arrest factor does not contain terms so vague as to leave

the jury without sufficient guidance for
determining the absence or presence of the
factor); <u>Washington v. State</u>, 653 So.2d 362
(Fla. 1994) (finding HAC aggravating
circumstance was neither vague nor arbitrarily
and capriciously applied); <u>Kelley v. Dugger</u>,
597 So.2d 262 (Fla. 1992) (rejecting argument
that aggravating factor of pecuniary gain was
overly broad). Appellate counsel's failure to
appeal an unpreserved and meritless issue is
not deficient performance.

<u>Reed III</u> at 439.

For the reasons stated above by the Florida Supreme Court,

this Court agrees that appellate counsel was not ineffective for

failing to raise this unpreserved and meritless issue on direct

appeal. Petitioner has not shown cause and prejudice for the

default. Additionally, he has not shown that he is entitled to the

fundamental miscarriage of justice exception.[30] Thus, this claim

is procedurally barred.

Even assuming arguendo that the claim is not procedurally

barred, it is without merit. In the Petition and Petitioner's

Memorandum, Petitioner does not explain why he asserts the

instructions were unconstitutionally vague.[31] However, when he

---

[30] Petitioner argues that he meets the requirement for the
fundamental miscarriage of justice exception because he is actually
innocent. For the reasons stated in Respondents' Surreply to
Gateway Claim of Actual Innocence (Doc. #26), filed August 7, 2007,
at 6-14, the Court finds that Petitioner has not made a colorable
showing of actual innocence. However, the Court will assume,
*arguendo*, that he has made such a showing and will therefore
address this claim on the merits, in the alternative.

[31] The instructions have been provided to this Court in Ex. 2
at 305-06.

raised this claim in state court, he focused on the "especially wicked, evil, atrocious or cruel" and the "cold, calculated and premeditated manner without any pretense of moral or legal justification" (hereinafter CCP) instructions. The Court notes that on Petitioner's direct appeal, the Florida Supreme Court found that the CCP factor could not stand because it was not proven beyond a reasonable doubt, reweighed the aggravating factors against the lack of mitigating factors, and then affirmed the death sentence. See Reed I at 207. In any event, the Eleventh Circuit has found that the CCP instruction given in Petitioner's case passes constitutional muster. See Harich v. Dugger, 844 F.2d 1464, 1468-69 (11th Cir. 1988) (en banc) (finding that the aggravating circumstance that the murder was committed in a "cold, calculated and premeditated manner without any pretense of moral or legal justification" genuinely narrowed the class of persons eligible for the death penalty; the statute required a greater degree of premeditation and cold-bloodedness than is required to obtain a first-degree murder conviction).

After Petitioner's direct appeal was final, the "especially wicked, evil, atrocious or cruel" instruction given in his case was found to be unconstitutionally vague. See Espinosa v. Florida, 505 U.S. 1079 (1991). However, "the Supreme Court has held that Espinosa announced a new rule that cannot be applied retroactively to cases on collateral review. See Lambrix v. Singletary, 520 U.S.

518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). Because [Petitioner's] conviction became final before Espinosa, his Espinosa claim is thus Teague-barred. See id.; Teague v. Lane, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)." Fortenberry, 297 F.3d at 1224. Thus, Petitioner cannot benefit from the Espinosa decision.

Petitioner does not offer any other argument or legal authority in support of his claim that the remaining instructions were unconstitutionally vague and overbroad. Thus, his conclusory claim that the jury instructions on these aggravating factors "failed to give the jury meaningful guidance as to what was necessary to find these factors present," Petition at 94, is wholly unsupported and does not entitle him to habeas corpus relief.

### G. Ground Seven

In ground seven, Petitioner raises the following claim:

> MR. REED'S DEATH SENTENCE RESTS UPON AN UNCONSTITUTIONAL AUTOMATIC AGGRAVATING CIRCUMSTANCE IN VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Petition at 967. Specifically, Petitioner alleges that the committed "in the course of a felony" aggravating factor[32] found to

---

[32] As noted previously, the trial court found as an aggravating factor that the capital felony was committed while the Petitioner was engaged in the commission of a sexual battery. Petitioner appears to argue that the jury's verdict of guilty with respect to the sexual battery charge resulted in the automatic applicability of this aggravating circumstance.

exist in his case is an unconstitutional automatic aggravating circumstance. Petitioner's Memorandum at 49.

Respondents contend, and this Court agrees, that this claim is without merit. The Eleventh Circuit "has considered this [automatic finding of the felony-murder aggravating factor] argument previously and found it to be meritless. See Johnson v. Dugger, 932 F.2d 1360, 1368-70 (11th Cir.), cert. denied, 502 U.S. 961, 112 S.Ct. 427, 116 L.Ed.2d 446 (1991); Bertolotti v. Dugger, 883 F.2d 1503, 1527-28 (11th Cir. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990)." Mills v. Singletary, 161 F.3d 1273, 1287 (11th Cir. 1998) (per curiam); see also Lowenfield v. Phelps, 484 U.S. 231 (1988) (finding that a death sentence could be imposed for first-degree murder even though the sole aggravating circumstance found by the jury at the sentencing phase, that defendant knowingly created a risk of death or great bodily harm to more than one person, was identical to an element of the capital crime of which defendant was convicted). Clearly, Petitioner is not entitled to relief on the basis of this claim.

## H. Ground Eight

In ground eight of the Petition, Petitioner raises the following claim:

> IT WAS ERROR TO FAIL TO REVERSE MR. REED'S
> SENTENCE OF DEATH AND REMAND FOR RESENTENCING
> UPON THE STRIKING OF TWO AGGRAVATING FACTORS,

IN VIOLATION OF DUE PROCESS, EQUAL PROTECTION,
AND THE EIGHTH AND FOURTEENTH AMENDMENTS.

Petition at 98.

As noted previously, on direct appeal, Petitioner challenged four of the six aggravating factors, and the Florida Supreme Court ruled upon these challenges as follows:

> Finally, Reed attacks four of the six aggravating circumstances. The prior felonies of violence relied upon by the judge were the other felonies committed against Mrs. Oermann. The state concedes that our decision in Wasko v. State, 505 So.2d 1314 (Fla. 1987), renders this aggravating circumstance invalid. We also agree that the finding that the killing was cold, calculated, and premeditated cannot stand. The only evidence which might support the conclusion that Reed intended to kill Mrs. Oermann when he went to her home was his comment made prior to the killing that he would "get even" with the Oermanns for their asking him to leave their house. However, he did not specify how he would get even, and his intent could have been, as he told his cellmate, to burglarize their house. The requisite evidence of heightened premeditation was not proven beyond a reasonable doubt. Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988).

> On the other hand, the evidence supports the finding that the killing was especially heinous, atrocious, and cruel. Upon first encountering Mrs. Oermann, Reed slapped her and tied her up. He then severely beat her, leaving numerous bruises on her body. Following this, he choked the victim and then raped her. Finally, he slashed her throat more than a dozen times. The medical examiner testified that because the stab wounds were made with a serrated-edge knife, they would have taken more and effort to inflict. Likewise, Reed told his cellmate, Nigel

Hackshaw, that he cut the victim's throat "to keep her from talking," thus proving the aggravating circumstance of committing the killing to avoid lawful arrest.

The elimination of the two aggravating circumstances would not have affected Reed's sentence. Rogers; Jackson v. Wainwright, 421 So.2d 1385 (Fla. 1982), cert. denied, 463 U.S. 1229, 103 S.Ct. 3572, 77 L.Ed.2d 1412 (1983). There remain four aggravating circumstances balanced against a total absence of mitigating circumstances.   We affirm the judgment and sentence.

Reed I at 207 (footnote omitted).

Petitioner raised the claim he presents in ground eight of this Petition as claim eleven in his initial motion for post-conviction relief, and the circuit court found that it "lacked jurisdiction to review the Florida Supreme Court's decision on appeal."  Ex. 30 at 316.  Upon Petitioner's appeal, the Florida Supreme Court addressed this claim as follows:

We next address Reed's claim that although on direct appeal this Court struck two of the aggravating circumstances, we failed to consider the effect on the jury of the instructions regarding these circumstances.  This claim has no merit. In our opinion, we specifically stated: "The elimination of the two aggravating circumstances would not have affected Reed's sentence. There remain four aggravating circumstances balanced against a total absence of mitigating circumstances." Reed, 560 So.2d at 207 (citations omitted).  Clearly, we considered the effect of striking the aggravators and concluded that the improper finding of the two aggravators constituted harmless error.

Reed II at 1095-96 (footnote omitted).

There is a qualifying decision from the Florida Supreme Court. Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state court's decision was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.   Deference will be given to the Florida Supreme Court's ruling.

## I. Ground Nine

In ground nine, Petitioner raises the following claim:

> FLORIDA'S CAPITAL SENTENCING STATUTE VIOLATES THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Petition at 100.

Petitioner raised this issue in his state court habeas petition, and the Florida Supreme Court adjudicated this claim as follows:

> Reed's first claim in this petition is that Florida's capital sentencing scheme is unconstitutional under <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).  This Court has consistently rejected Ring claims in postconviction cases.  <u>See</u>, <u>e.g.</u>, <u>Pace v. State</u>, 854 So.2d 167 (Fla. 2003), <u>cert</u>. <u>denied</u>, 540 U.S. 1153, 124 S.Ct. 1155, 157 L.Ed.2d 1049 (2004); <u>Chandler v. State</u>, 848 So.2d 1031 (Fla. 2003); <u>Banks v. State</u>, 842 So.2d 788 (Fla. 2003); <u>Jones v. State</u>, 845 So.2d 55 (Fla. 2003); <u>Cole v. State</u>, 841 So.2d 409 (Fla. 2003); <u>Porter v. Crosby</u>, 840 So.2d 981 (Fla. 2003); <u>Lucas v.

135

> State, 841 So.2d 380 (Fla. 2003); Spencer v.
> State, 842 So.2d 52 (Fla. 2003); Fotopoulos v.
> State, 838 So.2d 1122 (Fla. 2002); Bruno v.
> Moore, 838 So.2d 485 (Fla. 2002), cert.
> denied, 540 U.S. 840, 124 S.Ct. 100, 157
> L.Ed.2d 72 (2003); Marquard v. State, 850
> So.2d 417 (Fla. 2002); Bottoson v. Moore, 833
> So.2d 693 (Fla.), cert. denied, 537 U.S. 1070,
> 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v.
> Moore, 831 So.2d 143 (Fla.), cert. denied, 537
> U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556
> (2002). We likewise reject Reed's claims.

Reed III at 438-39.

There is a qualifying decision from the Florida Supreme Court. Upon thorough review of the record and the applicable law, it is clear Petitioner is not entitled to relief because the state court's decision was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law,[33] and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Deference will be given to the Florida Supreme Court's ruling.

## VI. Conclusion

28 U.S.C. § 2254(d) creates a deferential standard for federal court review of state court adjudications. Here, both the state circuit court (which conducted an evidentiary hearing) and the Florida Supreme Court have thoroughly considered the same issues

---

[33] See Schriro, 542 U.S. at 358 (finding that "Ring announced a new procedural rule that does not apply retroactively to cases already final on direct review.").

this Court is asked to review and have found that Petitioner is not entitled to relief.  This Court has now independently reviewed the substantial record and the applicable law and also concludes that Petitioner is not entitled to relief because the state courts' decisions were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

Any claims not specifically addressed are found to be without merit.  Accordingly, for the above-stated reasons, the Petition will be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.    The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.    If asked, the Court is prepared to issue a certificate of appealability on ground one (the <u>Batson</u> issue), sub-claim C of ground two (ineffectiveness of counsel for failing to utilize a blood-type expert) and sub-claim A of ground four (ineffectiveness of counsel for failing to present mitigating evidence during the sentencing phase of trial).

4.   The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of September, 2008.

TIMOTHY J. CORRIGAN
United States District Judge

ps 9/29
c:
Counsel of Record

138