# United States Court of Appeals

## For the Eleventh Circuit

No. 09-10059

District Court Docket No.
05-00612-CV-TJC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jan 11, 2010

THOMAS K. KAHN
CLERK

GROVER REED,

        Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF
CORRECTIONS,
ATTORNEY GENERAL,

        Respondents-Appellees.

-----------------------------------------------------------------

Appeal from the United States District Court
for the Middle District of Florida

-----------------------------------------------------------------

## J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:    January 11, 2010
For the Court:    Thomas K. Kahn, Clerk
By:    Simmons, Marcus

ISSUED AS MANDATE
MAR 17 2010
U.S. COURT OF APPEALS
ATLANTA, GA.

A True Copy - Attested:
Clerk, U.S. Court of Appeals,
Eleventh Circuit

By _____
Deputy Clerk
Atlanta, Georgia

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 09-10059

D. C. Docket No. 05-00612-CV-TJC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 11, 2010
JOHN LEY
ACTING CLERK

GROVER REED,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF
CORRECTIONS,
ATTORNEY GENERAL,

Respondents-Appellees.

Appeal from the United States District Court
for the Middle District of Florida

(January 11, 2010)

Before DUBINA, Chief Judge, CARNES and HULL, Circuit Judges.

HULL, Circuit Judge:

Florida death-row inmate Grover Reed appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. The district court granted Reed a certificate of appealability ("COA") on his claim that his trial counsel was constitutionally ineffective for failing to investigate and present mitigation evidence at the penalty phase. After review and oral argument, we affirm the denial of Reed's § 2254 petition.

## I. BACKGROUND

**A.    Crime and Arrest**

In December 1985 Reed, age 24, and his girlfriend and two children moved to Jacksonville, Florida. They were homeless. As a result, Lutheran minister Rev. Ervin Oermann and his wife Betty Oermann invited Reed and his family to stay in the Oermanns' home. See Reed v. State, 560 So. 2d 203, 204 (Fla. 1990) ("Reed I"). After a little more than a week, though, the Oermanns discovered Reed had drug paraphernalia in their home, and the Oermanns asked Reed and his family to leave. Id. Rev. and Mrs. Oermann continued to help Reed by giving him money and transportation, but eventually stopped after they began to feel they were being used. Id. Reed "resented the discontinuance of aid and vowed to get even." Id.

On the evening of February 27, 1986, while Rev. Oermann was away from

2

home at a night class, Reed raped and murdered Mrs. Oermann (age 57). Rev. Oermann returned home to find her body. An autopsy revealed Mrs. Oermann had been strangled, raped, and stabbed repeatedly in the throat. After an investigation linked Reed to evidence found at the crime scene, he was arrested.

**B.    Indictment and Pre-trial Proceedings**

In July 1986, Reed was indicted for first-degree murder, sexual battery, and armed robbery. Assistant public defender Alan Chipperfield initially represented Reed but became conflicted out. In August 1986, the state trial court appointed Richard Nichols, a private criminal defense attorney, to represent Reed.

In October 1986, Reed underwent a psychiatric evaluation to determine, inter alia, whether Reed suffered from mental illness or mental retardation, the nature and extent of any such mental illness or retardation, Reed's competence to stand trial, and Reed's sanity at the time of the crimes. Psychiatrist Dr. Ernest Miller evaluated Reed and filed a report with the state trial court. Social worker Karen Kaldor, M.S.W., co-authored Dr. Miller's October 30, 1986 report.

The report indicated Dr. Miller reviewed "extensive background information furnished by Mr. Nichols," including copies of Reed's medical records from Hendersonville Community Hospital ("Hendersonville Hospital"), Metropolitan Nashville General Hospital ("Nashville General"), and the Middle Tennessee

3

Mental Health Institute ("Middle Tennessee MHI"). Dr. Miller obtained Reed's history and performed mental status tests. Because of Reed's history of inhaling gas fumes and lead poisoning, Dr. Miller had Reed undergo neurological tests, including a 21-channel electroencephalogram test on October 20, 1986.

Dr. Miller's report detailed Reed's background and physical and mental condition. The report stated that Reed understood the purpose of the examination, the charges against him, his pleading options, and "the role of the various court officers." Reed claimed complete recollection of his circumstances on the day of Mrs. Oermann's murder, and told Dr. Miller he had ten alibi witnesses. As to Reed's family, educational, social, and vocational history, the report noted that Reed: (1) was removed from his mother's custody because of her alcoholism when he was four years old; (2) was raised primarily by his grandparents, and his mother shot and killed his father in self-defense; (3) had an eighth grade education, at which point he left school to work in a sawmill because his family needed money; (4) had a girlfriend, a child, and many friends; (5) was a self-described "jack of all trades" who had worked as a concrete worker and in the steel and oil industries; and (6) had no military service history.

As to Reed's medical and psychiatric history, Dr. Miller reported that Reed: (1) denied a family history of mental illness, epilepsy, or suicide; (2) denied

4

suffering from diseases; (3) suffered a fractured bone in his face from being struck with a pool cue; and (4) was evaluated and treated in 1981 at Nashville General and Middle Tennessee MHI for "lead encephalopathy related to the inhalation of gas fumes," but denied any other mental health care.

Although Reed drank heavily seven years before Dr. Miller's evaluation, Reed told Dr. Miller that he "slacked off after a period of treatment for this," and denied having a drinking problem anymore. Reed admitted huffing gasoline in the past but denied using other drugs except "occasional marijuana." Reed reported "seizures associated with his inhalation of gas fumes."

As noted earlier, Nichols gave Dr. Miller extensive hospital and medical records. They indicated that in 1979 Reed underwent two "uneventful" days of treatment at Hendersonville Hospital for "a fracture of facial and orbital bones." In November 1981, Reed was treated at Nashville General for "lead intoxication [and] multiple substance abuse." Reed was transferred from Nashville General to Middle Tennessee MHI, where he was diagnosed with "Lead Encephalopathy due to Chronic Lead Poison" and "Seizure Disorder caused by Valium Withdrawal and/or Lead Encephalopathy." The medical records noted that: (1) Reed had a history of "abusive behavior and combativeness at home"; (2) Reed indicated he "can't control [his] nerves"; and (3) his family reported that Reed had a "long

5

history of confusion, short attention span, and bizarre behavior when high on

gasoline – fighting trees and garage door, screaming – but no bizarre behavior

when not high."

Given his past lead encephalopathy related to gas fumes, Dr. Miller had

Reed undergo neurological tests. For example, the October 20, 1986

electroencephalograph report, which Dr. Miller ordered, showed that Reed was

examined with a "21-channel encephalograph with 20 scalp and 2 reference

electrodes, using 10-20 system of I.F.E.S. 3 montages including both serial and

linked pairs of electrodes." During the test, Reed was awake, relaxed, and

cooperative, and was not sedated. The electroencephalogram recorded Reed's

frontal, temporal, central, parietal, and occipital waking bandwidth. Reed had

normal regulation, symmetry, and synchrony results. The encephalographic report

concluded with Dr. Miller's assessment: "Normal waking electroencephalogram.

No paroxysmal sequences, no regional abnormalities."

Dr. Miller's report concluded that Reed was of average native intelligence

and his cognitive faculties were intact. The report also concluded that Reed had "a

fair general fund of information"; was "well able to use verbal and mathematical

abstractions"; had a good ability to register, store, and retrieve data; and was "not

hallucinated or delusional." The report noted that Reed had "[n]o pathologic

6

reflexes" and his "motor, sensory and cerebellar functions [were] normal." The report further advised that Reed was competent to stand trial, and that he "was able to understand the nature, quality and wrongfulness of his acts" at the time of the crimes. The state trial court, in turn, found Reed competent to stand trial.

## C.    Guilt Phase

The parties selected a jury on November 17, 1986. The guilt phase of Reed's trial began the next day and lasted three days. The State called fourteen witnesses. One key piece of physical evidence was Reed's baseball cap, which was found under a table near Mrs. Oermann's body. Witnesses testified they saw Reed wearing his baseball cap on the day of the murder before the probable time of death, but not afterwards. They "positively identified the cap as Reed's because of the presence of certain stains and mildew." Reed I, 560 So. 2d at 204. Reed's fingerprints were on checks that were taken from the Oermann home and found in their yard. Id. An expert witness testified that hairs found on Mrs. Oermann's body and in the baseball cap were consistent with Reed's hair. Id. Another expert testified that the semen found in Mrs. Oermann's body could have been Reed's. Id. And Reed's cellmate, Nigel Hackshaw, testified that Reed admitted breaking into the Oermann home and killing Mrs. Oermann. Id.

Reed decided not to testify or to present evidence in the guilt phase.[1]  On November 20, 1986, the jury found Reed guilty of first degree murder, sexual battery, and robbery with a deadly weapon.

**D.    Penalty Phase Before the Jury**

After the verdict, the state trial court excused the jurors until the penalty phase, which was scheduled to begin the following week.  For various reasons, Nichols made a strategic decision to pursue a penalty-phase strategy of residual doubt and to present no evidence in the penalty phase.[2]

Reed had prior convictions.  But the State agreed not to introduce any evidence before the jury of any of Reed's prior criminal acts if Reed stipulated that he would not argue the statutory mitigating factor of no significant prior criminal activity.[3]  Both Reed and the State ultimately agreed they would (1) rest on the

---

[1]In response to the state trial court's inquiries, Reed stated that he "discussed any and all [potential] witnesses that [Reed] may have furnished to Mr. Nichols with him," that Nichols advised him not to present any witnesses, and that Reed concurred with Nichols's advice. Nichols told the court he advised Reed that putting on defense witnesses would forfeit Reed's right to give the first and last closing argument, and that "none of the witnesses that we considered calling I thought would make a significant impact on the outcome of the trial and that I didn't think it was worth giving up the final argument in order to call those witnesses." Nichols did give the first and last closing argument in the guilt phase.

[2]In a colloquy after the jury was excused, Nichols informed the state trial court that Reed constantly had maintained his innocence, that a psychiatric examination was done already, and that, if Nichols decided to explore more psychiatric testimony, he would let the court know.

[3]Reed's prior convictions were for second-degree burglary, petit theft, malicious mischief, driving under the influence, and possession of drug paraphernalia.

8

evidence adduced during the guilt phase, (2) submit no evidence at the penalty

phase, and (3) proceed with closing arguments.

The parties informed the state trial court of their stipulation at the outset of

the November 26, 1986 penalty phase. The state trial court questioned counsel

about the stipulation. Nichols informed the court that he had advised Reed to

accept the stipulation because Reed had "at least one felony conviction and one

[petit] theft conviction," which made it unlikely Reed would be able to establish

the no significant prior criminal activity mitigating factor in any event:

> I have instructed Mr. Reed that one of the mitigating circumstances
> that we might argue was an absence of a significant history and I've
> told him that if we do that that [the State attorney] Mr. Bateh is going
> to put in the record that evidence as to at least one felony conviction
> and one petty theft conviction which I've told Mr. Reed that I think –
> that if we were going to debate the issue whether or not that was
> significant history or not, I told him I didn't think we'd [fare] very
> well and I have suggested to him that he allow me to do the stipulation
> and . . . I have advised him that should we do that that we will not be
> able to argue that factor, that I would be able to argue that there has
> been no showing of any significant history of violence, but that I
> could not make a reference to the lack of a criminal history and he has
> agreed to that stipulation.

Reed confirmed to the state trial court that this was correct, that he understood, and

that he agreed to the stipulation.

Nichols then addressed the state trial court regarding other potential

mitigating evidence in the penalty phase. Nichols told the court that he had

9

reviewed with Reed the aggravating and mitigating factors and that Reed did not

want to testify during the penalty phase. Nichols added:

> I have told Mr. Reed that he has a right, should he want to, to take the
> stand and argue or to present evidence of his own testimony in this
> hearing. I have – Mr. Reed has steadfastly maintained his innocence
> and has instructed me that he does not want to take the stand and I
> want to make sure the record reflects that he's been advised that he
> has a right, should he want to, that I've advised him against it and he
> has told me that he concurs in that advice.

Reed stated that he agreed, and did not want to testify in his own defense during

the penalty phase.

The State argued to the jury that six aggravating factors existed, including

that the murder (1) was especially heinous, atrocious, or cruel, (2) was committed

in a cold, calculated, and premeditated manner, and (3) was for pecuniary gain.

The State also argued that no mitigating factors existed.

In response, Nichols told the jury that Reed maintained his innocence and

argued Reed's life sentence should be spared because of residual doubt over his

guilt. Nichols explained that he would make little argument as to mitigating

circumstances because Reed was innocent and was not going to say "I did it and

here's why I did it." Nichols told the jury that although it had found Reed guilty

beyond a reasonable doubt, the State "d[id]n't have to eliminate all doubt and it's

that other aspect of any other doubt that as human beings you're going to consider

. . . when you decide whether or not you're going to vote to allow the state to take the life of a human being." Nichols argued that although the State's evidence was consistent with Reed's guilt, it did not make Reed's guilt certain.

After the jury retired to deliberate, the state trial court addressed whether it would order a presentence investigation report ("PSI"). Nichols conferred with Reed on this issue and told the state trial court that Reed did want a PSI so that the court could consider some aspects of Reed's background that Nichols did not argue before the jury. The state trial court ordered a PSI to be prepared.

After deliberating, the jury voted 11 to 1 to recommend the death penalty. The state trial court scheduled a hearing, at which it would consider any post-trial motions and "anything in mitigation or aggravation of sentence which has not already been presented to the Court."

E.    **Penalty Phase Before the Judge**

The post-trial hearing was originally scheduled for December 10 and held on December 18, 1986. Nichols filed: (1) the hospital and mental health records from Middle Tennessee MHI, Nashville General, and Hendersonville Hospital regarding Reed's drug dependency, toxic response from lead, and past emotional problems; and (2) letters from other witnesses, including one from Archie Ray Brooks and one from Reed's family member and lifelong acquaintance Joe B. Webb. The state

11

trial court also had the PSI, signed December 9, 1986.  The Florida Supreme Court

summarized the information in the PSI:

> The presentence investigation report contained a socioeconomic status
> report indicating: Reed's highest completed grade was the eighth
> grade; he previously was employed as a laborer and had five jobs in
> the prior two years; his father died in 1961 after being shot by his
> mother in self-defense; he had a one-year-old child to whom he
> provided voluntary support; he was diagnosed as suffering from lead
> intoxication and multiple substance abuse problems in 1981; and he
> was hospitalized for approximately one month at that time due to what
> Reed described as a "nervous breakdown." Additionally, the report
> contained comments by Reed's grandmother indicating that she never
> knew him to want to hurt anyone, believed his stepfather whipped the
> children and withheld food, and gained custody of her grandchildren
> due to Reed's mother's alcoholism and lack of interest in the children.
> The psychiatric examination report indicated mental status and
> neurologic testing were performed on Reed, as well as an extensive
> background review. The report repeated that Reed had an eighth grade
> education, was taken from his mother due to her alcoholism, and was
> treated in 1981 for lead encephalopathy related to the inhalation of gas
> fumes. The report reflected a normal waking electroencephalogram
> and a clinical impression of substance abuse disorder. The past
> medical records reflected Reed's long history of gasoline sniffing,
> Valium abuse, and the resulting lead encephalopathy and seizure
> disorder upon drug withdrawal. They also contained doctors' notes
> indicating Reed had previously shown bizarre and abusive behavior
> and combativeness at home.

Reed v. State, 875 So. 2d 415, 434 n.12 (Fla. 2004).  The PSI itself is in the record

and indicates that in his interview, Reed "denied the use of any drugs or narcotics."

The State filed certified copies of Reed's prior convictions for second-

degree burglary, malicious mischief, driving under the influence, possession of

drug paraphernalia, and petit theft.

In January 1987, the state trial court sentenced Reed to death. The state trial court found six statutory aggravating circumstances existed: (1) Reed was previously convicted of other felonies involving the use or threat of violence to the person;[4] (2) Reed committed the murder while engaged in the commission of sexual battery; (3) Reed committed the murder for the purpose of avoiding or preventing a lawful arrest; (4) Reed committed the murder for pecuniary gain; (5) the murder was especially heinous, atrocious, or cruel; and (6) Reed committed the murder in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. The state trial court found that no mitigating circumstances existed.

The state trial court found these statutory mitigating circumstances, among others, were not present: (1) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, (2) the defendant acted under extreme duress or under the substantial domination of another person, or (3) the murder was committed while the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. The state trial court stated:

---

[4]In concluding this statutory aggravating factor was present, the state trial court noted only that Reed "stands convicted of Sexual Battery and Armed Robbery in the instant case."

13

> While no evidence was offered to show that any of these three
> mitigating factors existed, the Court has, nonetheless, considered the
> psychiatric examination report of Dr. Ernest Miller and Karen Kaldor,
> dated October 31, 1986, and finds that there is no evidence to sustain
> a finding that any of the three factors exist.

As to non-statutory mitigating circumstances, the state trial court stated that "[n]o

evidence has been presented to show the existence of any other factors which

should be considered in mitigation."

**F.    Direct Appeal**

Reed appealed his convictions and death sentence. Reed argued, <u>inter alia</u>,

that insufficient evidence supported four of the six aggravating circumstances

found by the state trial court. <u>See</u> <u>Reed I</u>, 560 So. 2d at 205-07.

The Florida Supreme Court affirmed but did uphold Reed's challenge to two

of the six aggravating circumstances. It held the prior-violent-felony circumstance

was invalid because it relied only on the sexual battery and robbery of Mrs.

Oermann, and the cold, calculated, and premeditated circumstance was based on

insufficient evidence. <u>Id.</u> at 207. Nevertheless, the Florida Supreme Court

concluded that the elimination of two of the six aggravating circumstances would

not have changed Reed's sentence. <u>Id.</u> The Florida Supreme Court rejected

Reed's other claims as lacking in merit or not preserved for appeal. <u>Id.</u> at 205-07.

The United States Supreme Court denied certiorari. <u>Reed v. Florida</u>, 498 U.S. 882,

14

111 S. Ct. 230 (1990).

## G.    Rule 3.850 Motion, Appeal, and Remand

In February 1992, Reed filed in the state trial court a motion pursuant to

Florida Rule of Criminal Procedure 3.850 to vacate his convictions and sentence.[5]

Reed's Rule 3.850 motion raised many claims, including that trial counsel Nichols

was ineffective in failing to investigate and present mitigation evidence in the

penalty phase.

In August 1992, the Rule 3.850 court denied Reed's Rule 3.850 motion

without an evidentiary hearing.  The Rule 3.850 court noted that, despite bringing

ineffective trial counsel claims, Reed was refusing to waive the attorney-client

privilege between him and Nichols or to disclose Nichols's files to the State.  By

doing so, the Rule 3.850 court stated, Reed "has precluded the State from obtaining

the discovery to which it is entitled."  Consequently, the Rule 3.850 court denied

an evidentiary hearing on Reed's ineffective trial counsel claims.  It also found

each of Reed's assertions of deficient performance and prejudice were not

supported by the record.

Subsequently, the Florida Supreme Court affirmed the Rule 3.850 court's

denial of Reed's claims other than his ineffective trial counsel claims.  Reed v.

---

[5]We refer to the state trial court, in connection with Reed's Rule 3.850 proceedings, as
the "Rule 3.850 court."

15

State, 640 So. 2d 1094, 1095-98 (Fla. 1994) ("Reed II"). It reversed the Rule 3.850 court's denial of an evidentiary hearing. Id. at 1096. The Florida Supreme Court ruled that Nichol's files must be produced, and remanded the case to the Rule 3.850 court to hold an evidentiary hearing on Reed's ineffective trial counsel claims. Id. at 1097-98.

## H.    Rule 3.850 Evidentiary Hearing

Following a number of delays and further proceedings, including Reed's unsuccessful interlocutory appeal of the Rule 3.850 court's order permitting the State to review Nichols's files, the Rule 3.850 court held an evidentiary hearing on February 19-22, 2002. Eighteen witnesses testified. We summarize that testimony as to Reed's ineffective trial counsel claims as to mitigation evidence at the penalty phase.

### 1.    Alan Chipperfield: First Defense Counsel

Alan Chipperfield, who worked for the public defender's office and was Reed's first defense counsel, testified for Reed at the Rule 3.850 evidentiary hearing. Before Reed's case was transferred to Nichols, Chipperfield was working on gathering penalty phase information. Chipperfield was "real concerned with Grover Reed's history of huffing gasoline and the hospitalization that he had" for lead encephalopathy, seizure disorder, and Valium withdrawal. Chipperfield

described his investigation and preparation of this mitigation evidence:

A First thing is we got the medical records from the hospital that documented what we had been told by family members and then we were doing research on the effect of huffing gasoline on a person's brain and behavior and we had talked about getting witnesses. . . . "[W]e pulled some articles about lead poisoning from different publications.

Q And what ideas did those articles give you for the defense?

A Well, it was primarily a penalty phase investigation and we thought this would be mitigating if Grover Reed had organic brain damage or had suffered convulsions or was addicted to chemical substances or gasoline, and we believed that there was a relationship between gasoline huffing and brain damage.

Q Do you remember which mitigator you were going to try to apply that to?

A Well, it could apply to extreme mental or emotional disturbance. It could apply to inability to conform his actions to the requirements of the law or it could be – those two would be statutory mitigators or it could be a non-statutory mitigator[] if it was neither extreme nor substantial. It also affected his childhood and could – if he wasn't properly supervised in childhood and therefore was allowed to huff gasoline all the time from age nine I think at least you could present an argument that he didn't have real good parents.

Chipperfield noted that the Hendersonville Hospital and Middle Tennessee MHI records reported Reed suffered "lead encephalopathy due to chronic lead poison seizure disorder caused by valium withdrawal or lead encephalopathy."

When the case was transferred to Nichols, Chipperfield was "very concerned that [Nichols] should get information . . . that was relevant to [the] penalty phase about lead poisoning." Although at the time of the Rule 3.850 evidentiary hearing

17

Chipperfield did not recall whether he gave copies of his files to Nichols,

Chipperfield's normal practice when a case was transferred was to make his files

available to the new attorney.  As mentioned above, Dr. Miller's report, issued in

October 1986, states that Nichols furnished Dr. Miller with the Hendersonville

Hospital, Nashville General, and Middle Tennessee MHI records to assist in his

evaluation.  Thus, it is clear that Nichols had copies of the hospital records by

October 1986 at the latest.

### 2.    Dr. James Larson: 1992 Psychological Evaluation

Reed also called Dr. James Larson, a clinical psychologist, who performed a

psychological evaluation of Reed in 1992, more than five years after Reed's

sentence.  Reed's collateral counsel hired Dr. Larson and provided him with

background materials on Reed, including medical records and affidavits from

Reed's family members, friends, and former school teachers.[6]  Dr. Larson based his

conclusions on his review of this background information, a psychological

interview of Reed, and cognitive testing which included neuropsychological and

---

[6]Although Dr. Larsen did not have his complete file available during the evidentiary
hearing to refresh his recollection, he testified that this background information included: school
records from Robertson County, Tennessee and DeRidder, Louisiana; medical records from
Jesse Holman Jones Hospital, Henderson Hospital, Nashville Memorial Hospital, Metropolitan
Nashville General Hospital, and Middle Tennessee MHI; a September 1963 Robertson County
court order appointing a guardian for Reed; records from the Nashville Metropolitan Police
Department and the Jacksonville Sheriff's Office; Florida State Prison medical and inmate
records; Dr. Miller's evaluation report; and affidavits from Reed's grandmother, mother, uncles,
siblings, church members, school teachers, and principal.

personality tests.

In Dr. Larson's opinion, "[t]here was considerable mental health mitigation in this case." Dr. Larson opined that there were two statutory mitigators: (1) "One was for the offense for which the defendant was charged was committed while the defendant was under the influence of extreme emotional disturbance"; and (2) "the second one was whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." In Dr. Larson's opinion, the non-statutory mitigators that could have been presented were: (1) "impaired judgment, educational depr[i]vation, defect as a child, abuse as a child, cultural depr[i]vation, actual physical abuse, emotional abuse, alcohol abuse, adult child of an alcoholic"; and (2) "drug abuse, lead poisoning, organic brain syndrome diagnosed by medical doctors, personality disorder, history of mental illness as diagnosed by other physicians, deficiency of positive role models," and "possible interaction of organic brain syndrome and alcohol or drugs during the time frame of the events." Dr. Larson testified that several of the non-statutory mitigating circumstances arose from Reed's "very chaotic background" that included his mother essentially abandoning him, his being left with his grandmother, his stepfather abusing him, and his history of substance abuse and huffing gasoline. Dr. Larson testified that huffing gasoline an

19

extended period of time causes irreversible brain damage, and that he observed

signs of that type of brain damage in Reed during his psychological testing. Dr.

Larson added that the medical records suggested Reed had suffered a head injury

as well.

On cross-examination, Dr. Larson admitted that during his interview, Reed

minimized the extent of his drug use. Also, as to the day of the murder, Reed

admitted drinking beer but denied huffing gasoline. Dr. Larson also admitted that

Reed had no indications of formal thought disorder and Reed's thought processes

were "logical, coherent, relevant, and goal directed." Dr. Larson found no

evidence of delusional disorders.[7]

As to personality, Dr. Larson diagnosed Reed as having characteristics of

antisocial personality disorder and narcissistic personality disorder. Dr. Larson

characterized Reed as selfish, self-indulgent, thrill-seeking without regard to

consequences, and easily bored and frustrated. Dr. Larson admitted that in many

cases in which he has made a diagnosis of antisocial personality disorder, he is not

asked to testify because it is an unflattering diagnosis:

Q    Anti-social personality is not a pretty picture, is it?
A    No.  It's oftentimes referred to as a criminal personality.   It

---

[7]As to intelligence, Dr. Larson testified that Reed had a verbal IQ of 83, a performance IQ of 79, and a full-scale IQ of 79, which placed him in the "very upper part of the borderline range and statistically not different than the very lowest part of the low average range . . . ."

20

    essentially has to do with – it's a pretty picture in some ways. It gives you a job because so many of the people you prosecute would suffer from that kind of disorder.

Q Predisposition to criminality?

A That's correct.

Q In your experience, Doctor, you are not called upon too often to testify in front of a jury that anti-social personality disorder is a form of mitigation, are you?

A No, but actually [I] have been called on several times, even though the person does meet the criteria to explain to the jury how the individual got this disordered personality, and so sometimes when I have been called on by an attorney I have explained how early conditions in childhood resulted in this kind of personality development, but you are right, many times attorneys steer away from using me in testimony when I have used that kind of diagnosis in the diagnostic work.

Q And that's because an anti-social behavior is what really underlies a sociopath, is that right?

A Yes.

Q And a sociopath is a person who in a very literal, rubber meets the road sense of the word just doesn't give a damn, is that right?

A Yes.

Q This is the ultimate narcissistic personality, is that right?

A Yes.

3. <u>William Reed: Family Background</u>

Reed also called his brother William Reed ("William") to testify. William and Reed had "a pretty rough childhood." Their parents married when their father was eighteen and their mother was fourteen. Their father was "bad about drinking and fighting" and their parents "fought all the time." During one fight when William was four years old and <u>Reed was an infant</u>, their father came home drunk

and threw a pot of coffee on their brother Tony and threatened to kill them and their mother. Their mother locked the children in a bedroom and shot their father with a shotgun and killed him.

Their mother remarried two years later, but after a few years the children went to live with their grandparents. After a time they went back to live with their mother and her husband Charles Lassman. Stepfather Lassman was drunk and abusive to the children and their mother. William stayed out of Lassman's way, but "some nights I seen him beat [their sister] Diana and [Reed] all night long." Lassman was the most violent man William had ever seen. Lassman beat Reed because Reed had a bed-wetting problem.[8]

One time Lassman made all the children watch while he beat their mother, and William took one of Lassman's guns, pointed it at him, and told him to stop. Another time their grandmother chased Lassman out of the house with the butcher knife after she saw the scars on Diana and Reed from where Lassman beat them. After that, the children went back to live with their grandmother. While they lived with their grandparents, they heard from their mother only about once a year. She didn't see them, talk to them, or give them presents on their birthdays or at

---

[8]As discussed later, Diana Reed testified they lived with Lassman only eight months and she was beaten too for her bed-wetting.

Christmas.[9]

    William testified how the abuse they suffered affected him and his siblings:

> [T]he way I felt and everyone of us Reed's family if there is people
> out there do us and nobody do nothing about it then we are going to
> get them before they get us, and that's exactly the way we felt
> growing up, and the only people we really cared about was our two
> grandparents and the people that were around there, my aunts and
> uncles and that was it, and [Reed] it affected him so bad that he had
> always been extremely nervous – made us all nervous.

After they went to live with their grandparents, Reed received little discipline at all

because their grandmother was very indulgent with Reed. William testified that

his brother Reed was a "con artist" and would manipulate their grandmother into

letting him get what he wanted:

> [Reed] was like a con artist. I mean he had a way about wrapping
> [their grandmother] around his little finger and getting what he wanted
> and we never could figure out how he done it. . . .

Although all the children experienced this difficult childhood, William admitted

that none of Reed's three siblings (William, Diana, or Tony) had been charged

with murder, and none were in prison for anything.

    William testified that at about age ten Reed started huffing gasoline and

went downhill. Reed "would get so high that he didn't know what he was doing.

He would strike at anything, walls, anything." Afterward Reed began using other

--------

[9]The PSI states that Reed's grandmother got a lawyer and obtained custody of Reed and
his three siblings William, Tony, and Diane Reed.

23

drugs.

One time when Reed was huffing gasoline, his grandmother told him she wouldn't let him come in and eat supper, and Reed punched her and broke her nose. William and their grandmother went to talk to Reed. Reed agreed to go to drug rehabilitation, where he stayed about six weeks. But after getting out, Reed started using drugs again.

Before Reed moved to Florida, Reed stayed with William and his wife. William warned Reed not to use any drugs while staying at his house. When William's wife found a needle in the couch, William asked Reed to leave. Reed was angry and threatened to kill William's wife. William threatened his brother back. William "knew [Reed] wasn't going to do nothing. He was just threatening her." Reed left William's house and moved to Florida, and that was the last William saw of his brother.[10]

### 4.    Diana Reed Watts: Family Background

Reed also called his sister Diana Reed Watts ("Diana"). Diana testified that Lassman beat his stepchildren with a rope that he hung on the back porch to get wet with dew and then harden while it dried. Reed and Diana were Lassman's

---

[10]No one contacted William to see if he could testify on Reed's behalf until about ten years after Reed's trial was over. William did not come to the trial. Nor did he contact Reed or his attorney.

24

most frequent targets because they wet their beds. When they did, Lassman

> would beat us and then the next night we would have to sleep on the
> floor on the Army blanket and [when] we wet that we would hang it
> out on the line to dry and they would throw it back on the floor for us
> to sleep on that night.

Although Reed had no bed-wetting problems before they moved in with their

mother and Lassman, Reed and Diana wet their beds every day for the eight

months they lived with Lassman. Reed and Diana "had bruises and whips all over

us."

Their mother did not protect them from Lassman, and caused most beatings

by falsely telling Lassman they disobeyed her. Also, their mother beat them

herself with electrical cords. Lassman once invited them to say if they wanted to

go back to live with their grandparents. When Reed told Lassman he did, Lassman

made them spend three days kneeling before their mother and praying to her to

forgive them.

On cross-examination, Diana admitted that she and her brothers William and

Tony grew up in the same conditions as Reed did, and none of them were ever

arrested for a violent crime. Diana did say that she, Tony, and all of their half-

siblings (but not William) have had substance abuse problems.

    5.    Ronnie Yates: Personal Background

Reed called Ronnie Yates, his middle school physical education teacher.

Yates testified that Reed struggled as a student and repeated both seventh and eighth grades. Reed enjoyed Yates's P.E. class and showed some leadership skills there. On several occasions Reed showed up at school after having drunk alcohol. One time Yates had to get Reed to leave a school dance because Reed was drunk. Yates believed Reed did not have the family support and structure that he needed. Yates believed that Reed's academic problems stemmed from a failure to apply himself and from a lack of family encouragement and support.

### 6.    Christine Niznik: Drug Use

Christine Niznik, Reed's girlfriend and the mother of his child, testified for Reed as well. Reed had a drug problem throughout their relationship. He drank a lot, and also made and used a methamphetamine-type drug called "stove top" that he cooked on the stove and injected. Niznik said she injected stove top with Reed, but she did not use it anymore. Reed was "possibly" using stove top "around the time of the murder." The drug abuse that scared Niznik the most was Reed's gasoline huffing, because it made him act "wild" and hallucinate; it made him "different." When huffing gasoline, Reed "looked like he was mad" and "would raise his voice at things that weren't there." When Reed was under the influence of gasoline, Reed did not appear to be in control of himself, but Niznik couldn't say whether he was capable of controlling himself. On cross-examination, Niznik

26

admitted that she was abusing drugs and alcohol with Reed on a regular, almost

daily basis, and that she was "just as guilty as he is about that."

7.    Richard Nichols: Trial Counsel

Reed did not call his trial counsel Richard Nichols to testify, but the State

did. At the time of Reed's trial in November 1986, Nichols had been a lawyer for

thirteen years, and his practice at that time was mostly criminal defense. Before

private practice, Nichols was a prosecutor, and he had probably tried more than

thirty homicide cases either as a prosecutor or defense counsel. Most of the

homicide cases he tried were capital cases. In at least three cases, including one

murder case, Nichols called no witnesses at trial and obtained a not-guilty verdict

for his client.

Nichols began representing Reed after the public defender's office had a

conflict. The public defender's office already had done some work on the case by

the time Nichols was appointed. In preparing for trial, Nichols had discussions

with Reed.[11]  Those discussions included whether or not they would present

mitigation witnesses. Nichols testified that Reed instructed him not to present

mitigation evidence that either implied guilt or involved his family and friends:

---

[11]Although Reed never explicitly confessed guilt to Nichols, Nichols's discussions with
Reed left Nichols with the impression that Reed had committed the crime. Nichols testified that
the oblique admissions that Reed made to him did not, in Nichols's mind, lessen his obligation to
test the sufficiency of the State's evidence or the credibility of its witnesses.

Q    Turning to the . . . penalty phase of the trial and a decision to present mitigation or not present mitigation, did you discuss with Grover Reed whether you were going to present mitigation witnesses or not?

A    Yes.

Q    And what did he tell you?

A    Well, . . . mitigation comes in a couple different forms.

Q    Yes, sir.

A    <u>One of the forms at least requires that you essentially say, yes, I did it but here is why</u> and that would have been testimony about anything that had to do with his psychiatric or medical condition and he clearly instructed me not to argue anything that would imply that he was guilty and not to say he was guilty but here that you should forgive him or minimize this because of A, B and C, <u>and other aspects of mitigation is just to bring in family and friends to show that he is relatively a nice fellow and this was some</u> – not part of a pattern of behavior but just some <u>aberration,</u> and he essentially told me he did not want any of his family or friends to have to be subjected to this process and <u>he didn't want mitigation called in either of those categories.</u>[12]

(Emphasis added). When Nichols was asked whether he explained to Reed the

risks of not putting on mitigation testimony in the penalty phase, Nichols stated

that he was "sure we talked about it" and "I am sure I also had told him that prior

to the penalty phase that there was a high likelihood that he was going to be found

guilty of this." As discussed later, Nichols even had Reed sign an affidavit stating

that "My attorney has advised me that he believe[s] the chances of being sentenced

---

[12]Based on this testimony, Reed argues that Nichols's decision not to present mitigation evidence was based upon a mistaken belief that mitigation necessarily involves an admission of guilt. We disagree with this characterization of Nichols's testimony. Fairly read, Nichols's testimony states that many avenues of mitigation evidence imply that the defendant is guilty while seeking to explain or minimize culpability for the crime, not that mitigation requires or necessarily involves an admission of guilt.

to death were hypothetically <u>less</u> if I pled guilty and presented mitigating

psychological evidence."

    Reed's instruction to Nichols not to put on mitigation testimony came during

a conversation after the guilt phase.  Nichols reiterated that Reed agreed with the

decision not to present mitigation testimony:

> Q    So [Reed] agreed or concurred with the decision not to put on
> any mitigation testimony in the presence of the jury?
>
> A    Yes, and I am sure that there was some inquiry made.  There
> was an affidavit that I think I wrote out by hand where he said
> he did not want any of these people called.  Whether or not
> there was an inquiry made by the Court prior to the
> announcement that we were not going to call anybody I can't
> imagine that was not done but I don't recall it specifically.
>
> Q    And that affidavit, was that made a part of the record?
>
> A    I think so.  I am not – I don't know for sure.

    Nichols also explained that he decided strategically that he would present

some mitigation evidence to the state trial judge, instead of to the jury, because it

was medical or psychiatric evidence (such as Dr. Miller's report of Reed's gasoline

huffing) that a jury would not respond well to, but that a judge was more likely to

see in a favorable light:

> Q    . . . No actual testimony was put on in mitigation to the jury
> itself, but did you make a decision at the sentencing hearing
> itself, that is before the Judge did you make a decision to
> present mitigation to – directly to the Judge?
>
> A    Yes.
>
> Q    And what did you present to the Judge?

A        It's my recollection that I think it was Dr. Miller . . . had done
         an examination and part of that examination there were details
         concerning I think the huffing of gasoline and some other
         things of that nature that were presented to the Court.

Q        And was part of your decision to present that to the Court only
         was that you did not feel that huffing gasoline would be
         mitigation to the jury?

A        Yeah.  Part of my decision was Mr. Reed's instruction not to
         argue that kind of mitigation, but had I had the choice I
         probably would not have argued it because the nature of this
         crime, and it was a particularly brutal scenario once it was all
         presented to the jury, was one such that I didn't think the jury
         would really react well to that sort of medical or psychiatric
         mitigation, whereas I thought the Court would be more I guess
         sensitive – I think that the Court would understand the impact
         of that more than a jury would and not find it to be a shallow
         offer of mitigation.

Q        So you thought that you still had a chance with the Court at that
         point to mitigate it and perhaps get a life – a life sentence from
         the Judge?

A        Yeah.  It was a strategy decision.  I thought although it's not
         very likely in my experience that a Judge is going to override a
         large – as I recall I think the vote was 11 to 1 for death in this
         recommendation, I didn't think it was very likely the Judge
         would override it but that I thought it was much more likely
         that a Judge would take that into serious consideration than
         would the jury.

Nichols testified specifically that with respect to Dr. Larson's diagnosis of

antisocial personality disorder, if he had known Reed suffered from this disorder,

he would have chosen not to present that evidence to the jury because he didn't

think a jury would find it mitigating and because Dr. Larson's diagnosis was

"essentially the profile of a person who is going to be violent when it fits their

30

need":

| | |
|---|---|
| Q | Would you put on the fact that Grover Reed suffered from an antisocial personality disorder? |
| A | No. |
| Q | Why not? |
| A | I don't think a jury would find that mitigating. |
| Q | And is that because anti-social personality disorder is basically a personality of a criminal? |
| A | The report that I am now aware of [by Dr. James Larson, issued in 1992] that [Reed] is – that he had that particular disorder and I think they said with narcissistic tendencies is essentially the profile of a person who is going to be violent when it fits their need. |
| Q | And effective cross examination from a prosecutor would have brought that out to the jury? |
| A | I would think so, yes. |

## I.    Second Rule 3.850 Order

After the evidentiary hearing, the Rule 3.850 court issued an order denying

the remaining claims of Reed's Rule 3.850 motion.  The Rule 3.850 court divided

Reed's penalty-phase ineffective assistance claims into the failure to present

mitigating evidence of (1) Reed's family and personal background, and (2) mental

health testimony.  The Rule 3.850 court found that Reed failed to satisfy either the

performance or prejudice prongs for either claim.

As to Reed's family/personal/background mitigation claim, the Rule 3.850

court first noted the uncontroverted facts that Reed (1) "specifically refused to

permit trial counsel to offer mitigation which would in any way suggest his guilt of

31

the crimes with which he had been charged," and (2) at least twice instructed

Nichols not to involve his family members in the trial. The Rule 3.850 court found

confirmation of these instructions in Reed's handwritten waiver of trial evidence

form executed on November 19, 1986:

> At the evidentiary hearing, it was uncontroverted that the defendant specifically refused to permit trial counsel to offer mitigation which would in any way suggest his guilt of the crimes with which he had been charged. Furthermore, apparently on at least two (2) occasions, the defendant instructed trial counsel not to involve family members in the trial. That the defendant gave trial counsel such instructions is confirmed (albeit indirectly) by the handwritten waiver form signed by the defendant. While the form is more directly related to the defendant's waiver of trial evidence, paragraphs seven (7) and twelve (12) confirm trial counsel's testimony regarding the defendant's instructions declining any evidence of his guilt. It also confirms that trial counsel and the defendant discussed the admission of psychological evidence. The entire form is included herewith to insure context. (Bolding is supplied).
>
> 1.  I am Grover Reed, the defendant in 1st Degree Murder case in Duval County, Fla., Cs# 86-6123 CF Div. W.
> 2.  Throughout this case both publicly and privately and in all conversations with my attorney I have constantly maintained my complete innocense [sic] of all these charges.
> 3.  I have complete and clear recollection of the events before[,] during, and after Feb.[ ]27, 1986. There are no voids or gaps in my memory of this period.
> 4.  On Feb. 27, 1986 I was never at or near the residence of Betty Oermann, the victim in this case.
> 5.  I have not provided my attorney with the names of any people who were with me from the time Mike Shelbour[n]e left me with the broken down auto (about 2:30 p.m. 2-27-86) until I returned home to the trailer park because I was not with nor did I see anyone whose

name I know during that time.

6.    My attorney has discussed with me the possibility of a defense based on a theory that I in fact killed the victim but was temporarily insane.

7.    **I have refused to allow my attorney to as[s]ert or put forward any defense which assumes or implies I murdered Betty Oermann.**

8.    I understand the State argues 1st and last during closing argument [] if I call any witnesses other than myself. But my attorney argue[s] 1st and last if I call no witness other than myself.

9.    Although my attorney and I have discussed calling certain witnesses I believe that no witness could establish an[] alibi for me and no witness could contribute evidence which was not available either through my own testimony, if I testify, or through the state[']s own witnesses.

10.    I have therefore instructed my attorney to call no witnesses nor to offer any evidence in my behalf so my attorney can have 1st and last argument[.]

11.    My attorney has advised me that there is a high likelihood that I will be convicted of 1st Degree Murder and if convicted that I will be given the death penalty.

12.    **My attorney has advised me that he believe[s] the chances of being sentenced to death were hypothetically <u>less</u> if I pled guilty and presented mitigating psychological evidence.**

13.    No offers have been made by the State to induce me to plead.

14.    I have advised my attorney that although I understand his advice I will not plead guilty because I am not guilty.

11-19-86

(Signed Grover B. Reed)

In light of Reed's instructions to Nichols, the Rule 3.850 court concluded "that the defendant waived the presentation of mitigation evidence by his instructions to

counsel [and] cannot now be heard to complain."[13]

The Rule 3.850 court noted the testimony of Yates, William, and Diana about Reed's "horrific childhood, his substance abuse, and his propensity to violence." The Rule 3.850 court concluded that it was unlikely the jury would have found their testimony to be mitigating, especially given the fact that Reed threatened William's wife:

> In assessing the evidentiary hearing testimony, this Court concluded that it is highly unlikely that the jury would have considered this evidence to be mitigating. In fact, the brother related an instance in which he had taken the defendant into his residence because of the defendant's destitute situation. During the course of that stay, the brother found that the defendant was continuing his substance abuse and essentially evicted him from his home. Sometime during the course of this conflict, the defendant threatened the brother's wife.

The Rule 3.850 court determined that these facts were "entirely too similar" to the facts the jury heard in the guilt phase – that is, that Reed "was again taken into someone's residence, again lost his permission to be in the residence, and again threatened the woman of the house." The Rule 3.850 court also stressed the testimony that Reed attacked his grandmother and broke her nose. The Rule 3.850 court found that had Nichols known of the Rule 3.850 testimony, he would not

---

[13]The Rule 3.850 court also found confirmation for Reed's alleged desire not to have his family members involved in his defense from William's testimony at the Rule 3.850 evidentiary hearing that Reed left Tennessee after fighting with William and didn't contact William for at least ten years.

have introduced it because it – or the information the State could adduce on cross-

examination – was consistent with the State's position that Reed was a violent drug

abuser:

> [H]ad this evidence been known to trial counsel at the time, it is likely that he would not have opted to introduce it. If nothing else, the evidence would tend to support the state's trial position that the defendant was a substance abuser prone to violence.
>
> It should also be noted that had these family members testified, they would have more than likely been cross-examined by the state on the defendant's criminal record, his substance abuse, his propensity to violence and his otherwise questionable character. Although trial counsel might not actually have known at the time what the family members would have testified to (as he followed his client's instructions not to contact them), it is implausible to believe that he would have called them to the stand to have the jury learn anything about his client which was consistent with the state's position in the case.

As to the family and personal-background evidence, the Rule 3.850 court

concluded that even absent Reed's instruction that mitigation evidence not be

presented, Reed could not prove either deficient performance or prejudice because

the negative nature of the Rule 3.850 evidence was so damaging as to outweigh

any mitigating qualities:

> Forgetting for a moment this Court's conclusion that defendant effectively waived the opportunity to present mitigation evidence, upon the evidence actually presented at the evidentiary hearing, this Court cannot conclude that there was any deficiency on the part of counsel had the witnesses been available for trial. It seems obvious that the negative nature of their testimony about the defendant would have been so damaging to the defendant as to far outweigh any

mitigative qualities that there may have been to the evidence regarding the defendant's less than pleasant childhood. Accordingly, even if the evidence had been known to trial counsel, this Court cannot conclude that, had the witnesses testified, there would have been any difference in the outcome of the trial. In fact, it appears more likely than not that had they testified, the result would have been virtually the same.

As to Reed's mental health mitigation evidence claim, the Rule 3.850 court noted that although Nichols presented no such evidence to the jury, he did present it to the state trial court:

> It should also be noted at this point that, although counsel did not present mitigation evidence to the jury, he did present mitigation evidence to the trial court. That evidence consisted of the reports of Dr. Ernest Miller, a local psychiatrist, who had examined the defendant at the request of trial counsel during the course of his representation of the defendant. Dr. Miller's report documented the defendant's substance abuse, huffing of gasoline, and other psychiatric imbalances which were presumably considered by the trial court. In addition, trial counsel introduced hospital admission records indicating drug dependency, and records from a mental health facility showing mental health problems. . . . [T]he state's post-evidentiary hearing memorandum indicates that the records contained a diagnosis of "chronic lead poisoning encephalopathy with seizure disorder."

The Rule 3.850 court reviewed Dr. Larson's testimony, including his opinion that Reed exhibited an impaired capacity to conform his conduct to the law's requirements, impaired judgment, educational and cultural deprivation, physical and emotional abuse, drug use, and organic brain syndrome. The Rule 3.850 court also noted Dr. Larson's testimony that Reed had an antisocial personality disorder

36

with narcissistic personality disorder, and that persons with such diagnoses "tend to be selfish, self-indulgent, . . . frequently seek thrills without regard to their consequences . . . [and] are likely to be people who exploit others."

Given the testimony of Dr. Larson, Nichols, and Chipperfield, the Rule 3.850 court found that had Nichols known what Dr. Larson's testimony would have been, Nichols would not have offered it anyway:

> Assuming for a moment that trial counsel had the defendant's permission to present this form of mitigation evidence, which he did not, this Court concludes that trial counsel would not have offered the testimony of Dr. Larson anyway. Such a decision would have been appropriate given the facts of the murder and rape of which the defendant was convicted and the nature of Dr. Larson's diagnosis. This Court concludes that it is all too likely that this sort of psychiatric testimony would have fit perfectly into the picture of the defendant painted by the state at trial, a substance abuser whose self-indulgence permitted him to commit unrestrained acts against others, including those who had ventured to love and care for him.
> At the evidentiary hearing, [Chipperfield] testified that the concept of offering psychiatric/psychological mitigation evidence is "a real complicated one" where the defendant is diagnosed as a sociopath or with an anti-social personality. According to Mr. Chipperfield, "It is hard to put on a penalty phase where that's your only diagnosis." He further acknowledged that such a diagnosis is not a "real favorable" one, and that at least a large part of the problem is that the diagnosis of anti-social personality is one of a person who basically has no regard for the rights and feelings of others.
> Trial counsel testified at the evidentiary hearing that (had Dr. Larson examined the defendant before trial), trial counsel would not have put before the jury the fact that defendant suffered from anti-social personality disorder. Trial counsel related that he didn't think a jury would find that sort of evidence mitigating because anti-social personality disorder with narcissistic tendencies is "essentially the

> profile of a person who was going to be violent when it fits their need."  Trial counsel was further concerned that effective cross-examination by a prosecutor would have brought all of this information out before the jury.

Consequently, the Rule 3.850 court concluded that Reed "failed to establish a deficient performance on the part of trial counsel" for not presenting mental health mitigation evidence because even if Reed had granted his permission for such evidence to be presented, Nichols "understandably would not have done so." Moreover, in light of Dr. Larson's testimony, the Rule 3.850 court concluded that "had he testified at trial, the primary thrust of his testimony would have resulted in aggravation against the defendant rather than mitigation for the defendant."

**J.     Second Rule 3.850 Appeal & State Habeas Petition**

Reed appealed the Rule 3.850 court's denial of his Rule 3.850 motion to the Florida Supreme Court, and also filed in the latter court his state habeas petition. The Florida Supreme Court affirmed the Rule 3.850 court's order denying Reed's remaining Rule 3.850 claims and denied Reed's state habeas petition. See Reed v. State, 875 So. 2d 415, 418 (Fla. 2004) ("Reed III"). The Florida Supreme Court pointed out that: (1) trial counsel Nichols "clearly investigated or was aware of Reed's background and mental health to an extent, as evidenced by the presentence investigation report, psychiatric report, and medical records presented to the trial court for penalty-phase consideration"; (2) those "reports and records contained

38

much of the mitigating information testified to by Reed's brother and sister"; and (3) "even if Reed's counsel had gone against his client's wishes and investigated further, the testimony that could have been presented was just as likely to have resulted in aggravation against rather than mitigation for Reed." Id. at 436-37. The Florida Supreme Court concluded that Reed's alleged mitigation evidence presented "a double-edged sword." Id. at 437. As examples, the Florida Supreme Court noted that "the family background testimony involved numerous facts that placed Reed in a very negative light, such as that he once broke his grandmother's nose, abused drugs over many years, was jailed on various occasions, continued his drug use after his brother took him in on the condition that he stop using drugs, and threatened to kill his brother's wife." Id. The Florida Supreme Court added that: (1) "[n]ot only was this evidence negative in general but was also particularly disadvantageous in light of the facts of the crime"; (2) this evidence "would have opened the door for the State to draw a parallel between Reed's violent reaction to being evicted from his brother's home due to his drug use and the victim's murder after she and her husband discontinued assistance to Reed, also due in part to his drug use"; and (3) "testimony regarding Reed's violence toward his grandmother and threats toward his brother's wife would have established a pattern of violence against women who had taken him into their homes." Id.

39

As for the mental health evidence, the Florida Supreme Court found that "Dr. Larson himself acknowledged certain aspects of his examination and testimony might have been more helpful to the State than the defense," and "antisocial personality disorder is a trait most jurors tend to look disfavorably upon." Id. (quotation marks omitted).

The Florida Supreme Court reasoned that Reed's case was distinguishable from Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003), because "Wiggins' counsel's failure to thoroughly investigate 'resulted from inattention, not reasoned strategic judgment.'" Reed III, 875 So. 2d at 437 (quoting Wiggins, 539 U.S. at 526, 123 S. Ct. at 2537). In contrast, the Florida Supreme Court pointed out that in Reed's case: (1) there is competent, substantial evidence that Nichols advised Reed of the risks of not presenting mitigation evidence and that Reed steadfastly rejected its presentation; and (2) a comparison of the 3.850 testimony with the information in the presentence investigation report, Dr. Miller's report, and the hospital records that Nichols presented to the trial judge revealed that Nichols was aware "of the family and medical facts of Reed's background relevant to mitigation, including that Reed's education was limited, his father died after being shot by his mother, his mother suffered from alcoholism, and he was previously diagnosed as suffering from lead encephalopathy and substance abuse problems." Id.

40

The United States Supreme Court denied Reed's certiorari petition. Reed v. Florida, 543 U.S. 980, 125 S. Ct. 481 (2004).

**K.    Federal Habeas Proceedings**

On July 5, 2005, Reed filed his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Reed's § 2254 petition claimed, among other things, that Nichols rendered ineffective assistance at the penalty phase by not adequately investigating and presenting mitigation evidence.

On September 29, 2008, the district court denied Reed's § 2254 petition in a lengthy, comprehensive order. With respect to each of Reed's claims, the district court concluded that the state courts' decisions denying him relief were not contrary to established federal law, did not involve an unreasonable application of established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Reed filed this appeal.[14]

## II. STANDARD OF REVIEW

Pursuant to § 2254(d), as amended by the Antiterrorism and Effective Death

---

[14]As mentioned, the district court granted Reed a COA on his mitigation evidence claim. The district court also granted a COA on Reed's two claims that: (1) the State's peremptory challenges violated Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986); and (2) Reed's trial counsel was constitutionally ineffective for failing to utilize a blood-type expert at the guilt phase. We affirm the district court's denial of these latter two claims for the reasons set forth in the district court's thorough and well-reasoned order.

Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief to a

state prisoner

> unless a state court's adjudication of a claim "resulted in a decision
> that was contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme Court
> of the United States," or the relevant state-court decision "was based
> on an unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding."

Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) (quoting 28

U.S.C. § 2254(d)(1), (d)(2)) (citation omitted). "The question under AEDPA is not

whether a federal court believes the state court's determination was incorrect but

whether that determination was unreasonable – a substantially higher threshold."

Id.

　　"We review de novo the district court's decision about whether the state

court acted contrary to clearly established federal law, unreasonably applied

federal law, or made an unreasonable determination of fact." Smith v. Sec'y, Dep't

of Corr., 572 F.3d 1327, 1332 (11th Cir. 2009). Thus, under AEDPA we review

the district court's denial of Reed's § 2254 petition de novo, but we "owe

deference to the final state habeas judgment." Peterka v. McNeil, 532 F.3d 1199,

1200 (11th Cir. 2008), cert. denied, 129 S. Ct. 1039 (2009).

## III. DISCUSSION

**A.    General Principles:  Ineffective Assistance of Counsel**

42

To establish ineffective assistance of counsel, a defendant must show (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). To show ineffective assistance, the defendant must satisfy both the performance and prejudice prongs. Id.

As to counsel's performance, "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." Bobby v. Van Hook, 558 U.S. —, 130 S. Ct. 13, 17 (2009) (quotation marks omitted). Thus, to establish deficient performance, a defendant must show that his counsel's conduct fell "'below an objective standard of reasonableness' in light of 'prevailing professional norms'" at the time the representation took place. Id. at 16 (quoting Strickland, 466 U.S. at 688, 104 S. Ct. at 2064-65). In assessing the reasonableness of counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices

43

made after less than complete investigation are reasonable precisely to the extent

that reasonable professional judgments support the limitations on investigation."

Id. at 690-91, 104 S. Ct. at 2066.

     Furthermore, the defendant's own words and deeds play a role in assessing

the reasonableness of counsel's conduct. See id. at 691, 104 S. Ct. at 2066 ("The

reasonableness of counsel's actions may be determined or substantially influenced

by the defendant's own statements or actions. Counsel's actions are usually based,

quite properly, on informed strategic choices made by the defendant and on

information supplied by the defendant."). A mentally competent defendant's

instruction not to investigate or not to present mitigation evidence may make

counsel's decision not to investigate or present mitigation evidence reasonable.

See, e.g., Cummings v. Sec'y for the Dep't of Corr., — F.3d —, 2009 WL

4452816, at *23-25 (11th Cir. Dec. 4, 2009) (collecting cases); Blankenship v.

Hall, 542 F.3d 1253, 1276-77 (11th Cir. 2008); Newland v. Hall, 527 F.3d 1162,

1202-05 (11th Cir. 2008), cert. denied, 129 S. Ct. 1336 (2009). Although counsel

may not "blindly follow" his client's instructions not to look for or use mitigation

evidence, Newland, 527 F.3d at 1208; Dobbs v. Turpin, 142 F.3d 1383, 1388 (11th

Cir. 1998), when a competent defendant clearly instructs counsel not to investigate

or not to present mitigation evidence, the scope of counsel's duty to investigate is

significantly more limited than in the ordinary case. See, e.g., Cummings, 2009 WL 4452816, at *25 (collecting cases); Knight v. Dugger, 863 F.2d 705, 750 (11th Cir. 1988); Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986).

To establish the prejudice prong, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In considering whether prejudice exists, courts must look at all the available mitigation evidence – both the trial evidence and the evidence adduced during postconviction proceedings – and then re-weigh that evidence against the evidence in aggravation. Williams v. Taylor, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515 (2000). In that process, what matters is not merely the number of aggravating or mitigating factors, but their weight. Van Hook, 130 S. Ct. at 20.

Thus, the prejudice-prong question in this case "is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. Ct. at 2069. In this question, too, the defendant's instructions to counsel are relevant. See Landrigan, 550 U.S.

45

at 475-77, 127 S. Ct. at 1941-42 (stating that where a defendant instructed his counsel not to offer any mitigation evidence and "would have . . . refused to allow his counsel to present any such evidence," "counsel's failure to investigate further could not have been prejudicial under Strickland"); Cummings, 2009 WL 4452816, at *26; Gilreath v. Head, 234 F.3d 547, 551 n.12 (11th Cir. 2000).

**B.    Reed's Claim: Performance Prong**

Reed argues that Nichols's investigation of mitigation evidence was objectively unreasonable, as was his decision not to present mitigation evidence to the jury in the penalty phase. Reed further argues that the Florida state courts' contrary conclusions were unreasonable. We disagree.

As to Nichols's investigation, the Florida Supreme Court found that Nichols "clearly investigated or was aware of Reed's background and mental health to an extent," given especially the materials Nichols submitted to the state sentencing court. Reed III, 875 So. 2d at 436. As to Nichols's decision not to present mitigation evidence to the jury, the Florida Supreme Court determined that Reed did not show deficient performance by Nichols because (1) Reed steadfastly instructed Nichols not to present it and, (2) in any event, the proposed mitigation evidence "present[ed] a double-edged sword" and "the testimony that could have been presented was just as likely to have resulted in aggravation against rather than

46

mitigation for Reed." Id. at 436-37.

For several reasons, the Florida Supreme Court's conclusion as to Nichols's

performance was not based on an unreasonable determination of the facts, and was

neither contrary to, nor an unreasonable application of, clearly established federal

law.   First, Nichols obtained considerable potential mitigation evidence.

Specifically, Nichols had and reviewed Reed's medical records from Middle

Tennessee MHI, Hendersonville Hospital, and Metropolitan Nashville General

Hospital.   Nichols, in fact, was the one who provided Dr. Miller with these records

to assist in the background investigation and evaluation that was done by Dr.

Miller and social worker Karen Kaldor, M.S.W.   And, once Dr. Miller issued his

report on Reed well before trial, Nichols had that as well.   Dr. Miller's report and

the hospital records already contained the vast majority of mitigation-related

evidence along the lines later proffered at the Rule 3.850 hearing, such as: (1)

Reed's mother shot and killed his father in self-defense; (2) Reed was removed

from his mother's custody because of her alcoholism when he was four years old;

(3) Reed was raised primarily by his grandparents (who obtained custody); (4)

Reed had an eighth grade education, at which point he left school to work in a

sawmill because his family needed money; (5) Reed was a self-described "jack of

all trades" who had worked as a concrete worker and in the steel and oil industries;

47

(6) Reed had a child, a girlfriend, and many friends; (7) Reed suffered a fractured

bone in his face from being struck with a pool cue; (8) in 1979, Reed drank up to

two or three cases of beer a day, but "slacked off after a period of treatment for

this," and by 1986 drank about a six-pack per week; (9) Reed began huffing

gasoline at about age nine and continued to do so regularly; (10) Reed reported

seizures associated with his gasoline huffing and, when high, exhibited bizarre and

combative behavior, such as screaming and attacking trees and a garage door; and

(11) Reed received medical treatment in 1981 for Valium dependence and for "lead

encephalopathy" due to chronic lead poisoning from inhalation of gas fumes.

Indeed, Nichols filed Dr. Miller's report with the state trial court on the first day of

the guilt phase of trial.

Despite all this evidence the defense had, Reed faults Nichols for not finding

more. But again, except for Dr. Larson's testimony, Reed's 3.850 mitigation

testimony largely just recounted, in somewhat more detailed form, the factual

background that Nichols already obtained. While Dr. Larson's opinions may have

differed from those of evaluators Dr. Miller and Kaldor, the facts remain that: (1)

Nichols had a thorough evaluation of Reed conducted; (2) Nichols gave Dr. Miller

a significant quantity of hospital and medical records; (3) Dr. Miller examined

those and had Reed undergo a battery of mental status and neurological tests,

including an electroencephalogram; (4) social worker Kaldor also participated in

the evaluation; (5) Dr. Miller's report and the hospital records contained the

significant information about Reed's childhood; and (6) Reed himself knew his

own personal background and all of the more detailed facts later presented.[15]  That

Dr. Larson may disagree with Dr. Miller's evaluation does not make Nichols

ineffective.  Further, "the mere fact a defendant can find, years after the fact, a

mental health expert who will testify favorably for him does not demonstrate that

trial counsel was ineffective for failing to produce that expert at trial."  Davis v.

Singletary, 119 F.3d 1471, 1475 (11th Cir. 1997).

    And, none of the evidence Nichols obtained would have convinced any

reasonably competent counsel of a need to do a more extensive investigation.  In

this regard, Reed's case is similar to Van Hook, 130 S. Ct. at 19, in which the

Supreme Court concluded that the defendant's trial attorneys were not deficient for

not investigating more after discovering substantial mitigating evidence.  In

---

[15]It is important to note that the details about Reed's childhood, drug abuse and gasoline huffing were known to Reed himself, but Reed denied having substance abuse problems anymore and can fault no one but himself for not providing Dr. Miller or Nichols more graphic information about his childhood.  See, e.g., McClain v. Hall, 552 F.3d 1245, 1251-52 (11th Cir. 2008), cert. denied, — U.S. —, 130 S. Ct. 197 (2009) (noting that whether defendant informed his trial counsel about defendant's abusive childhood is "extremely important" to determining reasonableness of counsel's performance); Peterka, 532 F.3d at 1208-09 (finding counsel's performance was not deficient in not presenting evidence that defendant Peterka declined an opportunity to escape from prison because Peterka should have known this was the kind of mitigation evidence his counsel would be interested in but Peterka failed to disclose it to counsel).

reinstating Van Hook's death sentence, the Supreme Court reasoned:

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained. It is instead a case, like <u>Strickland</u> itself, in which defense counsel's decision not to seek more mitigating evidence from the defendant's background than was already in hand fell well within the range of professionally reasonable judgments.

<u>Id.</u> (quotation marks and citations omitted)). Further, in Reed's case, Dr. Miller's conclusions – that Reed was of average intelligence; he had a fair general fund of information; his cognitive faculties were intact; he was able to use verbal and mathematical abstractions well; he had a good ability to register, store, and retrieve data; he was not hallucinated or delusional; his motor, sensory, and cerebellar functions were normal; he had no pathologic reflexes; his electroencephalograph test was normal; he was competent to stand trial; and he was able to understand the nature, quality, and wrongfulness of his actions at the time of Mrs. Oermann's murder – suggested a further investigation of mental health evidence would be unlikely to bear fruit.[16]

---

[16]The attorney performance-related facts of Reed's case are wholly different from those of <u>Porter v. McCollum</u>, 558 U.S. —, 130 S. Ct. 447, 452-53 (2009), where non-experienced counsel had only "one short meeting" with the defendant Porter regarding the penalty phase, never interviewed any witnesses, never requested any of Porter's medical, school, or military records, "ignored pertinent avenues for investigation of which he should have been aware," and "failed to uncover" any evidence of Porter's mental health or mental impairment, his family background, or his military service. <u>Id.</u> at 453. As discussed in footnote 21, <u>infra</u>, the crux of counsel's deficient performance in <u>Porter</u> was the failure to investigate and present Porter's compelling military history. Unlike <u>Porter</u>, there is no evidence of military service here.

As the Florida Supreme Court concluded, Nichols's decision not to present mitigation evidence to the jury at the penalty phase was not objectively unreasonable either. Reed instructed Nichols that Reed did not want any of his family or friends to be subjected to the penalty-phase process and that he did not want any mitigation testimony from them. Reed also instructed Nichols that he did not want any mitigation evidence presented that implied he was guilty of Mrs. Oermann's murder. According to Nichols, this instruction extended to "testimony about anything that had to do with [Reed's] psychiatric or medical condition." Reed's affidavit reveals that Nichols even advised Reed that his chances of receiving a death sentence were less if he pled guilty and presented mitigating psychological evidence, but Reed refused. The ultimate "decision whether to use mitigating evidence is for the client." Dobbs, 142 F.3d at 1388. And Reed was undisputably competent to make that decision. Indeed, Reed never testified in the Rule 3.850 proceedings and never said that if he had known about the 3.850 evidence, he would have changed his mind at trial and let his counsel present the mitigation evidence to the jury at trial.

Nichols also did not "blindly follow" Reed's instruction that he not present mitigation evidence. See Newland, 527 F.3d at 1208-09; Mitchell v. Kemp, 762 F.2d 886, 889-90 (11th Cir. 1985). Indeed, here Nichols also made an independent

51

<u>strategic</u> decision not to present to the jury the mitigation evidence that was unearthed. At the Rule 3.850 hearing, Nichols testified that he decided to submit mitigation evidence to the state trial judge – but not to the jury. Nichols explained that his strategic decision not to present the proposed mitigation evidence to the jury stemmed from his belief that, given the brutal nature of this crime, the jurors would not react well to the types of medical and psychiatric evidence about Reed he had discovered, and that jurors would find such evidence in Reed's case to be "a shallow offer of mitigation" and would probably not give it serious consideration. Nichols testified: "It was a strategy decision."

And Nichols's strategic decision was well informed by his extensive experience as a trial lawyer. At the time of Reed's trial, Nichols had served both as a prosecutor and a criminal defense attorney, had thirteen years' experience, and had tried more than thirty homicide cases, most of which were capital cases. The presumption that counsel's performance is reasonable is "even stronger" when counsel is particularly experienced. <u>See Chandler v. United States,</u> 218 F.3d 1305, 1316 & n.18 (11th Cir. 2000) (<u>en banc</u>) (noting that, although "[n]o one's conduct is above the reasonableness inquiry" and "even the very best lawyer could have a bad day," "[e]xperience is due some respect").

Because Nichols believed that the jury would not find significant the types

52

of mitigation evidence in this case, he advised Reed against testifying and obtained

an agreement with the State that neither side would submit new evidence at the

penalty phase, but would proceed directly to their arguments. As part of this

agreement, Nichols stipulated on Reed's behalf that he would not argue that the no-

significant-criminal-history statutory mitigating factor existed (which Nichols

thought he could probably not establish in any event), and in return the State would

not introduce before the jury any evidence of Reed's prior convictions.

In short, Nichols decided not to present mitigating evidence at the penalty

phase, partly because of Reed's instructions to him and partly based on his own

independent judgment that the jury would not react well to the types of mitigating

evidence about Reed. Nichols made the strategic decision to argue residual doubt

and to keep the jury from hearing new aggravating evidence from the State at the

penalty phase in return for not making a mitigation-evidence presentation that he

considered weak. See Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 787-88

(11th Cir. 2003) (noting that "[c]reating lingering or residual doubt over a

defendant's guilt is not only a reasonable strategy, but 'is perhaps the most

effective strategy to employ at sentencing'"); Stewart v. Dugger, 877 F.2d 851, 856

(11th Cir. 1989) ("Trial counsel made a strategic decision that in light of the

atrocious nature of the offense, [the defendant's] only chance of avoiding the death

penalty was if some seed of doubt, even if insufficient to constitute reasonable doubt, could be placed in the minds of the jury. . . . Trial counsel cannot be faulted for attempting to make the best of a bad situation."). Under the circumstances, Reed has not "overcome the presumption that . . . the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks omitted).[17]

For all of these reasons, we conclude that Reed has not satisfied his burden of showing that the Florida Supreme Court's determination that Nichols's penalty-phase performance was reasonable was contrary to, or involved an unreasonable application of, clearly established federal law. Nor has Reed demonstrated that the

---

[17]Reed contends Nichols did not present mitigation evidence to the jury because he could not procure mitigation witnesses' attendance for financial or logistical reasons. Reed cites this statement by Nichols to the state trial judge:

> I want to alert the Court . . . that we had passed the matter to today to try to get witnesses here from out of state to testify in Mr. Reed's behalf, primarily in the fashion of character witnesses[,] and because of finances and logistics, none of those people are available and I don't have any reasonable likelihood that they're going to be available so I cannot and will not at this time ask the Court to delay this hearing any further on that basis.

Reed ignores that Nichols made this statement at the December 18, 1986 sentencing hearing before the state trial judge, which took place weeks after the penalty phase in front of the jury was finished on November 26, 1986. This sentencing hearing was scheduled for December 10 and eventually held on December 18, 1986. In this context, it is clear that "the matter" that was "passed . . . to today to try to get witnesses here" was the hearing before the judge, not the penalty phase before the jury. Thus, the statement is consistent with Nichols's strategy, developed before the penalty phase, of presenting mitigation evidence to the judge instead of the jury. And Nichols's ultimate decision to rely on the submitted documentary evidence before the state court is also consistent with the fact Nichols knew his audience was a judge instead of a jury.

Florida Supreme Court's decision was based on an unreasonable determination of the facts in light of the state court record.

## C.    Reed's Claim: Prejudice Prong

Alternatively, even assuming Nichols's performance was deficient, Reed has not shown the requisite prejudice. As the Florida Supreme Court found, "the testimony that could have been presented was just as likely to have resulted in aggravation against rather than mitigation for Reed." Reed III, 875 So. 2d at 436-37. The Florida Supreme Court determined that: (1) the proposed family background testimony "involved numerous facts that placed Reed in a very negative light," including his long-term drug use, multiple terms in jail, breaking his grandmother's nose, and threatening to kill his brother's wife; (2) the negative evidence was "particularly disadvantageous in light of the facts of the crime," as Reed's violent attack on his grandmother and his threatening of his brother's wife "established a pattern of violence against women who had taken [Reed] into their homes"; and (3) several aspects of the mental health evidence, including the antisocial personality disorder diagnosis, "might have been more helpful to the State than the defense." Id. at 437.

In Reed's case, "the worst kind of bad evidence would have come in with the good" mitigation. Wong v. Belmontes, 558 U.S. —, 130 S. Ct. 383, 390

55

(2009); see Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1251 (11th Cir.

2009) (finding prejudice prong not satisfied where proposed mitigation testimony

would have opened the door to damaging evidence); Gaskin v. Sec'y, Dep't of

Corr., 494 F.3d 997, 1004 (11th Cir. 2007) (same); Robinson v. Moore, 300 F.3d

1320, 1350-51 (11th Cir. 2002) (same).[18]  In fact, brother William's "mitigation"

testimony was a gold mine of aggravation for the State.  William described Reed as

a "con man" who threatened his sister-in-law and attacked their grandmother who

raised them and saved them from their abusive stepfather.  Specifically, William

testified that Reed: (1) punched his grandmother in the face and broke her nose

when she told him she wouldn't let him come inside her house; and (2) threatened

to kill William's wife after she found evidence that Reed was using drugs in her

and William's home and William asked Reed to leave.  Additionally, Dr. Larson's

diagnosis of antisocial personality disorder was equally not "good" mitigation.

See, e.g., Cummings, 2009 WL 4452816, at *35 (stating that a diagnosis of

antisocial personality disorder "is not mitigating but damaging") (collecting cases);

---

[18]In Belmontes, the Supreme Court reinstated petitioner Belmontes's death sentence because it found that even if Belmontes's trial counsel's performance in investigating and presenting mitigation evidence was deficient, Belmontes could not show prejudice. Belmontes, 130 S. Ct. at 384-86. Belmontes's counsel "built his mitigation strategy around the overriding need to exclude" evidence that Belmontes has committed an earlier execution-style murder. Id. at 385. The Supreme Court concluded that not only was Belmontes's proposed mitigation evidence cumulative of much of the evidence his counsel had presented to the jury, but it would have opened the door to the extremely damaging other-murder evidence that "would have made a difference, but in the wrong direction for Belmontes." Id. at 387-88.

see also Looney v. State, 941 So. 2d 1017, 1028-29 (Fla. 2006) (observing that "[t]his Court has noted that a diagnosis as a psychopath is a mental health factor viewed negatively by jurors and is not really considered mitigation") (citing Dufour v. State, 905 So. 2d 42, 57-58 (Fla. 2005)); Freeman v. State, 858 So. 2d 319, 327 (Fla. 2003).

Had trial counsel Nichols put on Reed's family members or other witnesses to testify about his family background, the State assuredly would have brought out that Reed assaulted his own grandmother and threatened his brother's wife. Had this occurred, it would have been devastating for Reed's chances at sentencing for killing Mrs. Oermann, because as the Florida Supreme Court correctly noted, the instances of Reed's attacking his grandmother and threatening his sister-in-law show a disturbing "pattern of violence against women who had taken [Reed] into their homes." Reed III, 875 So. 2d at 437. When persons who tried to help Reed put limits on his conduct and forbade drug use in their homes, Reed responded with violence. And even without the jury hearing this specific testimony, it would have been all too easy for the State to use Reed's own mitigation witnesses to paint him as a violent, manipulative person with long-standing drug abuse issues and brushes with the law. The probability of proposed mitigating evidence opening the door to strong aggravating evidence is an important factor to consider in assessing

57

the reasonable probability of a different sentencing result. <u>Belmontes</u>, 130 S. Ct. at 389-90; <u>see</u> <u>Windom</u>, 578 F.3d at 1251; <u>Gaskin</u>, 494 F.3d at 1004; <u>Robinson</u>, 300 F.3d at 1350-51.[19] Here, it was not just a reasonable probability, but a virtual certainty that Reed's "good" mitigation evidence would have led to the introduction of "bad" evidence. <u>Belmontes</u>, 130 S. Ct. at 390.

In short, Reed has not shown that there is a reasonable probability that he would have received a sentence less than death had the proposed 3.850 evidence been presented. <u>See</u> <u>Porter v. McCollum</u>, 558 U.S. —, 130 S. Ct. 447, 453 (2009) (stating that, to establish prejudice, petitioner "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence"). The Florida Supreme Court considered all the evidence – both adduced at trial and in postconviction proceedings – in mitigation <u>and</u> aggravation of sentence. <u>See</u> <u>Porter</u>, 130 S. Ct. at 453-54 ("To assess that probability [of a different sentence], we consider the totality of the available mitigation evidence –

---

[19]In addition, Reed instructed Nichols that he did not want his family or friends to testify at the penalty phase, and that he did not want Nichols to present any mitigation evidence that implied he was guilty of Mrs. Oermann's murder, including any "testimony that had anything to do with his psychiatric or medical condition." Reed chose not to testify himself. These instructions completely overlap with the areas of proposed mitigation evidence offered at the Rule 3.850 hearing. Reed has not demonstrated that he would have permitted his counsel to introduce the proposed mitigation evidence even if counsel had been ready, willing, and able to present it, and, consequently, Reed has not shown his counsel's conduct prejudiced him. <u>See</u> <u>Landrigan</u>, 550 U.S. at 475, 127 S. Ct. at 1940-41; <u>Cummings</u>, 2009 WL 4452816, at *26.

both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." (quotation marks and brackets omitted)).  This includes aggravating evidence to which the proposed mitigating evidence would open the door.  See Belmontes, 130 S. Ct. at 387 ("In evaluating [the prejudice] question, it is necessary to consider all the relevant evidence that the jury would have had before it if [counsel] Schick had pursued the different path – not just the mitigation evidence Schick could have presented, but also the [aggravating] Howard murder evidence that almost certainly would have come in with it.").

And the crime evidence itself in aggravation was substantial.  Reed raped, strangled, and repeatedly stabbed a 57 year old woman who had helped him and his family when they were homeless and in need.  The four statutory aggravating factors were: (1) Reed murdered Mrs. Oermann while committing sexual battery; (2) Reed murdered Mrs. Oermann for pecuniary gain; (3) Reed murdered Mrs. Oermann to avoid or prevent arrest; and (4) Reed's murder of Mrs. Oermann was especially heinous, atrocious, or cruel.  In considering the weight of the aggravating factors, see Van Hook, 130 S. Ct. at 20, this last circumstance looms large.  The evidence showed Reed slapped Mrs. Oermann, tied her up and beat her severely, then choked her and raped her.  Reed then killed her by repeatedly

59

slashing her throat more than a dozen times. All told, the brutal circumstances of the crime alone provided powerful aggravating evidence. And the "bad" evidence that would follow the "good" mitigation evidence would have piled on top of the crime-related aggravation.

By contrast, the proposed mitigation evidence was weak, and most of it was alloyed with negative information. Even the portions that were "good" mitigation evidence – Reed's horrific childhood clearly qualifies – would have opened the door to damaging testimony. For example, Reed's brother William testified that their father was abusive and was killed by their mother in self-defense, but Reed was an infant when his father died and William never had the problems Reed did. Both brother William and sister Diana testified that Reed and Diana suffered physical and mental abuse at the hands of their stepfather Charles Lassman, but Reed only lived with Lassman for about eight months, and Reed spent the rest of his childhood in the care and custody of his loving grandparents. William and Diana testified that Reed and his three siblings (William, Diana, and Tony) were affected by the same childhood abuse and neglect he suffered, but acknowledged that Reed was the only one of the siblings who had ever been arrested for a violent crime. Reed's middle-school teacher Ronnie Yates testified that Reed struggled in school, but that his struggles stemmed from a failure to apply himself.

Reed argues his history of drug abuse and huffing gasoline was mitigating, but no one testified that Reed was under the influence of drugs or had been huffing gasoline when he killed Mrs. Oermann.  In fact, Reed denied to the parole officer using any drugs or narcotics.[20]  We recognize that: (1) William testified that Reed began huffing gasoline when he was about ten and continued for years; (2) Yates testified that when Reed was in the seventh and eighth grades, he repeatedly showed up to school and school functions while drunk; and (3) Reed's former girlfriend Christine Niznik testified that Reed abused drugs – including alcohol, gasoline, and a homemade methamphetamine-based drug called "stove top" – throughout their relationship.  However, "presenting evidence of a defendant's drug addiction to a jury is often a 'two-edged sword': while providing a mitigating factor, such details may alienate the jury and offer little reason to lessen the sentence."  Pace v. McNeil, 556 F.3d 1211, 1224 (11th Cir.), cert. denied, 130 S. Ct. 190 (2009); see Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse . . . can harm a capital defendant as easily as it can help him at sentencing.").

Similarly, Dr. Larson's diagnosis – that Reed had an antisocial personality

---

[20]The only testimony remotely linking Reed's drug abuse to Mrs. Oermann's murder was Niznik's testimony that Reed was "possibly" using stove top "around the time of the murder." However, Reed denied committing the murder, and as noted, denied to the parole officer who prepared the PSI that he used any drugs.

disorder and narcissistic personality disorder – was more harmful to Reed than mitigating. See Parker, 331 F.3d at 788 ("Counsel decided not to put Dr. Stillman on the stand because Dr. Stillman had opined that Parker was antisocial and a sociopath, a diagnosis the jury might not consider mitigating. . . . Counsel cannot be deemed deficient in failing to call a witness whose testimony is of such limited value."); Clisby v. State of Ala., 26 F.3d 1054, 1056 & n.2 (11th Cir. 1994) (rejecting ineffective assistance claim on prejudice grounds because mental health expert's testimony would not have changed the result, noting that "[s]entencing courts need no experts to explain that 'antisocial' people–people who by common definition have little respect for social norms or the rights of others–tend to misbehave if they abuse drugs and alcohol" and "[i]t has been estimated that 91% of the 'criminal element' are 'antisocial' personality types"); Weeks v. Jones, 26 F.3d 1030, 1035 n.4 (11th Cir. 1994) (stating antisocial personality disorder is "not . . . mitigating as a matter of law"). Dr. Larson himself admitted that it is an unflattering diagnosis. Indeed, as part of his diagnosis, Dr. Larson characterized Reed as selfish, self-indulgent, hedonistic, and exploitative. This characterization was confirmed by Reed's brother William, who testified that Reed was manipulative and "like a con artist."

We recognize Dr. Larson also opined that in addition to drug abuse and

personality disorders, there was "<u>possible interaction</u> of organic brain syndrome

and alcohol and drugs during the time frame of the events." (Emphasis added).

The problem for Reed is Dr. Larson is a clinical psychologist who never addressed:

(1) the electroencephalogram test, which Dr. Miller, a medical doctor, ordered and

which showed Reed's brain was functioning within normal limits in 1986; (2) that

Reed denied having a drinking (or substance abuse) problem anymore when he was

examined by Dr. Miller and social worker Kaldor in October 1986; (3) that there

was no evidence at trial that Reed was under the influence of drugs or gasoline

huffing at the time of the murder; (4) that none of the Rule 3.850 testimony

concerned Reed's mental state on the day of the murder; (5) that no neurological or

other medical test revealed organic brain syndrome around the time of the murder;

(6) that Reed's verbal, performance, and full-scale IQ scores were 83, 79, and 79

respectively; and (7) that Dr. Larson testified to only a possibility that was not

supported by any doctor or medical evidence around the time of the murder. And

although Dr. Larson summarily opined (six years after the crime) that it appeared

that Reed was under the influence of extreme emotional disturbance and lacked the

capacity to appreciate the criminality of his conduct or to conform his conduct to

the requirements of the law, Dr. Larson did not explain why he believed these

factors appeared to have been met. Regardless, even crediting Dr. Larson's largely

63

unsupported and speculative 3.850 testimony as to the existence of statutory

mitigating factors, the fact remains that had Dr. Larson taken the stand to give his

opinions, the State would have used him to reveal to the jury that Reed had an

antisocial personality, was selfish, was unconcerned with the rights of others, and

was prone to repeated violence against women who tried to help him.  The net

result of Dr. Larson testifying would not have been so mitigating as to raise a

reasonable probability that Reed would have received a different sentence.  As the

Rule 3.850 court stated, "It is certainly not ineffective assistance of counsel for an

attorney not to call an expert when doing so causes his client to run the risk of

having the state successfully make his client look like a sociopathic killer."

In sum, we conclude that the Florida Supreme Court's denial of Reed's

3.850 ineffective assistance claims as to mitigation evidence was not contrary to or

an unreasonable application of clearly established federal law, and was not based

on an unreasonable determination of the facts in light of the state court record.[21]

---

[21]This case is wholly different from Porter, where the Supreme Court found the defendant was prejudiced by his trial counsel's failure to present the uniquely strong mitigating nature of military service in combat situations.  Porter, 130 S. Ct. at 454-56.  Porter's counsel failed to present powerful mitigating evidence that: (1) Porter was "a veteran who was both wounded and decorated for his active participation in two major engagements during the Korean War"; (2) "his combat service unfortunately left him a traumatized, changed man"; and (3) he "struggle[d] to regain normality upon his return from war."  Id. at 448, 454.  Paragraph after paragraph in the Porter opinion concerns Porter's combat experience in Korea, recounted in great detail.  Id. at 449-51, 455.  The diagnosis in Porter was post-traumatic stress disorder from combat, not antisocial personality disorder.  Id. at 450 n.4, 455 & n.9.  Porter's military service was critical to the holding in Porter.  Moreover, in Porter there was no finding, as here, that the proposed

Thus, he cannot satisfy <u>Strickland</u>'s prejudice prong.

## IV. CONCLUSION

For all of the reasons set forth above, we affirm the district court's denial of

Reed's § 2254 petition.

**AFFIRMED.**

A True Copy - Attested:
Clerk, U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

mitigating evidence would have opened the door to damaging evidence that could be used by the State. <u>Id.</u> at 454-55.